**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LIAT ATZILI, KEITH SIEGEL, ADRIENNE SIEGEL, SHAI SIEGEL, SHIRT SIEGEL, ELAN TIV, GAL SIEGEL, LUCY SIEGEL, DAVID SIEGEL, LEE SIEGEL,<br><br>Plaintiffs,<br><br>vs.<br><br>ISLAMIC REPUBLIC OF IRAN, HARAKAT AL-MUQAWAMA AL-ISLAMIYA A/K/A/ HAMAS, BINANCE HOLDINGS LIMITED, D/B/A BINANCE.COM, BAM MANAGEMENT US HOLDINGS INC., BAM TRADING SERVICES INC. D/B/A BINANCE.US, AND CHANGPENG ZHAO,<br><br>Defendants. | Case No. 1:24-cv-03365 (CJN)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**BINANCE HOLDINGS LIMITED'S MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

THE AMENDED COMPLAINT'S ALLEGATIONS .................................................................... 3

ARGUMENT ................................................................................................................................. 6

I. THE AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD PERSONAL JURISDICTION OVER BHL. ................................................................................................. 6

    A. There is No Statutory Basis for Jurisdiction Over BHL. ................................................. 6
    B. The Exercise of Personal Jurisdiction Over BHL Would Violate Due Process. ............. 9
    C. Plaintiffs Do Not Sufficiently Allege Alter Ego as a Basis for Personal Jurisdiction. ................................................................................................................... 13

II. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA (COUNTS 12 & 13). ........................................................ 15

    A. The Amended Complaint Does Not Adequately Allege that BHL Committed an Act of International Terrorism, Nor Could It. ............................................................... 16
    B. The Amended Complaint Does Not Adequately Allege that BHL Proximately Caused Plaintiffs' Alleged Injuries. .............................................................................. 19

III. THE AMENDED COMPLAINT FAILS TO STATE AN AIDING-AND-ABETTING CLAIM UNDER THE ATA AND JASTA (COUNT 11). .............................. 20

    A. The Amended Complaint Does Not Allege That Defendants Knowingly and Substantially Assisted the Attacks. ............................................................................... 20
    B. The *Halberstam* Factors Confirm That the Amended Complaint Fails to State an Aiding-and-Abetting Claim. ..................................................................................... 28
    C. The Amended Complaint Does Not Allege That BHL Was Generally Aware of Any Role in the Relevant Terrorist Activity. ................................................................. 29

IV. THE AMENDED COMPLAINT FAILS TO STATE A NEGLIGENCE CLAIM (COUNTS 4, 5, 8 & 16). ................................................................................................... 31

    A. Negligence (Count 4) ................................................................................................... 31
    B. Negligent Infliction of Emotional Distress ("NIED") (Count 5) .................................. 35
    C. Loss of Consortium (Count 16) .................................................................................... 36
    D. Negligence Per Se (Count 8) ........................................................................................ 37

V. THE AMENDED COMPLAINT FAILS TO STATE A PRODUCTS LIABILITY CLAIM (COUNTS 6, 7, 9, & 10). ..................................................................................... 39

    A. Plaintiffs Fail to Allege a Defective "Product." ........................................................... 39

B. The Binance Platform Did Not Proximately Cause Plaintiffs' Alleged Injuries. .......... 42

C. Plaintiffs Have Failed to Plead a "Manufacturing" Cause of Action. ........................... 42

VI. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT ENTRUSTMENT (COUNT 14). ......................................................................................... 43

VII. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PUBLIC NUISANCE (COUNT 15). .................................................................................................... 44

CONCLUSION ............................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Agape Litig.*,
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) ....................................................................................38

*Akhmetshin* v. *Browder*,
   761 F. Supp. 3d 1 (D.D.C. 2024).....................................................................................11, 12

*Amorosa* v. *Gen. Elec. Co.*,
   2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)...........................................................................4

*Asahi Metal Indus. Co.* v. *Superior Ct. of California, Solano Cnty.*,
   480 U.S. 102 (1987)................................................................................................................13

**Ashley* v. *Deutsche Bank Aktiengesellschaft*,
   144 F.4th 420 (2d Cir. 2015) ........................................................................................ *passim*

*Aston* v. *Johnson & Johnson*,
   248 F. Supp. 3d 43 (D.D.C. 2017).........................................................................................43

*AstraZeneca UK Ltd.* v. *Atchley*,
   No. 20-7077 (D.C. Cir.)..........................................................................................................20

*Averbach* v. *Cairo Amman Bank*,
   2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022).........................................................................18

*B & W Mgmt., Inc.* v. *Tasea Inv. Co.*,
   451 A.2d 879 (D.C. 1982) .......................................................................................................44

*In re Baan Co. Sec. Litig.*,
   245 F. Supp. 2d 117 (D.D.C. 2003).........................................................................................14

**Bernhardt* v. *Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022)....................................................................................... *passim*

*Bogard* v. *TikTok Inc.*,
   2025 WL 604972 (N.D. Cal. Feb. 24, 2025) ..........................................................................41

*Brooks* v. *iSECUREtrac Corp.*,
   2014 WL 12489670 (D. Md. Mar. 26, 2014)..........................................................................42

*Buie* v. *D.C.*,
   2023 WL 6142139 (D.D.C. Sept. 20, 2023) ...........................................................................43

*Casper* v. *Barber & Ross Co.*,
  288 F.2d 379 (D.C. Cir. 1961) ...............................................................................37

*Cherry-El* v. *Blount*,
  2025 WL 2336431 (D.D.C. Aug. 13, 2025) ............................................................36

*Clark* v. *Comput. Sci. Corp.*,
  958 F. Supp. 2d 208 (D.D.C. 2013) ........................................................................36

*Cockrum* v. *Donald J. Trump for President, Inc.*,
  319 F. Supp. 3d 158 (D.D.C. 2018) ......................................................................7, 9

*Coinbase, Inc.* v. *SEC*,
  126 F.4th 175 (3d Cir. 2025) ..................................................................................25

*Coulibaly* v. *J.P. Morgan Chase Bank, N.A.*,
  2011 WL 3476994 (D. Md. Aug. 8, 2011) ................................................................4

*D'Ambrosio* v. *Rajala*,
  2025 WL 1383286 (N.D. Ill. May 13, 2025) ..........................................................43

\*\**D.C.* v. *Beretta, U.S.A., Corp.*,
  872 A.2d 633 (D.C. 2005) .........................................................................32, 33, 44

*D.C.* v. *Howell*,
  607 A.2d 501 (D.C. 1992) ......................................................................................37

*de Los Rios* v. *NationsBank, N.A.*,
  911 F. Supp. 8 (D.D.C. 1995) ...........................................................................34, 35

*Delorenzo* v. *HP Enter. Servs., LLC*,
  207 F. Supp. 3d 26 (D.D.C. 2016) .........................................................................37

*Direct Sales Co.* v. *U.S.*,
  319 U.S. 703 (1943)................................................................................................26

*Doe* v. *GTE Corp.*,
  347 F.3d 655 (7th Cir. 2003) ...........................................................................43, 44

*Doe* v. *United States*,
  797 F. Supp. 2d 78 (D.D.C. 2011) .........................................................................14

*Doe* v. *Unocal Corp.*,
  27 F. Supp. 2d 1174 (C.D. Cal. 1998) ......................................................................8

*Durham* v. *LG Chem., Ltd.*,
  2022 WL 274498 (11th Cir. Jan. 31, 2022) ..............................................................8

*E.M.* v. *Shady Grove Reprod. Sci. Ctr., P.C.*,
　　2025 WL 947515 (D.D.C. Mar. 28, 2025).................................................................................36

*Fields* v. *Twitter, Inc.*,
　　881 F.3d 739 (9th Cir. 2018) ..................................................................................................19

*Fuld* v. *Palestine Liberation Org.*,
　　606 U.S. 1 (2025).....................................................................................................................13

*GTE New Media Services Inc.* v. *BellSouth Corp*,
　　199 F.3d 1343 (D.C. Cir. 2000).................................................................................................8

*Halberstam* v. *Welch*,
　　705 F.2d 472 (D.C. Cir. 1983)............................................................................................28, 29

*Harris* v. *Washington Metro. Area Transit Auth.*,
　　490 F. Supp. 3d 295 (D.D.C. 2020)........................................................................................34

*Hedgepeth* v. *Whitman Walker Clinic*,
　　22 A.3d 789 (D.C. 2011) .........................................................................................................31

*Henderson* v. *Wells Fargo Bank*,
　　799 F. Supp. 3d 910 (S.D. Tex. Mar. 31, 2025) .....................................................................35

*Hicks* v. *United States*,
　　511 F.2d 407 (D.C. Cir. 1975).................................................................................................33

*Hill* v. *Medlantic Health Care Grp.*,
　　933 A.2d 314 (D.C. 2007) .......................................................................................................37

*Holland* v. *TD Ameritrade, Inc.*,
　　2012 WL 592042 (E.D. Cal. Feb. 22, 2012)............................................................................40

*Huynh* v. *Air Canada*,
　　2025 WL 522053 (D.D.C. Feb. 18, 2025) ...............................................................................10

*InjuryLoans.com, LLC* v. *Buenrostro*,
　　529 F. Supp. 3d 1178 (D. Nev. 2021)......................................................................................38

*Jackson* v. *Airbnb, Inc.*,
　　639 F. Supp. 3d 994 (C.D. Cal. 2022) ...............................................................................39, 40

*Jacobs* v. *Meta Platforms, Inc.*,
　　2023 WL 2655586 (Cal. Super. Mar. 10, 2023) .....................................................................41

*Jograj* v. *Enter. Servs., LLC*,
　　270 F. Supp. 3d 10 (D.D.C. 2017)...........................................................................................36

*Johnson-Tanner* v. *First Cash Fin. Servs.*,
   239 F. Supp. 2d 34 (D.D.C. 2003) ........................................................................................... 15

*Kemper* v. *Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ................................................................................................... 17

*Kent Grp. Partners, LLC* v. *Citizens Bank, NA*,
   688 F. Supp. 3d 608 (N.D. Ohio 2023) .................................................................................... 45

*King* v. *Habib Bank Ltd.*,
   2022 WL 4537849 ............................................................................................................. 15, 16

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
   1985 WL 9447 (D.D.C. Aug. 2, 1985) ..................................................................................... 34

*Langeman* v. *Garland*,
   88 F.4th 289 (D.C. Cir. 2023) ................................................................................................... 5

*Legal Tender Servs. PLLC* v. *Bank of Am. Fork*,
   506 P.3d 1211 (Utah App. Ct. 2022) ....................................................................................... 40

*Linde* v. *Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ..................................................................................................... 18

*Malek* v. *Flagstar Bank*,
   70 F. Supp. 3d 23 (D.D.C. 2014) ........................................................................................ 31, 32

*Marchak* v. *JPMorgan Chase & Co.*,
   2016 WL 3911926 (E.D.N.Y. July 15, 2016) ........................................................................... 38

*Marlin* v. *Moody Nat. Bank, N.A.*,
   2006 WL 2382325 (S.D. Tex. Aug. 16, 2006) ......................................................................... 38

*Material Supply Int'l, Inc.* v. *Sunmatch Indus. Co., Ltd.*,
   62 F. Supp. 2d 13 (D.D.C. 1999) ............................................................................................. 15

*Mazza* v. *Verizon Washington D.C., Inc.*,
   852 F. Supp. 2d 28 (D.D.C. 2012) ........................................................................................... 14

*McCarthy* v. *Sturm, Ruger & Co.*,
   916 F. Supp. 366 (S.D.N.Y. 1996) ........................................................................................... 42

*McNeil Pharm.* v. *Hawkins*,
   686 A.2d 567 (D.C. 1996) ........................................................................................................ 37

*Melehy* v. *Salha*,
   2023 WL 6313195 (D.D.C. Sept. 28, 2023) ............................................................................. 34

*Merial Ltd.* v. *Cipla Ltd.*,
  681 F.3d 1283 (Fed. Cir. 2012)................................................................................................9

*Newman* v. *Associated Press*,
  758 F. Supp. 3d 1357 (S.D. Fla. 2024) ............................................................................17, 18

*O'Sullivan* v. *Deutsche Bank AG*,
  2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ...........................................................16, 18, 26

*Ofisi* v. *BNP Paribas, S.A.*,
  77 F.4th 667 (D.D.C. 2023) .................................................................................................19

*Payne* v. *Soft Sheen Prods., Inc.*,
  486 A.2d 712 (D.C. 1985) ....................................................................................................42

*Pinkett* v. *Dr. Leonard's Healthcare Corp.*,
  2020 WL 1536305 (D.D.C. Mar. 31, 2020)..........................................................................43

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011)....................................................................................4

*Reeve* v. *Monex Inc.*,
  2024 WL 3566133 (D.D.C. July 29, 2024)...........................................................................11

*Reynolds* v. *Binance Holdings Ltd.*,
  481 F. Supp. 3d 997 (N.D. Cal. 2020) ..................................................................................14

*Romero* v. *ITW Food Equip. Grp., LLC*,
  987 F. Supp. 2d 93 (D.D.C. 2013) ........................................................................................39

*Rothstein* v. *UBS AG*,
  708 F.3d 82 (2d Cir. 2013)....................................................................................................19

*Siegel* v. *HSBC North America Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)..................................................................................................26

*Sigmund* v. *Starwood Urb. Inv.*,
  475 F. Supp. 2d 36 (D.D.C. 2007).........................................................................................32

*Smartmatic USA Corp.* v. *Herring Networks, Inc.*,
  610 F. Supp. 3d 92 (D.D.C. 2022)..........................................................................................7

**Smith & Wesson Brands, Inc.* v. *Estados Unidos Mexicanos*,
  605 U.S. 280 (2025).......................................................................................................*passim*

*Smith* v. *Hope Vill., Inc.*,
  481 F. Supp. 2d 172 (D.D.C. 2007).......................................................................................33

*Stutts* v. *De Dietrich Grp.*,
2006 WL 1867060 (E.D.N.Y. June 30, 2006) .......................................................................32

*Tall* v. *Comcast of Potomac, LLC*,
729 F. Supp. 2d 342 (D.D.C. 2010) ........................................................................................14

*In re Terrorist Attacks on Sept. 11, 2001*,
2008 WL 7073447 (S.D.N.Y. Dec. 23, 2008) ........................................................................35

*In re Terrorist Attacks on Sept. 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y.) ..............................................................................................32

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 118 (2d Cir. 2013) ....................................................................................................19

*Toumazou* v. *Turkish Republic of N. Cyprus*,
71 F. Supp. 3d 7 (D.D.C. 2014) ................................................................................11, 13, 14

*Tucci* v. *D.C.*,
956 A.2d 684 (D.C.2008) ........................................................................................................44

**Twitter, Inc.* v. *Taamneh*,
598 U.S. 471 (2023) ........................................................................................................ *passim*

*United States* v. *Emor*,
850 F. Supp. 2d 176 (D.D.C. 2012) ........................................................................................14

*Venture Gen. Agency, LLC* v. *Wells Fargo Bank, N.A.*,
2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) .........................................................................38

*Walden* v. *Fiore*,
571 U.S. 277 ............................................................................................................................10

*In re Washington Med. Ctr., Inc.*,
10 B.R. 616 (Bankr. D.D.C. 1981) .........................................................................................15

*Washington* v. *Washington Hosp. Ctr.*,
579 A.2d 177 (D.C. 1990) .......................................................................................................37

*Webster* v. *Pacesetter, Inc.*,
259 F. Supp. 2d 27 (D.D.C. 2003) ..........................................................................................39

*Weiss* v. *Nat'l Westminster Bank, PLC.*,
993 F.3d 144 (2d Cir. 2021) ..............................................................................................16, 17

*Wultz v. Islamic Republic of Iran*,
755 F. Supp. 2d 1 (D.D.C. 2010) ..............................................................................................8

*Youmans* v. *Federal Motor Carrier Safety Admin.*,
   2022 WL 2982453 (D.D.C. July 28, 2022)..............................................................................7

*Zapata* v. *HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) ..................................................................................19

*Ziencik* v. *Snap, Inc.*,
   2023 WL 2638314 (C.D. Cal. Feb. 3, 2023)..........................................................................40

*Zobay* v. *MTN Group Ltd.*,
   695 F. Supp. 3d 301 (E.D.N.Y. 2023) ...............................................................................8, 21

## Statutes

18 U.S.C. § 2331...........................................................................................................16, 17, 18

18 U.S.C. § 2333..................................................................................................................1, 20

18 U.S.C. § 2334........................................................................................................................8

D.C. Code § 13-423 ..............................................................................................................6, 7

## Other Authorities

Federal Rule of Civil Procedure 4(k).......................................................................... *passim*

Black's Law Dictionary (12th ed. 2024)..............................................................................22, 39

Restatement (Second) of Torts § 402A (1965), comment d ..........................................................39

Restatement (Third) of Torts: Prods. Liab. § 19 (1998) ..............................................................40

## PRELIMINARY STATEMENT

Binance Holdings Limited ("BHL")[1] unequivocally condemns all acts of terrorism, including the reprehensible attacks on the State of Israel on October 7, 2023 (the "October 7 Attacks" or "Attacks"). The perpetrators of the Attacks should be brought to justice and made to compensate the victims. But BHL is not responsible for the Attacks, and the Amended Complaint does not plausibly allege otherwise. This lawsuit, like so many others that have been dismissed, is an opportunistic attempt to exploit another anti-money laundering ("AML") and sanctions settlement involving a financial institution. Plaintiffs are suing BHL for money damages by asserting claims under the Anti-Terrorism Act of 1990 ("ATA") (18 U.S.C. § 2333(a)), the Justice Against Sponsors of Terrorism Act ("JASTA") (18 U.S.C. § 2333(d)), and various common law tort theories. These claims are all based on the unsupported and untenable theory that BHL somehow facilitated those Attacks. Each of those claims fails and should be dismissed.

*First*, the Amended Complaint fails to plead a plausible basis for personal jurisdiction over BHL. Lacking any suit-related contacts between BHL and the forum, the Amended Complaint relies on a theory of alter ego jurisdiction, namely that BHL is subject to jurisdiction in this District based on the contacts of separate corporations—BAM Management US Holdings Inc. and BAM Trading Services Inc. (collectively, "BAM"). But Plaintiffs' baseless attempt to ignore the distinction between these companies does not come close to the showing necessary to pierce the corporate veil, and the failure of this theory of jurisdiction is fatal to their claims against BHL.

*Second*, Plaintiffs' ATA primary liability claims (Counts 12 and 13) fail because the Amended Complaint does not plausibly allege that BHL committed an "act of international

---

[1] Unless otherwise noted, capitalized terms have the same definitions as in the Amended Complaint (ECF No. 47) (the "Amended Complaint," or "AC"), emphasis is added, and internal citations and quotations are omitted.

terrorism," nor that BHL proximately caused Plaintiffs' injuries, both of which are necessary for a primary liability claim.

*Third*, the Amended Complaint fails to plead ATA/JASTA aiding-and-abetting liability against BHL (Count 11), since, among other deficiencies, it does not plausibly allege that BHL actively, intentionally, and knowingly assisted terrorists in carrying out the Attacks. At most, the Amended Complaint relies on conclusory allegations that terrorist groups use money to carry out their violent acts, that they acquired some of the money from digital assets—including through BHL's generally-available exchange that provides the same services to hundreds of millions of customers worldwide—and that BHL failed to implement adequate anti-money laundering controls to prevent this. These allegations are plainly insufficient under controlling Supreme Court precedent. *See Twitter, Inc.* v. *Taamneh*, 598 U.S. 471 (2023); *Smith & Wesson Brands, Inc.* v. *Estados Unidos Mexicanos*, 605 U.S. 280 (2025) (both discussed in detail below).

*Fourth*, Plaintiffs' claims sounding in negligence—negligence, negligent infliction of emotional distress, loss of consortium, and negligence *per se* (Counts 4, 5, 8, and 16)—all fail, because, among other things, BHL does not owe any applicable duty to Plaintiffs, Plaintiffs have not alleged that BHL breached a duty to any of the Plaintiffs, nor that any of the Plaintiffs' injuries were proximately caused by any such breach.

*Fifth*, Plaintiffs' products liability claims—design defect, manufacturing defect, negligent design, and negligent manufacturing (Counts 6, 7, 9, and 10)—fail because the Binance platform is a *service,* not a "product" (to which these claims exclusively apply). Moreover, regardless of how it is classified, the Binance platform did not proximately cause Plaintiffs' injuries.

*Sixth*, Plaintiffs' negligent entrustment claim (Count 14) fails because the Binance platform is, again, a service, not chattel (to which this claim exclusively applies), and because, as discussed, Plaintiffs have not adequately pled the required elements of duty or proximate cause.

*Finally*, Plaintiffs' public nuisance claim (Count 15) fails because providing routine exchange services does not remotely resemble the type of conduct that could give rise to a nuisance claim, and in any event, the Amended Complaint fails to plead the duty and proximate causation that such a claim would require.

Accordingly, the Amended Complaint should be dismissed with prejudice.

## THE AMENDED COMPLAINT'S ALLEGATIONS

Plaintiffs are ten victims of the Attacks, and their family members. (AC ¶¶ 10-19). Their Amended Complaint seeks compensation from BHL for physical and emotional harm they allegedly suffered from Attacks that Plaintiffs acknowledge were perpetrated by terrorist organizations, *not* BHL. Despite spanning nearly 150 pages, the Amended Complaint contains no allegations directly tying BHL to any terrorist attack, let alone the Attacks at issue here. At best, the Amended Complaint alleges that the Binance platform, which—like many financial institutions worldwide—is publicly available and offers the same arm's-length services to hundreds of millions of users, had insufficient AML and sanctions controls; and that these deficient controls failed to detect and stop certain users with supposed, but unspecified, ties to foreign terrorist organizations ("FTOs") from using the exchange. But, even accepting those allegations as true, that does not make Binance liable for the FTOs' attacks, just as Twitter is not liable for terrorist propaganda posted on its platform, nor Toyota for the misuse of its vehicles by FTOs. The Amended Complaint does not allege that BHL: (1) planned or participated in the Attacks; (2) supported the Attacks; (3) had advance knowledge of the Attacks; or (4) had any connection with,

or relationship to, the Attacks' perpetrators.  Nor does the Amended Complaint draw a causal link between a single act or omission by BHL, or transaction on the Binance platform, and the Attacks.

The most the Amended Complaint can do is string together a disjointed assortment of allegations that fail to establish any plausible basis for liability.  According to Plaintiffs, BHL disregarded the possibility that individuals associated with designated FTOs were among the millions of users across 180 countries that transacted on the Binance platform since 2017; and the volume of transactions with supposed links to designated FTOs implies that, in hindsight, some of those transactions *must* have been connected to the Attacks in some unspecified way.  These allegations are plainly insufficient to hold BHL liable for the Attacks.

To support their allegation that BHL *must* have known FTO-linked users were accessing the Binance platform, the Amended Complaint (impermissibly) relies on public documents from BHL's 2023 settlements with U.S. regulators concerning compliance deficiencies, including a Consent Order between BHL and the Financial Crimes Enforcement Network ("FinCEN") and a complaint by the Commodity Futures Trading Commission ("CFTC").[2]  But—as the actual documents, rather than Plaintiffs' cherry-picked excerpts and paraphrasing, make clear—BHL was fined in those matters for a lack of sufficient AML and sanctions controls, and failing to register

---

[2] Plaintiffs may not rely on pre-adjudication regulatory complaints or settlements to plead the "underlying facts of liability" necessary to sustain the Amended Complaint.  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011) ("neither a complaint nor references to a complaint [that] results in a consent judgment may properly be cited in the pleadings" because "preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial[.]"); *see also Amorosa* v. *Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022) ("[A] consent judgment between a federal agency and a private corporation" is "not the result of an actual adjudication of any of the issues" and reflects nothing more than "the result of private bargaining[.]"); *Coulibaly* v. *J.P. Morgan Chase Bank, N.A.*, 2011 WL 3476994, at *9 (D. Md. Aug. 8, 2011) ("the mere existence of a settlement does not establish liability or wrongdoing" because "the realities of modern litigation [are that] parties settle for a myriad of reasons").

with FinCEN as a money service business.  (*See* Aug. 29, 2025 Declaration of Samson A. Enzer in support of BHL's Motion to Dismiss ("Enzer Decl."), Exs. 1-4).[3]  The government did *not* allege, and the settlements provide *no evidence*, that BHL intentionally supported terrorists, let alone the Attacks.  Indeed, the FinCEN Consent Order explicitly acknowledged that despite its failure to file suspicious activity reports ("SARs"), BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing."  (Enzer Decl., Ex. 2 (FinCEN Consent Order) at 46).  Plaintiffs failed to cite this part of the FinCEN Consent Order, presumably because it utterly refutes the notion that BHL had any intent to support terrorism.  The regulatory settlements reflect compliance shortcomings, not complicity in terrorism.  Plaintiffs' attempt to equate regulatory violations with liability for terrorist attacks is not only legally flawed, it is contradicted by the very documents they cite.

While the Amended Complaint relies on the regulatory settlements as supposed evidence of BHL's knowledge that terrorists were transacting on the Binance platform, the most the settlements actually say is that the agencies' backward-looking reviews, and third-party compliance services, found transactions that, with the benefit of hindsight, had associations with terrorist groups.  (*See, e.g.*, AC ¶¶ 208 ("Binance user addresses were found" at unspecified times "to interact with bitcoin wallets associated with [terrorist groups]"), 192 ("In April 2019, Binance received reports from its third-party service provider, identifying Hamas-associated transactions.  Nonetheless, Binance filed no SARs with FinCEN.")).  These findings provide no support for Plaintiffs' claims that BHL intentionally assisted in the Attacks, or in any terrorist activity.  The remainder of Plaintiffs' allegations of BHL's supposed knowledge are conclusory and unsupported

---

[3] The Court may consider these materials in deciding BHL's motion to dismiss, because they were incorporated by reference into the Amended Complaint.  (*See, e.g.*, AC ¶¶ 148, 179, 187-200, 203, 208-12, 222-27, 260-281, 286, 404, 521, 533, 623).  *See also Langeman* v. *Garland*, 88 F.4th 289, 291-92 (D.C. Cir. 2023).

by any citation to actual evidence.  (*E.g.*, *id.* ¶ 209 (alleging BHL was aware "Hamas, PIJ, and other architects of the October 7th Attacks were using Binance to fundraise" at the time donations were made through Binance)).  And even these conclusory allegations do nothing to support Plaintiffs' claims that BHL intentionally and substantially aided terrorists.

Plaintiffs also rely on supposed FTO-linked transactions on the Binance platform, but cite absolutely no detail or particulars about such transactions:  not the dates, nor the amounts, nor how the transactions were supposedly linked to an FTO, let alone whether Binance knew or even could have known of such a connection at the time of the alleged transactions.  (*Id.* ¶¶ 123, 191-92, 203, 208, 210, 224, 279).  These conclusory, unsupported allegations are plainly insufficient to plead— as Plaintiffs must—that BHL knew and intended to aid in the Attacks, nor even that a single transaction on the Binance platform had any connection whatsoever to the Attacks.

## ARGUMENT

### I.    THE AMENDED COMPLAINT FAILS TO ADEQUATELY PLEAD PERSONAL JURISDICTION OVER BHL.

#### A.  There Is No Statutory Basis for Jurisdiction Over BHL.

The Amended Complaint cites D.C. Code § 13-423(a) (*id.* ¶¶ 54-56) and Federal Rules of Civil Procedure 4(k)(1)-(2) (*id.* ¶ 61) as statutory bases for jurisdiction in this case, but they do not support the exercise of jurisdiction over BHL.

##### 1.  D.C.'s Long-Arm Statute Does Not Provide a Basis for Jurisdiction.

The Amended Complaint asserts jurisdiction over BHL under the D.C. long-arm statute (D.C. Code Section 13-423(a)).  (*Id.* ¶ 54).  While the Amended Complaint does not specify the provision of the long-arm statute on which Plaintiffs rely, none support jurisdiction over BHL.

Plaintiffs cannot rely on D.C. Code Section 13-423(a)(1), which provides for the exercise of jurisdiction over a defendant "transacting any business in the District of Columbia."  As

discussed *infra* I.B.1, the Amended Complaint lacks any non-conclusory allegations concerning *suit-related* contacts arising from business BHL transacted in the District.[4]  Likewise, Plaintiffs cannot establish personal jurisdiction under D.C. Code Section 13-423(a)(2), which applies to a defendant having "contract[ed] to supply services in the District of Columbia[,]" because, as discussed *infra* I.B.1, the Amended Complaint fails to connect any services allegedly provided by BHL in the District to the Attacks in any way.  Nor can Plaintiffs rely on D.C. Code Sections 13-423(a)(3)-(4), which both require that the defendant caused "tortious injury in the District of Columbia."  The Amended Complaint does not allege that any of the Plaintiffs were ever residents of the District of Columbia, nor does it point to other harm allegedly suffered *in the District*.  *See Youmans* v. *Federal Motor Carrier Safety Admin.*, 2022 WL 2982453, at *5 (D.D.C. July 28, 2022) (plaintiff could not rely on the "tortious injury provision because she ha[d] not alleged that [defendant] cause[d] tortious injury *in* the District of Columbia") (emphasis in original).

### 2. Plaintiffs Cannot Rely on 4(k)(1)(C) Because They Have Not Satisfied the Rule's and the ATA's Service Requirements.

The Amended Complaint also asserts jurisdiction over BHL under Federal Rule of Civil Procedure 4(k)(1)(C).  (AC ¶ 61).  Under this rule, service of a summons establishes personal jurisdiction over a defendant "when [service is] authorized by a federal statute."

Because Counts 4-10 and 14-16 purport to state common law claims, for which service is not authorized by federal statute, Rule 4(k)(1)(C) does not provide a basis for personal jurisdiction with respect to these claims.  *See Cockrum* v. *Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018) (specific jurisdiction must be established as to "each claim").  Nor can

---

[4] As D.C. Code § 13-423(a)(1) has been interpreted to be coextensive "with the Fourteenth Amendment's Due Process Clause[,]" *Smartmatic USA Corp.* v. *Herring Networks, Inc.*, 610 F. Supp. 3d 92, 98 (D.D.C. 2022), BHL addresses these deficiencies below in the context of Constitutional due process.

Plaintiffs invoke Rule 4(k)(1)(C) as a basis for jurisdiction with respect to their federal law claims (Counts 11-13), because Plaintiffs did not serve BHL, a foreign company, within the United States, as required by the rule. Where a federal statute, such as the ATA (18 U.S.C. § 2334(a)), allows nationwide service,[5] Rule 4(k)(1)(C) "permits the exercise of personal jurisdiction over parties properly served anywhere in the United States." *Zobay* v. *MTN Group Ltd.*, 695 F. Supp. 3d 301, 322 (E.D.N.Y. 2023). But where, as here, the defendant was not served in the United States, Rule 4(k)(1)(C) does not provide a basis for the exercise of "personal jurisdiction over a party notwithstanding its lack of contacts with the forum state." *See Durham* v. *LG Chem., Ltd.*, 2022 WL 274498, at *2 (11th Cir. Jan. 31, 2022) (per curiam) (Rule 4(k)(1)(C) inapplicable because service was affected under the Hague Convention rather than a federal statute authorizing nationwide service); *see also Doe* v. *Unocal Corp.*, 27 F. Supp. 2d 1174, 1183 (C.D. Cal. 1998) ("[I]t would be inappropriate for a federal court to effectively extend the territorial reach of a federal statute by applying a national contacts test for personal jurisdiction where service is not effected pursuant to that federal statute."); *cf. GTE New Media Services Inc.* v. *BellSouth Corp*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (recognizing in the context of the Clayton Act's venue requirement, that "[a] party seeking to take advantage of . . . liberalized service provisions must follow" the statute's limiting clauses).

Plaintiffs have not served a summons on BHL, nor have they filed a waiver of service in this action. Instead, the parties entered into a stipulation, which explicitly provided that BHL "*does not concede that service has been effectuated within the District of Columbia (or anywhere else)*, and Plaintiffs agree not to argue that the waiver affects any of [BHL's] other rights, defenses, or

---

[5] "The ATA authorizes nationwide service of process to establish personal jurisdiction over a defendant" in a district "where the defendant resides, is found, or has an agent." *Wultz* v. *Islamic Republic of Iran*, 755 F. Supp. 2d 1, 31 (D.D.C. 2010).

objections (including but not limited to defenses based upon lack of personal or subject matter jurisdiction . . . )." (ECF No. 20).  Because BHL has not conceded service and has not been served, it is not subject to personal jurisdiction under Rule 4(k)(1)(C).

### 3.  Plaintiffs Cannot Satisfy the Elements of Rule 4(k)(2).

Nor can Plaintiffs establish jurisdiction over BHL under Rule 4(k)(2).  This rule authorizes personal jurisdiction over a defendant only where:  (1) the claim arises under Federal law; (2) "a summons has been served"; (3) "the defendant is not subject to the jurisdiction of any single state court"; and (4) "the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States."  *Mwani* v. *bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005).  Here again, because Plaintiffs' common law claims do not arise under Federal law, they cannot rely on this rule to assert jurisdiction over BHL.  Nor can Plaintiffs' ATA claims predicate jurisdiction on this rule, since, as indicated, Plaintiffs did not serve BHL.  Nor would the exercise of jurisdiction over BHL on any of Plaintiffs' claims be consistent with the Due Process Clause of the Constitution, because, as discussed below, the Amended Complaint fails to allege any suit-related contacts between BHL and the United States.[6]

### B.  The Exercise of Personal Jurisdiction Over BHL Would Violate Due Process.

In addition to pleading a statutory basis for jurisdiction, Plaintiffs must also demonstrate that the exercise of jurisdiction comports with due process.  *Cockrum*, 319 F. Supp. 3d at 173.  This requires that Plaintiffs show that BHL, a foreign defendant, "has purposefully directed [its]

---

[6] Nor can Plaintiffs satisfy the requirement to allege that the defendant is not subject to the jurisdiction of any single state court, where the Amended Complaint expressly alleges (albeit in conclusory terms) that BHL has substantial contacts with the District of Columbia.  *See Merial Ltd.* v. *Cipla Ltd.*, 681 F.3d 1283, 1293-94 (Fed. Cir. 2012) ("Rule 4(k)(2) was adopted to provide a forum for federal claims in situations where a foreign defendant lacks substantial contacts with any single state but has sufficient contacts with the United States as a whole to satisfy due process standards and justify the application of federal law.").

activities at residents of the forum, *and that the alleged injuries arise out of or relate to those activities*." *Bernhardt* v. *Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022). Where, as here, the relationship between the defendant's alleged connection to the forum and the plaintiffs' injuries "is somewhere between tenuous and nonexistent," it "cannot give rise to specific jurisdiction." *Huynh* v. *Air Canada*, 2025 WL 522053, \*6 (D.D.C. Feb. 18, 2025).

### 1. The Amended Complaint Does Not Allege Sufficient Suit-Related Contacts with the District.

BHL's alleged contacts with the District are that it: (1) permitted users in the District to transact on the Binance platform (AC ¶¶ 122, 133); (2) had employees who reside in and worked from the District (*id.* ¶ 127); and (3) was a member of District-based trade organizations and appeared in court in the District to defend securities laws claims (*id.* ¶ 134-36). None of these alleged contacts are suit-related. *See Walden* v. *Fiore,* 571 U.S. 277, 284 (suit-related contacts are those contacts creating a substantial relationship between the defendant and the forum and that relate to the specific claims being asserted). Moreover, BAM's motion to dismiss explains why Plaintiffs' attempt to use impermissible group pleading to draw a connection between Defendants and the District is insufficient. To avoid burdening the Court with duplicative briefing, BHL incorporates those arguments by reference here. *See* BAM Br. at Section III.A.

**District-Based Users.** The Amended Complaint states, without any factual support, that the Binance Defendants derived "substantial revenue in this District." (*Id.* ¶ 133). Whether or not that is true, it is insufficient for jurisdiction because it fails to connect any such revenues, or the transactions that generated them, with Plaintiffs' claims. Indeed, the Amended Complaint does not allege even that a single transaction involving a D.C.-based user funded the Attacks, or was connected with the Attacks in any way. To the contrary, Plaintiffs' own allegations state that any

potentially relevant transactions on the platform "occurred primarily *outside* the United States." (AC ¶ 583).[7]

**District-Based Employees.**  The Amended Complaint alleges that certain BHL employees "worked from and reside[d] in this District" during the years leading up to the October 7 Attacks, including employees with responsibilities related to AML compliance and investigations.  (AC ¶ 127).  But Plaintiffs do not allege—and could not plausibly allege—that any of these employees had any connection with any transaction, act, or omission that was connected in any way to the Attacks.  Nor do Plaintiffs allege that any of these employees were involved in broader compliance issues identified in the government settlement materials.  Without some factually supported connection to Plaintiffs' claims, these employees' alleged presence in the District is insufficient. *See Reeve* v. *Monex Inc.*, 2024 WL 3566133, at *4 (D.D.C. July 29, 2024) (having worked in D.C. is insufficient for purposes of personal jurisdiction without allegation "that the acts giving rise" to the claims "took place while . . . working in the District of Columbia").

**Trade Groups and Court Appearances.**  Allegations regarding BHL's involvement with trade groups, and its having appeared to defend itself in connection with a lawsuit alleging violations of the securities laws, similarly lack a sufficient nexus to Plaintiffs' claims to be jurisdictionally relevant.  *See, e.g.*, *Akhmetshin* v. *Browder*, 761 F. Supp. 3d 1, 11-13 (D.D.C. 2024) ("providing fact testimony to the U.S. government, engaging lobbying and public relations firms, meeting with members of Congress and their staff, and attending NGO gatherings" insufficient to establish jurisdiction because D.C. contacts were not related to subject of the suit).

---

[7] Plaintiffs' allegations that Binance's website was available to D.C. residents (AC ¶ 57) fails for similar reasons.  *Toumazou* v. *Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 16-17 (D.D.C. 2014) ("[T]he mere accessibility of a website in the District is insufficient to establish minimum contacts.  A website accessible by computers in the District of Columbia, or by District of Columbia residents, is not purposeful availment; rather, it is merely an unavoidable side-effect of modern Internet technology.").

**Group Pled Allegations.** Apart from the above, Plaintiffs offer nothing more than conclusory allegations that the "Binance Defendants' strategy to act negligently" or failure to adequately "design, guard, and manufacture the Platform . . . occurred in large part in this District." (*See* AC ¶ 137). Not only does this allegation lack *any* factual basis, but its reference to the "Binance Defendants" generally is the type of impermissible group pleading that courts routinely reject. *See Akhmetshin*, 761 F. Supp. 3d at 7 ("[P]laintiff bears the burden of establishing a factual basis for the exercise of personal jurisdiction over *each* defendant.").

### 2. The Amended Complaint Fails to Allege Sufficient Suit-Related Contacts with the United States.

Because Plaintiffs cannot invoke either Federal Rule of Civil Procedure 4(k)(1) or 4(k)(2) as statutory bases for jurisdiction (*see supra* at I.A.2-3), the Court need not reach the question of whether BHL has sufficient contacts with the United States as a whole. Nevertheless, there can be little doubt that those contacts are not sufficient to comport with due process.

BHL's alleged contacts with the United States are substantially the same as those discussed above. (*See* AC ¶¶ 120-22 (alleging that BHL serviced and marketed to customers in the U.S.), 124-25 (similar), 126 (alleging that BHL employees not otherwise referenced in the Complaint were U.S.-based), 128 (alleging that BHL employees interacted with U.S.-based customers at networking and social events in the U.S.)). Just as allegations that BHL had users or employees based in the District were insufficient to satisfy due process with respect to jurisdiction under the state long-arm statute (*see supra* I.B.1), allegations that BHL serviced users or had employees across the United States are not sufficiently suit-related to comport with due process.

Plaintiffs also contend BHL has sufficient contacts with the United States based on admissions that it circumvented U.S. money laundering and sanctions laws. (AC ¶¶ 176-221, 224). In *Bernhardt* v. *Islamic Republic of Iran*, another ATA case, the D.C. Circuit considered and

rejected a similar theory of jurisdiction.  47 F.4th 856 (D.C. Cir. 2022).  There, the plaintiffs alleged that the foreign bank "purposefully directed [its] conduct at U.S. markets by coordinating with [its] domestic affiliates . . . to facilitate financial transactions in violation of U.S. sanctions."  *Id.* at 864.  In affirming the dismissal for lack of personal jurisdiction, the Circuit observed that allegations that the bank evaded U.S. sanctions, including with respect to Iranian users, were not sufficient to satisfy the demands of due process because the plaintiff could not connect "the sanctions evasion by the foreign defendants and the injuries suffered in the terrorist attack."  *Id.* at 866.  Here too, the Amended Complaint cannot connect BHL's conduct to Plaintiffs' alleged injuries, as Plaintiffs do not allege a connection between any transaction on the Binance platform, let alone by a sanctioned user, and the Attacks.  Without a connection between the alleged wrongdoing and their claims, Plaintiffs cannot demonstrate that exercising jurisdiction over BHL would comport with due process.[8]

### C.  Plaintiffs Do Not Sufficiently Allege Alter Ego as a Basis for Personal Jurisdiction.

Finally, Plaintiffs attempt to establish jurisdiction over BHL not on its own alleged contacts with the forum, but on BAM's.  Plaintiffs seek to do this by asserting that BAM is the alter ego of BHL, and that BAM's alleged jurisdictional contacts can be imputed to BHL.  (*See* AC ¶¶ 56, 178).  However, Plaintiffs' allegations are not even sufficient to establish jurisdiction over BAM,[9] let alone alter ego jurisdiction over BHL.  *See Toumazou*, 71 F. Supp. 3d at 19 ("Veil-piercing is

---

[8] Even had Plaintiffs served BHL, as required by Rule 4(k)(1), the exercise of personal jurisdiction in this case—where none of the alleged wrongdoing has any connection to the U.S.—would not be reasonable, and thus would violate due process.  *Fuld* v. *Palestine Liberation Org.*, 606 U.S. 1, 23 (2025) (citing *Asahi Metal Indus. Co.* v. *Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 115 (1987).

[9] As discussed in Section III.B of BAM's memorandum of law in support of its motion to dismiss.

an extraordinary procedure that courts should not use lightly, and only extreme circumstances call for disregard of corporate form.").

It is well-established that a court should only "impute personal jurisdiction under an alter ego theory in cases where [a company is] so dominated [by the alter-ego] as to negate its separate personality." *Mazza* v. *Verizon Washington D.C., Inc.*, 852 F. Supp. 2d 28, 41 (D.D.C. 2012). The alter ego test analyzes "(1) whether there is such unity of interest and ownership that the separate personalities of the companies no longer exist; and (2) whether an inequitable result will follow if the court treats [the affiliated entity's] allegedly wrongful acts as those of [the affiliated entity's] alone." *Mazza*, 852 F. Supp. 2d at 41; *see also Doe* v. *United States*, 797 F. Supp. 2d 78, 85 (D.D.C. 2011). Plaintiffs fail to satisfy either of these elements.

*First*, Plaintiffs fail to make the requisite showing of "unity of ownership and interest" between BAM and BHL. *See In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 131 (D.D.C. 2003) ("[R]elationship . . . must be closer than one of control; it must be formal domination such that the separateness of the entities is but a pure fiction."). Plaintiffs claim BAM and BHL disregarded corporate formalities because BHL provided certain services to BAM, such as data storage and custodying of assets. (*See, e.g.*, AC ¶¶ 158, 165). But a court in the Northern District of California has already rejected arguments that BAM Trading and BHL are alter egos. *See Reynolds* v. *Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1005 (N.D. Cal. 2020) ("[T]hat [BHL] and [BAM Trading] share board members and a CFO does not on its own sufficiently establish a unity of interest."); *see also Tall* v. *Comcast of Potomac, LLC*, 729 F. Supp. 2d 342, 348 n.5 (D.D.C. 2010) ("[s]hared executives, by itself, does not demonstrate that two corporations are alter egos."); *United States* v. *Emor*, 850 F. Supp. 2d 176, 207 (D.D.C. 2012) ("domination of a corporation by a single individual" insufficient "to find the corporation to be the individual's alter ego").

Even if Plaintiffs could show a unity of interest between BHL and BAM at some point in time, that is not sufficient because veil-piercing requires a showing of the requisite control "at the time of the alleged [wrongdoing]."  *See Johnson-Tanner* v. *First Cash Fin. Servs.*, 239 F. Supp. 2d 34, 38 (D.D.C. 2003) (evaluating whether defendant "had active and substantial control of [its subsidiary] at the time of the alleged racial discrimination" in an employment discrimination case). But the Amended Complaint's allegations that BHL exercised control over BAM all predate the October 7 Attacks by *years*.  (*See, e.g.*, AC ¶¶ 158, 160-62, 166).

*Second*, Plaintiffs fail to establish a causal link between BHL's alleged control of BAM and their claims.  *See In re Washington Med. Ctr., Inc.*, 10 B.R. 616, 622 n.13 (Bankr. D.D.C. 1981) ("[C]ontrol of one corporation by another is a necessary element and that the control must be a proximate cause of the alleged injustice at issue.").  At best, the Amended Complaint alleges that BHL used BAM as a mechanism for retaining U.S. customers without regulatory scrutiny between 2019 and 2023.  (*See, e.g.*, AC ¶ 154).  But there are no allegations connecting any U.S. transaction—on either Binance.com or Binance.US—to the Attacks, or that any U.S. transaction otherwise caused harm to Plaintiffs.  Nor have Plaintiffs offered any other explanation of how BHL's alleged control of a U.S. corporation gave rise to terror attacks across the globe.  *See, e.g.*, *Material Supply Int'l, Inc.* v. *Sunmatch Indus. Co., Ltd.*, 62 F. Supp. 2d 13, 21 (D.D.C. 1999) ("[T]he control must be a proximate cause of the alleged injustice at issue[.]").  Plaintiffs' attempt to impute the U.S. contacts of BHL's corporate affiliate to BHL are therefore insufficient.

## II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA (COUNTS 12 & 13).

Plaintiffs' primary liability claims against BHL (Counts 12 and 13) lack any legal basis as courts have consistently rejected attempts to bring these claims against entities that are not terrorist organizations.  *See, e.g.*, *King* v. *Habib Bank Ltd.*, 2022 WL 4537849, at *5 (S.D.N.Y. Sept. 28,

2022 ("liability for banking services provided to support a terrorist group's mission more generally are properly analyzed under JASTA's aiding-and-abetting provision"); *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446, at *8 (S.D.N.Y. Mar. 28, 2019) ("The Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life.").  But that is precisely what Plaintiffs are impermissibly trying to do here and their claims should be rejected on the same basis.

### A. The Amended Complaint Does Not Adequately Allege that BHL Committed an Act of International Terrorism, Nor Could It.

Plaintiffs cannot state an ATA primary liability claim because the Amended Complaint fails to plausibly allege that BHL committed "an act of international terrorism" as required by the ATA.  Under Title 18, United States Code, Section 2331, acts of international terrorism:

(A)  involve *violent acts or acts dangerous to human life* [i] that are a violation of the criminal laws of the United States or of any State, or [ii] that would be a criminal violation if committed within the jurisdiction of the United States or of any State; [and]

(B)  appear to be intended—(i)  to intimidate or coerce a civilian population; (ii)  to influence the policy of a government by intimidation or coercion; or (iii)  to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C)  occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries[.]

18 U.S.C. § 2331(1)(A)-(C).  The Amended Complaint falls short under Sections (A) and (B).

**No Violent or Dangerous Acts.**  Plaintiffs could not, and do not even try to allege that BHL committed violent or dangerous acts.  Plaintiffs allege only that BHL provided generally-available transaction services that were used by individuals or entities later identified as having unspecified connections to Hamas or PIJ.  But courts have consistently ruled that providing ordinary transaction services, even if used by a terrorist organization, is insufficient to plead a violent or dangerous act.  *See Weiss* v. *Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 162-63 (2d Cir. 2021) ("[T]he provision of banking services, in and of itself, is insufficient either to show that

the services involved an act of violence or threat to human life or to give the appearance that such services were intended to intimidate or coerce a civilian population or government."); *Raanan*, 2025 WL 605594, at \*15-16 (same; collecting authority and dismissing claim). The same is true even if the services violated AML or sanctions laws. *See id.* at \*16; *see also Kemper* v. *Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) ("That [defendant's] business dealings may violate U.S. sanctions does not convert them into terrorist acts.").

**No Qualifying Criminal Law Violations.** Nor does the Amended Complaint adequately allege a qualifying criminal act by BHL. Plaintiffs assert, in conclusory terms, that BHL violated Title 18, United States Code, Sections 2339A (making it a crime to provide material support or resources "*knowing or intending* that they are to be used in preparation for, or in carrying out a violation of*" specified criminal statutes) (Count 12) and 2339B (making it a crime to "*knowingly* provide[] material support or resources to a [FTO]") (Count 13). However, the Amended Complaint does not come close to pleading the requisite *mens rea* for either offense—*i.e.*, a showing of contemporaneous knowledge or intent. At best, Plaintiffs allege that certain Binance users transacted with individuals or entities somehow associated with Hamas or PIJ, and that BHL *at some point* became aware of those transactions' supposed links to the FTOs. (*See, e.g.*, AC ¶¶ 9, 209). Those allegations do not plausibly suggest that BHL knew, at the time BHL provided those services, that any particular transaction was connected to Hamas or PIJ, or their acts of terror.[10] *See Newman* v. *Associated Press*, 758 F. Supp. 3d 1357, 1379-80 (S.D. Fla. 2024) (alleging "mere

---

[10] Allegations that the Israeli National Bureau for Counter Terror Financing (NBCTF) identified and seized funds from Binance accounts allegedly "affiliated with various terrorist organizations" (AC ¶¶ 217-18) do not support Plaintiffs' claims. There are no allegations suggesting that BHL had reason to know about those specific accounts' alleged affiliations, and the allegations only go to show that Binance proactively works with law enforcement agencies to combat terrorism financing, as the AC acknowledges (*id.* ¶ 213 (recognizing that Binance "complied with Israeli law enforcement in numerous seizures of wallets.")).

notice" of third parties' "relationship with Hamas" is insufficient to satisfy *mens rea* requirement under §§ 2339A or B). Even if these allegations were sufficient to plead a criminal violation (which they are not), "it is not enough to allege claims under §§ 2339A and B to automatically render them acts of international terrorism[,]" and as such, Plaintiffs' failure to plead a violent act by BHL would still be fatal. *Id.* at 1376 (collecting authority); *Raanan*, 2025 WL 605594, at *15-16 (same).

**No Terroristic Intent.** The Amended Complaint also fails to plead a violation of Subsection (B) of Section 2331 (the ATA's primary liability provision) because it lacks any factual allegations that BHL acted with objective terroristic intent (an intent to intimidate or coerce a civilian population or influence a government). To establish terroristic intent, Plaintiffs must show that BHL processed transactions that were explicitly identified as payments for terrorist activities. *See, e.g.*, *Averbach* v. *Cairo Amman Bank,* 2022 WL 2530797, at *19 (S.D.N.Y. Apr. 11, 2022).[11] But the law is clear that providing routine transaction services to persons or entities "with connections" to terrorist organizations, as opposed to the organizations themselves, is insufficient. *See, e.g.*, *Raanan*, 2025 WL 605594, at *16 (dismissing primary liability claim based on same facts and circumstances alleged here because plaintiffs "failed to allege that the defendants themselves committed acts dangerous to human life"); *O'Sullivan*, 2019 WL 1409446 at *7-8 (no terroristic intent where defendants allegedly provided financial services to Iranian banks and businesses "with connections to terrorist organizations[,]" as opposed to providing services directly to terrorists). Yet that is the extent of the allegations here. (*See, e.g.*, AC ¶¶ 217 (alleging that the NBCTF identified "accounts *affiliated* with various terrorist organizations, including individuals *associated*

---

[11] *Cf. Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 321 (2d Cir. 2018) (holding that defendant bank processing transfers that "were explicitly identified as payments for suicide bombings" was sufficient to create triable issue of fact as to whether the bank acted with the requisite intent).

with Hamas"), 208 (alleging that FinCEN identified "Binance user addresses [which] were found to *interact* with bitcoin wallets *associated with*" FTOs)).

## B. The Amended Complaint Does Not Adequately Allege that BHL Proximately Caused Plaintiffs' Alleged Injuries.

Counts 12 and 13 must also be dismissed on the independent ground that the Amended Complaint fails to plausibly allege proximate causation. *See Ofisi* v. *BNP Paribas, S.A.*, 77 F.4th 667, 678-79 (D.D.C. 2023) (affirming dismissal of primary liability claim where appellants failed to establish "a flow of money" between defendant bank and terrorist group that injured appellants); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013). To plead proximate causation, Plaintiffs must plausibly allege that they were injured "by reason of" an act that BHL *itself*—not Hamas or PIJ—committed. *Fields* v. *Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir. 2018) ("[T]o satisfy the ATA's 'by reason of' requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts."); *Rothstein* v. *UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (no proximate cause where plaintiff failed to allege a "relationship between the cash transferred by [defendant bank] to Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs"). The Amended Complaint does not come close to meeting this standard. Plaintiffs rely on the conclusory assertion that BHL's routine transaction services in some way caused the Attacks, and thereby caused Plaintiffs' injuries. (*See, e.g.*, AC ¶¶ 9, 221, 258). Courts routinely dismiss ATA claims that rest on such attenuated allegations, and at least one court has already rejected identical allegations against BHL. *See Raanan*, 2025 WL 605594, at *17; *see also, e.g.*, *In re Terrorist Attacks*, 714 F.3d at 124 ("We also are not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda . . . proximately caused the September 11, 2001 attacks or plaintiffs' injuries."); *Zapata* v. *HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356 (E.D.N.Y. 2019) (no proximate cause where plaintiffs failed

to allege "any relationship between [defendant bank's] money laundering and the acts of violence perpetrated against them"), *aff'd*, 825 F. App'x 55 (2d Cir. 2020). This Court should do the same.

## III. THE AMENDED COMPLAINT FAILS TO STATE AN AIDING-AND-ABETTING CLAIM UNDER THE ATA AND JASTA (COUNT 11).

JASTA imposes civil liability on "any person who aids and abets, by knowingly providing substantial assistance" to "the person who committed [the] act of international terrorism" that injured the plaintiff. 18 U.S.C. § 2333(d)(2). An aider and abettor must "intend to facilitate [the offense's] commission." *Smith & Wesson*, 605 U.S. at 291. With respect to JASTA specifically, to plead an aiding-and-abetting claim, a plaintiff must allege the defendant: (1) "knowingly and substantially assist[ed] the principal violation[,]" and (2) "[was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance." *Twitter*, 598 U.S. at 485-86. The Amended Complaint does not adequately plead either element.

### A. The Amended Complaint Does Not Allege that Defendants Knowingly and Substantially Assisted the Attacks.

*Twitter* established a demanding standard for the knowing and substantial assistance element of aiding-and-abetting liability, requiring a plaintiff to demonstrate that (1) there is a sufficient nexus between the defendant's conduct and the plaintiff's injuries, and (2) the defendant's participation was conscious, voluntary, and culpable. 598 U.S. at 493-94, 506.[12] The Amended Complaint falls short on both prongs. The aiding-and-abetting analysis begins by evaluating the nexus (or, in this case, the lack thereof) between the defendant's conduct and the *specific attack* that injured the plaintiffs. *See id.* at 497 ("[B]ecause they are trying to hold

---

[12] While the D.C. Circuit has not yet had occasion to interpret *Twitter,* it is expected to do so when it issues its decision in *AstraZeneca UK Ltd.* v. *Atchley*, No. 20-7077 (D.C. Cir.). In 2024, the U.S. Supreme Court granted a petition for certiorari, vacated the D.C. Circuit's decision that had previously overturned the district court's dismissal of JASTA aiding-and-abetting claims, and remanded the case for further consideration in light of *Twitter.* 2024 WL 3089470, at *1 (U.S. June 24, 2024).

defendants liable for the Reina attack, plaintiffs must plausibly allege that defendants aided and abetted ISIS in carrying out *that attack*"); *see also id.* at 506 ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated in *the tort at issue*. *The focus must remain on assistance to the tort for which plaintiffs seek to impose liability.*"). The Supreme Court elaborated that providing substantial assistance to terrorists' "activities in general" is not sufficient to impose aiding-and-abetting liability; "the question is whether defendants gave substantial assistance to [the FTO that carried out the attack] with respect to the [specific] attack. The focus thus must remain on the [specific] attack[.]" *Id.* at 503; *see also id.* at 495 ("[I]t is not enough . . . that a defendant [has] given substantial assistance to a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it."); *Ashley* v. *Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 444 (2d Cir. 2015) ("[I]t is not enough to say that the defendant assisted the terrorist organization's activities in general.").

*Twitter* established an inverse relationship between the nexus and intent components of substantial assistance. A showing of more direct and significant assistance (*i.e.*, a direct and concrete nexus) may reduce the required showing of intent, whereas a more attenuated nexus "drastically increases" the pleading burden for intent. *Twitter*, 598 U.S. at 503; *see also id.* at 500 (where there is "distance between [the] defendants' acts (or failures to act) and the . . . attack [that injured the plaintiffs], plaintiffs would need some other very good reason to think that defendants were *consciously trying to help or otherwise participate in the . . . attack*"). In other words, "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through *intentional aid that substantially furthered the tort*." *Id.* at 506; *see also Zobay*, 695 F. Supp. 3d at 345 ("If the relationship between a defendant's assistance and the

ultimate tortious act is attenuated, then plaintiffs need some other very good reason to think that defendants were consciously trying to help or otherwise participate in the [specific] attack.").

Here, the Amended Complaint does not come close to pleading a "definable nexus between . . . [D]efendants' [alleged] assistance and the [A]ttack." *Twitter*, 598 U.S. at 503. It alleges only that BHL's AML lapses enabled users allegedly *associated with* Hamas and other FTOs to access Binance, and that the FTOs then used these funds to commit terrorist attacks, including the Attacks. (*See, e.g.*, AC ¶¶ 135, 137, 206, 209, 258, 265, 291). The Amended Complaint discusses in broad terms how FTOs have exploited cryptocurrency (as they have all types of currency) as part of their fundraising efforts. (*See id.* ¶¶ 27, 72). But—aside from purely conclusory allegations—nowhere does the Amended Complaint plead *facts* demonstrating how any transactions on the Binance platform are directly "connect[ed] or link[ed]"[13] to the Attacks that caused Plaintiffs' alleged injuries. The Amended Complaint broadly alleges that BHL provided substantial assistance to Hamas by "maintaining bank accounts and cryptocurrency exchange wallets," providing Hamas "with access to U.S. dollars and the U.S. banking system" and "transferring funds to Hamas that could foreseeably be used to commit terrorist attacks." (*Id.* ¶ 568). At bottom, this is nothing more than an allegation of "assistance to [the FTOs'] activities in general," which *Twitter* explicitly held is insufficient. 598 U.S. at 503 (overturning Ninth Circuit decision that "framed the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general").

The Second Circuit's recent decision in *Ashley* makes clear that the Amended Complaint's allegations are insufficient to allege knowing and substantial assistance in the Attacks. In *Ashley*, the plaintiffs alleged that defendants "engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists," and that "some of the money

---

[13] *See Nexus*, Black's Law Dictionary (12th ed. 2024).

must have gone to the terrorists' violent activities." 144 F.4th at 444. The Second Circuit squarely rejected this argument as insufficient under *Twitter*, because it was nothing more than an allegation that the defendants assisted the terrorists' activities in general, and the alleged connection to the terrorists' violent activities was too attenuated. *Id.*

Where, as here, there is no "definable nexus" between defendants' alleged acts or omissions and the attack, a JASTA claim is insufficient unless plaintiffs can plausibly allege that defendants consciously and "culpably associate[d] [themselves] with the attack, participate[d] in it as something that [they] wishe[d] to bring about, or sought by [their] action to make it succeed." *Id.* at 498. The Amended Complaint falls far short of that "drastically increase[d]" requirement. *Id.* at 503. At most, the Amended Complaint alleges that BHL was, at some point in time, aware accounts affiliated with FTOs were using its services but *failed to stop* that use, the "foreseeable result[s]" of which included attacks like the October 7 Attacks. (*See* AC ¶¶ 206, 453, 463, 493, 561). *Twitter* made clear that these types of allegations are insufficient. 598 U.S. at 499 ("[I]t might be that bad actors like ISIS are able to use platforms like defendants' for illegal—and sometimes terrible—ends. . . . Yet, we generally do not think that . . . service providers incur culpability merely for providing their services to the public writ large.").

Moreover, like the social media platforms at issue in *Twitter*, the Binance platform is global in scale and serves "millions of users in more than 180 countries" (AC ¶ 116), and "there are no allegations that defendants treated [FTOs] any differently from anyone else." 598 U.S. at 500. In fact, as is clear from documents the Amended Complaint itself relies on, far from giving FTOs special treatment, BHL sought to keep them off its platform. (*See* Enzer Decl., Ex. 2 (FinCEN Consent Order) at 46 (BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing"); *see also* AC ¶ 213 (recognizing that Binance "complied

with Israeli law enforcement in numerous seizures of wallets on its platform")).  Absent any allegations that BHL favored or attempted in any way to aid terrorists, let alone a specific attack, the Amended Complaint fails to plead the requisite "strong showing of assistance and scienter" that *Twitter* demands.  598 U.S. at 500.

> *Ashley* is again instructive in this regard.  Unlike BHL, the defendants in *Ashley* were alleged to have given "special treatment" to bad actors even after being notified by the U.S. government that such actors were utilizing their services; not only did those defendants continue to provide banking services to specific customers after being explicitly told by the U.S. military that those services were facilitating terrorism, the defendants were also alleged to have actively engaged in terrorist financing, by "custom build[ing]" and "operat[ing]" money laundering schemes known to fund terrorism.  144 F.4th at 429-31.  Still, the Second Circuit found that such allegations did not support a JASTA aiding-and-abetting claim, because defendants' continued services did not amount to "interested cooperation" with the FTOs.  *Id.* at *443.  BHL's alleged passive nonfeasance here (*i.e.*, a failure to halt or report illegal activity on the Binance platform) comes nowhere close to the conduct in *Ashley*.

> Given the lack of a definable nexus between BHL's conduct and the Attacks, and the lack of any intent on BHL's part to further the Attacks, the controlling holding of *Twitter* requires dismissal of Plaintiffs' aiding-and-abetting claim.  Although *Twitter* acknowledged that there may be extraordinary circumstances where these pleading requirements might be relaxed, those exceptions require a defendant to have "so systemically and pervasively assisted" the terrorist group that the defendant "could be said to aid and abet every single" attack.  598 U.S. at 501.  Such a finding is reserved for circumstances where "aiding-and-abetting liability begins to blur with conspiracy liability," and where "a defendant has so consciously participate[d] in a series of

tortious acts in order to make [each one] succeed." *Id.* at 496; *see also id.* at 501-02 (no liability where "Plaintiffs do not claim that defendants intentionally associated themselves with [the FTO's] operations or affirmatively gave aid that would assist each of [the FTO's] terrorist acts" or otherwise "formed a near-common enterprise" with the FTO); *Ashley*, 144 F.4th at 445 (plaintiffs failed to meet this "high bar" where defendants were "alleged to have culpably executed financially suspect transactions writ large, not in a manner that actively sought to associate[] themselves with the [terrorists] operations or to form a near-common enterprise with" them). Here, Plaintiffs do not even attempt to plead BHL aligned itself with Hamas or any other FTO in such a manner. To the contrary, as the Treasury Department acknowledged, despite its AML lapses, BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing," and "cooperated with Israeli law enforcement in numerous seizures related to the al Qassam brigades." (Enzer Decl., Ex. 2 (FinCEN Consent Order) at 46).

Nor is there any plausible argument that BHL marketed a "dangerous ware," or offered its services in an "unusual way" that could distinguish this case from *Twitter's* controlling holding. *See* 598 U.S. at 502. Cryptocurrency transactions are not inherently dangerous, but rather involve fungible digital assets functionally equivalent to any other form of currency. *See, e.g.*, *Coinbase, Inc.* v. *SEC*, 126 F.4th 175, 203 n.11 (3d Cir. 2025) ("digital assets are a growing part of the financial sector and are emerging as an increasingly important form of online payment"). And Binance, the world's largest centralized digital asset exchange, offered only routine exchange services to its hundreds of millions of users worldwide. Those services are not qualitatively different from the services offered by other types of financial institutions, which are neither inherently dangerous nor unusual, even when coupled with the failure to comply with identical

AML duties.[14]  *See Ashley*, 144 F.4th at 442-43 (offering routine financial services to the general public that could have been used to fund violent acts does not make those services "dangerous ware[s]"); *see also Siegel* v. *HSBC North America Holdings, Inc.*, 933 F.3d 217, 225-26 (2d Cir. 2019) (dismissing JASTA claim despite admitted AML failures); *O'Sullivan*, 2019 WL 1409446, at *10 (same); *compare id.*, *with Twitter*, 598 U.S. at 502 (citing *Direct Sales Co.* v. *U.S.*, 319 U.S. 703, 707, 711-12, 714-15 (1943) (registered morphine distributor could be liable as a co-conspirator of an illicit operation to which it mailed morphine far in excess of normal amounts)).

The recent Supreme Court decision in *Smith & Wesson* further underscores the fatal defects in the Amended Complaint's aiding-and-abetting claims.  605 U.S. 280.  In *Smith & Wesson*, the government of Mexico sued seven American gun manufacturers alleging that they had aided and abetted gun dealers' unlawful sales of guns to Mexican drug cartels.  *Id.* at 287.  Mexico's complaint alleged that the manufacturers "supply firearms to retail dealers whom they know illegally sell to Mexican gun traffickers," and "failed to impose" adequate "controls on their distribution networks that would prevent illegal sales[.]"  *Id.* at 289-90.  While *Smith & Wesson* involved indisputably dangerous wares (guns), the Supreme Court unanimously held that those allegations are insufficient to establish aiding-and-abetting liability.  *Id.* at 294.  The Court explained that, even crediting the complaint's allegations that the manufacturers were aware that unlawful gun sales took place, the plaintiff had still not adequately pled "that the manufacturers participate in those sales as [] something that [they] wish[] to bring about and seek by [their] action to make succeed."  *Id*.  At best, the plaintiffs had alleged "that the manufacturers elect to sell guns to, among others, known rogue dealers[.]"  *Id*.  But, as the Court explained, an aider and abettor

---

[14]  Even if Plaintiffs could plausibly allege that one of these exceptions applies—which they cannot—allegations of intent are still required and are utterly lacking here.  *See Twitter*, 598 U.S. at 502 (where plaintiffs allege that defendant offered "dangerous wares" or "unusual" services, "plaintiffs *might* be able to establish liability with a *lesser* showing of scienter").

generally "must intend to facilitate the offense's commission" and "an ordinary merchant[] does not become liable for all criminal misuse[s] of [his] goods, even if he knows that in some fraction of cases misuse will occur." *Id.* at 291-92. Rather, "[t]he merchant becomes liable only if, beyond providing the good on the open market, he takes steps to promote the resulting crime and make it his own." *Id.* at 292. The deficient allegations in *Smith & Wesson* go far beyond what Plaintiffs allege here—where the Amended Complaint boils down to allegations that the Binance platform was offered broadly to the general public, and BHL knew, at some point in time, that accounts associated with terrorists were using its services yet failed to stop this use. (*See, e.g.*, AC ¶¶ 9, 213, 407). In other words, if the allegations in *Smith & Wesson* fail to state an aiding-and-abetting claim, those in the Amended Complaint most certainly fail to do so as well.[15]

Plaintiffs' allegation that BHL could or should have implemented stronger controls against illicit activity does not cure this defect. As the Supreme Court explained in *Smith & Wesson*, "[w]hen a company merely knows that some bad actors are taking advantage of its products for criminal purposes, it does not aid and abet," and "that is so even if the company could adopt measures to reduce their users' downstream crimes." *Id.* at 293. At most, the failure to adopt such measures reflects "passive nonfeasance" which is "rarely the stuff of aiding-and-abetting liability." *Id.* at 282. Moreover, aiding-and-abetting liability does not attach just because terrorists took advantage of the same services that BHL made generally available to over 100 million customers worldwide. *Id.* at 297-98 (noting that guns were legal and used by ordinary consumers such that

---

[15] Although *Smith & Wesson* considered criminal rather than civil aiding and abetting liability (605 U.S. at 281), the Second Circuit recently cited the decision as relevant to evaluating civil aiding and abetting liability under JASTA. *See Ashley*, 144 F.4th at 443 (affirming dismissal of JASTA claims and citing *Smith & Wesson* for the proposition that liability for aiding and abetting the sale of "dangerous wares" does not ordinarily attach to "an upstream financial institution of a company that itself produces a potentially dangerous ware.").

"manufacturers cannot be charged with assisting in criminal acts just because Mexican cartel members like those guns too").

## B. The *Halberstam* Factors Confirm That the Amended Complaint Fails to State an Aiding-and-Abetting Claim.

*Twitter* stated that the factors set forth in *Halberstam* v. *Welch*, 705 F.2d 472, 483-84 (D.C. Cir. 1983) are relevant in determining whether aiding-and-abetting liability has been sufficiently pled. 598 U.S. at 485-88. Here, *all six Halberstam* factors weigh in favor of dismissing Plaintiffs' JASTA aiding-and-abetting claim:

- **Nature of the Act**: The Amended Complaint relies on conclusory allegations that the routine services BHL provided were "indisputably important" to the Attacks. *See Halberstam*, 705 F.2d at 488. Plaintiffs allege that "access to U.S. dollars and the U.S. banking system" (AC ¶ 568) is important for FTOs, including Hamas; BHL's failure to file SARs made "the U.S. Government's work countering terrorism by preventing, prohibiting, and interrupting terrorism funding" more challenging (*id.* ¶ 523); and the Attacks demonstrated that expensive equipment and coordination were required (*id.* ¶¶ 7, 79, 289). Such general allegations fail to connect BHL's routine services to the Attacks, ignore the multitude of FTO funding sources, and overlook that BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorist financing." (Enzer Decl., Ex. 2 (FinCEN Consent Order) at 46).

- **Amount of Assistance**: Plaintiffs do not allege that Binance processed a single transaction, let alone a substantial volume, directly linked to the Attacks. *Compare* AC ¶ 289 (alleging that BHL "facilitated, contributed to, and enabled acts of terrorism, including specifically the October 7th attack" by allowing users associated with FTOs to access Binance), *with Halberstam*, 705 F.2d 472, 488 (D.C. Cir. 1983) (alleging that live-in companion and bookkeeper for burglar stored and laundered illegal goods).

- **BHL's Presence at Attacks**: Plaintiffs have not (and cannot) plead any facts to show that Defendants were present during the Attacks.

- **BHL's Relation to the Tortious Actor**: The Amended Complaint does not allege that BHL had any relationship with Hamas or PIJ, or gave them any special treatment as compared to the hundreds of millions of other users who transacted on the Binance platform during the period covered by the Amended Complaint.

- **BHL's State of Mind**: The Amended Complaint alleges no affirmative act, nor even an omission, by BHL with the intent of facilitating the Attacks. *Cf. Halberstam*, 705 F.2d at 487-88 ("continuous participation" in two-person stolen goods venture as "banker, bookkeeper, recordkeeper, and secretary" reflected "intent and desire to make the venture succeed"); *see also Twitter*, 598 U.S. at 490 (no aiding-and-abetting liability where defendants were not alleged to have taken an "affirmative act" with "intent of facilitating" the attack).

- **<u>Duration of the Assistance</u>**: The Amended Complaint alleges that BHL provided services to FTOs for years leading up to the Attacks, but says nothing about the "quality and extent" of the alleged relationship between BHL and FTOs (compared to BHL's user base generally); nor does it suggest that the duration of the relationship resulted in an increased "amount of aid" to the FTOs. *Halberstam*, 705 F.2d at 484 ("The length of time an alleged aider-and-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided."). Plaintiffs also fail to connect any BHL-specific services temporally to any of the Attacks.

In sum, the facts alleged here—allegedly failing to prevent users associated with FTOs from accessing the same services accessed by hundreds of millions of other users across the globe—are a far cry from the immediate, direct, and purposeful assistance that characterized *Halberstam*.

### C. The Amended Complaint Does Not Allege that BHL Was Generally Aware of Any Role in the Relevant Terrorist Activity.

Because Plaintiffs fail to allege knowing and substantial assistance, their aiding-and-abetting claim fails on this basis alone, and the Court need not consider the general awareness element. But the Amended Complaint's failure to sufficiently plead general awareness is an independent basis requiring dismissal of Count 11. To plead this element, Plaintiffs must plausibly allege that Defendants were "generally aware of [their] role in an overall illegal activity from which an act of international terrorism was a foreseeable risk"—*i.e.*, that Defendants were "assuming a role in [the FTOs'] terrorist activities[.]" *Bernhardt*, 47 F.4th at 867, 869; *see also Ashley*, 144 F.4th at 438. The Amended Complaint tries to plead this element by citing to internal chats that occurred years before the Attacks (*see, e.g.*, AC ¶¶ 188, 200, 280), and otherwise makes unsupported and conclusory allegations that BHL "knowingly provided substantial assistance to Hamas" (*id.* ¶ 568). But that is not enough. Even if BHL had notice that users associated with Hamas and PIJ were attempting to transact on the Binance platform, the Amended Complaint fails to plausibly allege that BHL was aware it was "assuming a role" in Hamas and PIJ's terrorist activities related to the Attacks. *See Bernhardt*, 47 F.4th at 869.

*Ashley* is again instructive here.  There, plaintiffs alleged that defendants facilitated a value-added tax ("VAT") fraud scheme, which funneled money to terrorists.  144 F.4th at 446-47.  The Second Circuit held that plaintiffs had failed to plead "general awareness"—even where "public sources connect[ed] VAT fraud with terrorism" and "an internal compliance employee raised concerns about VAT fraud" at one of the banks.  *Id.*  Although plaintiffs had alleged the defendants' awareness of their involvement in wrongful activity, plaintiffs failed to plausibly allege that defendants knew they were assuming a role in the terrorist organization's violent terrorist activities.  *Id.* ("Perhaps these allegations support the inference that the Banks were aware that they were involved in tax fraud. But the red flags made it possible—not plausible—that [their customers'] transactions were closely intertwined with [terrorists].").  The same is true here.  Plaintiffs allege, at best, that BHL was generally aware that users somehow associated with FTOs were using the Binance platform, but they do not allege (nor could they) that BHL knew it was assuming a role in the FTOs' activities.

Moreover, when assistance is alleged to have been provided to an FTO's intermediary—which is the most that is alleged here, given the allegations merely support an inference that users "associated with" FTOs were on the platform—to plead general awareness, a plaintiff must show that "(1) the defendant was aware of the intermediary's connection to the terrorist organization, and (2) the intermediary is so closely intertwined with the terrorist organization's illegal activities as to give rise to an inference that the defendant was generally aware of its role in the organization's terrorist activities."  *Bernhardt*, 47 F.4th at 867-68, 870 (even where defendant "had client banks with ties to terrorist organizations and [had] admitted to helping those banks evade U.S. sanctions[,]" it was "not sufficient for aiding and abetting liability under the ATA").  Here, at most, the Amended Complaint alleges that BHL permitted certain unnamed customers with undefined

"associations" with Hamas or PIJ to conduct routine transactions; and that at some unspecified point in time, BHL learned of these users' supposed "association" with Hamas or PIJ.  (*See, e.g.*, AC ¶ 208 ("Binance user addresses were found to interact with bitcoin wallets associated with" FTOs)). The Amended Complaint does not identify these supposed intermediaries, how they were supposedly connected to an FTO, let alone that they were "closely intertwined," nor when BHL supposedly learned of this connection.  This is plainly insufficient to allege general awareness.

## IV.    THE AMENDED COMPLAINT FAILS TO STATE A NEGLIGENCE CLAIM (COUNTS 4, 5, 8 & 16).

Plaintiffs' four causes of action sounding in negligence—negligence, negligent infliction of emotional distress, loss of consortium, and negligence *per se*—all fail to state a claim.

### A.  Negligence (Count 4)

To state a negligence claim, Plaintiffs must plausibly allege that:  (1) BHL owed the Plaintiffs a duty of care, (2) BHL breached that duty, and (3) BHL's actions proximately caused Plaintiffs' injuries.  *See Hedgepeth* v. *Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).  The Amended Complaint fails to sufficiently allege any of these elements.

#### 1.   BHL Did Not Owe Plaintiffs a Duty of Care.

Plaintiffs admit that they "do not and never have had a Binance account."  (AC ¶ 20).  Yet, the Amended Complaint contends that BHL—a foreign corporation involved in the operation of a digital asset exchange—somehow owed Plaintiffs a duty to protect them from a terrorist attack, of which BHL had absolutely no advance notice.  (*Id.* ¶ 451).  No such duty exists.

*First*, the Amended Complaint claims that BHL owed a duty of care to the public at large, including Plaintiffs, by virtue of having offered generally available transaction services.  (*See id.* ¶ 450).  But courts have consistently rejected such an expansive theory of negligence.  *See, e.g.*, *Malek* v. *Flagstar Bank*, 70 F. Supp. 3d 23, 32 (D.D.C. 2014) ("[A] bank does not owe a duty of

care to a noncustomer with whom the bank has no direct relationship."); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y.) ("Banks do not owe non-customers a duty to protect them from the intentional torts of their customers."); *Stutts* v. *De Dietrich Grp.*, 2006 WL 1867060, at \*15 (E.D.N.Y. June 30, 2006) ("An injured plaintiff must show that the defendant owed not merely a general duty of care to society, but a specific duty that was owed to him or her[.]").  No duty flows to Plaintiffs from BHL's provision of generally available services.

    *Second*, there is no support for the Amended Complaint's theory that BHL's previous compliance shortcomings gave rise to a duty of care by making it foreseeable that Plaintiffs would fall victim to a terrorist attack in Israel.  (*See* AC ¶¶ 451, 463).  Where, as here, the alleged injury "is caused by the intervening criminal act of a third party[,]" the plaintiff must make a "heightened showing of foreseeability[,]" which requires "proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location."  *Sigmund* v. *Starwood Urb. Inv.*, 475 F. Supp. 2d 36, 42 (D.D.C. 2007), *aff'd sub nom. Sigmund* v. *Starwood Urb. Retail VI, LLC*, 617 F.3d 512 (D.C. Cir. 2010).  Moreover, courts will "reject[] liability as a matter of law where foreseeability (hence duty) was not limited by any evidentiary reference to *a precise location or class of persons*."  *D.C.* v. *Beretta, U.S.A., Corp.*, 872 A.2d 633, 642 (D.C. 2005).

    Here, Plaintiffs have failed to plead foreseeability with anywhere close to the requisite precision.  The Amended Complaint alleges that because "Hamas uses funds to perpetrate terrorist attacks" and "Hamas' primary target has been Israelis and Americans[,]" it was foreseeable that BHL's compliance failures would cause the October 7 Attacks that allegedly injured Plaintiffs. (*See* AC ¶¶ 257, 451).  These allegations are far too vague to support a duty to Plaintiffs.  Under Plaintiffs' logic, *any* terrorist attack in Israel (or that targeted either Israeli or U.S. citizens) should have been foreseeable to BHL.  Plaintiffs' theory would create boundless liability to plaintiffs that

have no connection to BHL.  That is not the law.  Indeed, the D.C. Court of Appeals explicitly rejected just "such limitless notions of duty and foreseeability," in *Beretta*, where it concluded that gun manufacturers do not owe a duty of care to all D.C. residents that may experience gun violence at the hands of criminal wrongdoers.  *Beretta*, 872 A.2d at 643.  The same logic applies here.

*Third*, Plaintiffs try to manufacture a duty of care by alleging that BHL "had control over" which users could access the Binance platform, and therefore, BHL maintained a "special relationship with Hamas[,]" such that BHL owed a duty to prevent Hamas' wrongdoing.  (*See* AC ¶ 449).  "In the District of Columbia, as in many other jurisdictions, courts ha[ve] been reluctant to see a defendant held liable for harm caused by the criminal act of a third party" except where the defendant has a particular ability to control the conduct of the intervening actor.  *See Smith* v. *Hope Vill., Inc.*, 481 F. Supp. 2d 172, 185 (D.D.C. 2007).  Here however, Plaintiffs do not show the requisite control between BHL and Hamas.  "Hamas" is not alleged to have had an account on the Binance platform—rather the Amended Complaint vaguely alleges that third parties in some way "associated" with FTOs had, at some point in time, transacted on the Binance platform.  (*See, e.g.*, AC ¶¶ 191-92, 203, 210, 217).

Even if Plaintiffs had alleged such a connection, their allegations of "control" miss the point entirely.  While BHL may have been able to control *users'* access to the Binance platform, BHL undeniably could not "control the conduct" of *Hamas* so as to have a special relationship that would have allowed BHL "to prevent [them] from causing physical harm" to Plaintiffs.  *Smith*, 481 F. Supp. 2d at 186; *compare id.* at 187-89 (special relationship existed between halfway house and violent felon, such that halfway house owed "a duty to exercise reasonable care to control the [felon] to prevent him from" committing further violent crimes); *Hicks* v. *United States*, 511 F.2d 407, 418 (D.C. Cir. 1975) (finding duty of care where hospital wrongfully released violent

psychiatric patient), *with Melehy* v. *Salha*, 2023 WL 6313195, at *6 (D.D.C. Sept. 28, 2023) (no special relationship where plaintiff alleged only a standard bank-depositor relationship). Because BHL could not control or prevent Hamas' conduct, no "special relationship" existed.[16]

### 2. BHL Did Not Proximately Cause Plaintiffs' Alleged Injuries.

Plaintiffs' negligence claim must be dismissed for the independent reason that the Amended Complaint fails to plead proximate causation. *See supra* II.B.  Like the analysis of duty, when the intervening criminal acts of a third party cause the injury, courts consider whether "the chain of events leading to the plaintiff's injury" was a foreseeable result of the defendant's actions. *Harris* v. *Washington Metro. Area Transit Auth.*, 490 F. Supp. 3d 295, 308 (D.D.C. 2020) ("[P]roximate cause requires at least some showing of circumstances that would give the defendant an increased awareness of the danger of a particular criminal act, as opposed to criminal activity in general."); *see also In re Korean Air Lines Disaster of Sept. 1, 1983*, 1985 WL 9447, at *5 (D.D.C. Aug. 2, 1985) ("[T]here is no duty to guard against criminal acts since independent illegal acts of third persons are deemed unforeseeable and therefore the sole proximate cause of the injury, which excludes the negligence of another as a cause of injury.").

Here, Plaintiffs rely on attenuated, conclusory allegations that the Attacks were "highly foreseeable" because BHL "was required to have KYC, AML, sanctions, and compliance programs" designed to prevent "[A]ttacks exactly like this one."  (AC ¶ 463).  But the Amended Complaint fails to substantiate Plaintiffs' claim that the October 7 Attacks were a foreseeable result of BHL's conduct—providing routine transaction services to individuals or entities with some unidentified affiliation to FTOs.  For example, Plaintiffs have not connected a single Binance user or transaction directly to the October 7 Attacks, much less alleged that "without [the Binance

---

[16] To the extent Plaintiffs intend to premise a duty on violations of the Bank Secrecy Act or other statutory obligations, this too fails for the reasons discussed *infra* IV.D.

platform] the [Attacks] would not have occurred." *de Los Rios* v. *NationsBank, N.A.*, 911 F. Supp. 8, 10-11 (D.D.C. 1995). A court in the Southern District of New York rejected an identical theory of causation when it dismissed a claim alleging various banks negligently facilitated the September 11 terrorist attacks. *See In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 7073447, at \*1-2 (S.D.N.Y. Dec. 23, 2008). There, the plaintiff alleged that the bank defendants "failed to comply with anti-money laundering statutes and regulations, and other national and international industry standards[,]" and that this "purported noncompliance . . . significantly contributed to concealing the true source and/or destination of funds passing through accounts at [bank defendants] and ultimately being used for the benefit of terrorists." *Id.* at \*1. But the court found that the plaintiff had "failed to plead factual allegations sufficient to show that it was plausible that tighter financial oversight would have averted the 9/11 tragedy[,]" and the fact that transactions processed by the bank defendants "might eventually find their way to terrorists through a series of unrelated transfers was, as a matter of law, not reasonably foreseeable." *Id.*; *see also Henderson* v. *Wells Fargo Bank*, 799 F. Supp. 3d. 910, 918 (S.D. Tex. Mar. 31, 2025) (bank defendant's failure to provide adequate fraud monitoring and recovery was not proximate cause of plaintiff's injury because "fraudsters hacking and manipulating his account (or bank accounts in general)" constituted an "intervening act of a third party" that was not foreseeable). The Court should reach the same conclusion here—and dismiss Plaintiffs' negligence claim—because the Amended Complaint can neither link the Binance platform, nor any of the transactions conducted on it, to conduct from which the October 7 Attacks would have been a foreseeable result.

### B. Negligent Infliction of Emotional Distress ("NIED") (Count 5)

Plaintiffs' failure to plead a negligence claim is fatal to Plaintiffs' NIED claim as well. "Although [NIED] has additional elements specific to the nature of emotional harm and the foreseeability of distress, both negligence and [NIED] claims require a showing that the defendant

owed a duty to the plaintiff, a breach of that duty, and that the breach proximately caused the plaintiff's injury. As such, *a claim for [NIED] requires an underlying negligence claim because [NIED] is predicated on the defendant's breach of a duty owed to the plaintiff*." *E.M.* v. *Shady Grove Reprod. Sci. Ctr., P.C.*, 2025 WL 947515, at \*13 (D.D.C. Mar. 28, 2025); *see also Clark* v. *Comput. Sci. Corp.*, 958 F. Supp. 2d 208, 214 (D.D.C. 2013) (dismissing NIED claim where plaintiff failed to allege that defendants "owed a duty of reasonable care" or "cause[d] serious emotional distress to plaintiff").

### C. Loss of Consortium (Count 16)

Plaintiffs' claim for loss of consortium suffers from a number of flaws, all of which are independent bases for dismissal of this claim.

*First*, Plaintiffs have failed to plead which law applies. Under D.C. law, "courts [are] to apply the law of the state where the marriage is domiciled when considering loss of consortium claims." *Jograj* v. *Enter. Servs., LLC*, 270 F. Supp. 3d 10, 27 (D.D.C. 2017). Because the law regarding loss of consortium differs significantly by jurisdiction (for example, "Virginia has abolished loss of consortium" (*id.*)), BHL cannot meaningfully respond to this claim and it should be dismissed. *See Cherry-El* v. *Blount*, 2025 WL 2336431, at \*4 (D.D.C. Aug. 13, 2025) (a court may dismiss a claim under Rule 8 where the complaint does not provide "the grounds upon which it rests").[17]

*Second*, Plaintiffs Shai Siegel, Shir Siegel, Elan Tiv, Gal Siegel, Lucy Siegel, David Siegel, and Lee Siegel (referred to in the Amended Complaint as the "Family Member Plaintiffs"), may not bring claims for loss of consortium, because they base their claims on alleged injuries to other family members, and D.C. law only recognizes such a claim for injury to a spouse. *See Washington*

---

[17] For purposes of this motion to dismiss only, BHL presumes the application of D.C. law.

v. *Washington Hosp. Ctr.*, 579 A.2d 177, 179 n.1 (D.C. 1990) (foreclosing "claims for loss of consortium in favor of a parent or child of the injured party"); *D.C.* v. *Howell*, 607 A.2d 501, 506 (D.C. 1992) (rejecting "parent-child consortium as a basis for damages").

*Finally*, Plaintiffs' failure to adequately allege negligence also defeats their loss of consortium claim.  *See Hill* v. *Medlantic Health Care Grp.*, 933 A.2d 314, 331 (D.C. 2007) ("A loss of consortium claim depends on whether the underlying claim of negligence against the defendant has been proven."); *Casper* v. *Barber & Ross Co.*, 288 F.2d 379, 380 n.1 (D.C. Cir. 1961) (plaintiff's "claim for damages for loss of consortium must stand or fall" with his negligence claim).

### D. Negligence Per Se (Count 8)

To state a claim for negligence *per se*, a plaintiff must plausibly allege that:  (1) the defendant violated an applicable statute or regulation; and (2) the violation proximately caused the plaintiff's injury.  *See McNeil Pharm.* v. *Hawkins*, 686 A.2d 567, 578 (D.C. 1996) ("[T]he plaintiff must establish the applicable standard of care, show that the defendant violated that standard, and that the violation was the proximate cause of the injury.").  Where, as here, the alleged injury was caused by the intervening criminal acts of a third party, "the third-party criminal conduct [must] be the very injury . . . which the statute intended to prevent" and "the statutory purpose must be narrowly defined to match the criminal conduct as closely and precisely as possible."  *Delorenzo* v. *HP Enter. Servs., LLC*, 207 F. Supp. 3d 26, 65 (D.D.C. 2016); *see also McNeil*, 686 A.2d at 579 ("[T]he statute or regulation relied on must promote public safety and have been enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred.").

Plaintiffs premise their negligence *per se* claim on BHL's admitted violations of U.S. banking regulations regarding AML and sanctions.  (AC ¶¶ 520-44).  But these statutes do not provide for a private right of action—the only duty owed is to the government—and therefore a

violation of these statutes does not give rise to a duty of care to Plaintiffs.  *See Venture Gen. Agency, LLC* v. *Wells Fargo Bank, N.A.*, 2019 WL 3503109, at \*7 (N.D. Cal. Aug. 1, 2019) ("[C]ourts are unanimous in holding that there is no private right of action under the [Bank Secrecy Act ("BSA")] or Patriot Act. . . .  Further, as there is no private right of action, there can be no duty of care arising out of the BSA's monitoring requirements."); *Marchak* v. *JPMorgan Chase & Co.*, 2016 WL 3911926, at \*3 (E.D.N.Y. July 15, 2016) ("Negligence *per se* is available only when the plaintiff is a member of the class intended to be benefited by the statute . . . .  The BSA does not meet that standard, as courts have repeatedly held that a bank's duty [under the BSA] is owed only to the government and not to private parties."); *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) ("[T]he Court can perceive no sound reason to recognize a duty of care that is predicated upon the [BSA]'s monitoring requirements."); *Marlin* v. *Moody Nat. Bank, N.A.*, 2006 WL 2382325, at \*7 (S.D. Tex. Aug. 16, 2006), *aff'd*, 248 F. App'x 534 (5th Cir. 2007) ("The obligation under that statute is to the government rather than some remote victim.  The [bank's] obligation is not to roam through its customers looking for crooks and terrorists.").

In fact, courts across the country have consistently dismissed negligence *per se* claims alleging a duty of care based on financial reporting statutes such as the BSA.  *See, e.g.*, *Venture*, 2019 WL 3503109, at \*6-8 (finding plaintiffs "cannot rely on [banking regulations] to create a duty of care" and dismissing negligence *per se* claim); *InjuryLoans.com, LLC* v. *Buenrostro*, 529 F. Supp. 3d 1178, 1185-86 (D. Nev. 2021) ("Courts appear to have held unanimously that there is no private right of action under the Bank Secrecy Act, Patriot Act, and associated regulations . . . under a theory of negligence *per se*.").  Accordingly, because the Amended Complaint does not allege an actionable statutory violation, Plaintiffs' negligence *per se* claim must be dismissed.

## V.   THE AMENDED COMPLAINT FAILS TO STATE A PRODUCTS LIABILITY CLAIM (COUNTS 6, 7, 9, & 10).

Plaintiffs bring four causes of action for products liability, two claims asserting strict liability (design defect (Count 6) and manufacturing defect (Count 7)) and two claims asserting negligence (negligent design (Count 9) and negligent manufacturing (Count 10)).  Where, as here, "the allegedly negligent conduct is the sale of a defective product, negligence and strict liability are functionally the same[,]" and all of the "claims rise and fall with the alleged defect in the product itself."  *Romero* v. *ITW Food Equip. Grp., LLC*, 987 F. Supp. 2d 93, 100 (D.D.C. 2013); *see also Webster* v. *Pacesetter, Inc.*, 259 F. Supp. 2d 27, 38 (D.D.C. 2003) ("The same factors are considered in both a negligent design case and a strict liability case.").  Accordingly, to plead a products liability claim, the Amended Complaint must sufficiently allege that:  (1) BHL designed and/or manufactured a product; (2) the product was defective; and (3) this defect proximately caused Plaintiffs' injuries.  *See Webster*, 259 F. Supp. 2d at 30.  Plaintiffs have not adequately alleged any of these elements.

### A.  Plaintiffs Fail to Allege a Defective "Product."

The sale of a product is, of course, a prerequisite to establishing a products liability claim. *See id.*  Products are "tangible personal property,"[18] such as "an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide."  *See* Restatement (Second) of Torts § 402A (1965), comment d.  When considering a products liability claim, courts distinguish between products and services—service providers, as opposed to product manufacturers, are not subject to products liability.  *See Jackson* v. *Airbnb, Inc.*, 639 F. Supp. 3d 994, 1010-11 (C.D. Cal. 2022) ("A products liability claimant . . . . must show that the object or instrumentality claimed to be defective was in fact a 'product' . . . .

---

[18] *See Product*, Black's Law Dictionary (12th ed. 2024).

Services, even when provided commercially, are not products."); *see also* Restatement (Third) of Torts: Prods. Liab. § 19 (1998) ("Services, even when provided commercially, are not products.").

Here, Plaintiffs' attempt to distort the Binance platform—an exchange providing routine transaction services—into a "product" is unavailing. Plaintiffs point out that (1) the Binance website uses the term "product" (*see* AC ¶ 229); (2) the Binance application can be downloaded to a mobile device (*see id.* ¶ 232); and (3) data from the Binance platform "take[s] up physical space on servers" (*see id.* ¶ 236). But these allegations exalt form over substance. Services performed at any local bank are not transformed into a product simply because they are made available through the internet, nor called a banking product.

In fact, several courts have found that digital banking applications—which, just like the Binance platform, provide online transaction services—are not subject to products liability claims. *See, e.g.*, *Holland* v. *TD Ameritrade, Inc.*, 2012 WL 592042, at *6 (E.D. Cal. Feb. 22, 2012) (dismissing products liability claim against digital trading platform because "[t]he 'product' at issue in this case is an intangible 'good' and service" and "[s]trict products liability . . . applies only to products not services"); *Legal Tender Servs. PLLC* v. *Bank of Am. Fork*, 506 P.3d 1211, 1220 (Utah App. Ct. 2022) (affirming dismissal of products liability claim because bank defendant's "payment portal is much more of a service than it is a product"). This is consistent with a number of decisions dismissing products liability claims related to digital applications on the grounds that they offer services, not products. *See, e.g.*, *Jackson*, 639 F. Supp. 3d at 1010-11 (dismissing products liability claim against Airbnb because it "is more akin to a service than to a product"); *Ziencik* v. *Snap, Inc.*, 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023) ("[T]he Court is not persuaded that the Snapchat app constitutes a 'product.' . . . Indeed, Snapchat is more like a service than a product, and services are not subject to the laws of strict products liability.");

*Jacobs* v. *Meta Platforms, Inc.*, 2023 WL 2655586, at \*4 (Cal.Super. Mar. 10, 2023) ("Facebook is more akin to a service than a product.").

But even assuming *arguendo* this Court were to accept that the Binance platform in some way resembles a product—which it does not—it would not bring Plaintiffs any closer to stating a products liability claim. That is because even where a product is at issue, if the alleged defect relates to a *service-related* component of that product, the products liability claim is foreclosed. *See, e.g.*, *Bogard* v. *TikTok Inc.*, 2025 WL 604972, at \*7 (N.D. Cal. Feb. 24, 2025) (finding that TikTok's "content moderation processes and reporting practices . . . are not products" because "this is an objection to Defendants' decisions . . . to remove or not remove certain videos; it is not an objection to the functionality of the reporting tool itself"). Here, the defects alleged in the Amended Complaint are service-related—namely, BHL's AML/KYC efforts—not the Binance platform itself. (*See* AC ¶ 119 (conceding that BHL "offers both a product . . . and services")). Plaintiffs claim that BHL's compliance staff: (1) failed to adequately trace transaction activity (*see, e.g.*, *id.* ¶¶ 270a, b); (2) failed to collect adequate background information on the platform's customers (*see, e.g.*, *id.* ¶¶ 270a, c); and (3) failed to prevent the Binance platform from being accessed in sanctioned jurisdictions (*see, e.g.*, *id.* ¶¶ 270d, 271-72). Plaintiffs try to frame these services as components of a product by using buzzwords such as "coding," "automating," and "implementing" to describe how the alleged defects could be remedied. (*See, e.g.*, *id.* ¶¶ 282a-d, 493a-e, 495). But these allegations fail. As evidenced by the remedial measures BHL undertook in response to the deficiencies identified in the settlement agreement with U.S. regulators, these so-called defects were, in fact, remedied by improving the services provided by BHL's compliance personnel through staffing and training. (*See, e.g.*, *id.* ¶¶ 283a ("ensuring all levels of management understood the importance of compliance programs"), 283b ("replacing ineffective compliance

staff with experienced employees and staffing the department with enough people to monitor the number of users the platform had"), 283f ("[p]roviding adequate training to employees on AML and CFT")). Because the Amended Complaint does not plausibly allege that the Binance platform is a product, Plaintiffs' products liability claims must be dismissed.

### B. The Binance Platform Did Not Proximately Cause Plaintiffs' Alleged Injuries.

Plaintiffs' products liability claims must be dismissed for failure to plead proximate causation. *See Payne* v. *Soft Sheen Prods., Inc.*, 486 A.2d 712, 725 (D.C. 1985) ("In a defective design or defective manufacture case" plaintiff must "show that but for the defect, the injury would not have occurred."). Even accepting Plaintiffs' contention that the Binance platform is a product—which again, it is not—a manufacturer is not liable for failing "to prevent criminal misuse of its products[.]" *McCarthy* v. *Sturm, Ruger & Co.*, 916 F. Supp. 366, 369 (S.D.N.Y. 1996) ("Such liability exposure [for manufacturers] would be limitless and thus to impose a duty here would be inappropriate."), *aff'd sub nom. McCarthy* v. *Olin Corp.*, 119 F.3d 148 (2d Cir. 1997); *see also Brooks* v. *iSECUREtrac Corp*., 2014 WL 12489670, at \*9 (D. Md. Mar. 26, 2014) (rejecting plaintiff's theory of proximate cause whereby manufacturer of defective ankle monitor would be liable to "anybody who would be injured as a result of [third-party criminal's] violence while he is out there, roaming the streets[,]" and noting that liability "is not limitless"). As discussed *supra* IV.A.2, the Amended Complaint fails to plausibly allege any connection between the Binance platform and the October 7 Attacks, or more importantly, Plaintiffs' alleged injuries. Plaintiffs' failure to plead proximate causation requires dismissal of their products liability claims.

### C. Plaintiffs Have Failed to Plead a "Manufacturing" Cause of Action.

"A product that is typically safe contains a manufacturing defect when [it] departs from its intended design. To establish a claim under this theory, a plaintiff must show that a specific product unit was defective as a result of some mishap in the manufacturing process itself, improper

workmanship, or because defective materials were used in construction." *Pinkett* v. *Dr. Leonard's Healthcare Corp.*, 2020 WL 1536305, at *4 (D.D.C. Mar. 31, 2020). Here, Plaintiffs' manufacturing defect claim (Count 7) and negligent manufacturing claim (Count 10) fail for the independent reason that the Amended Complaint is devoid of any allegations as to how the allegedly defective product (*i.e.*, the Binance platform) was manufactured or in what way its "manufacture" was "defective." *See id.* at *5 (dismissing manufacturing products liability claim because all allegations related to product's design); *Aston* v. *Johnson & Johnson*, 248 F. Supp. 3d 43, 53 (D.D.C. 2017) (same). These claims are facially deficient, and must be dismissed.

## VI.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT ENTRUSTMENT (COUNT 14).

To state a claim for negligent entrustment, a plaintiff must allege: "(1) The making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) [whom] the supplier should expect to be endangered by its use." *Buie* v. *D.C.*, 2023 WL 6142139, at *12 (D.D.C. Sept. 20, 2023).

Plaintiffs contend that the Binance platform is chattel. (*See* AC ¶ 606). But, as discussed *supra* V.A, the Binance platform is a digital service, and therefore is not chattel. *See Doe* v. *GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003) ("Plaintiffs want us to treat [the internet provider's] servers, routers, and optical-fiber lines as chattels negligently 'entrusted' to [wrongdoers] and used to injure others. But [the internet provider] did not entrust its computers, network, or any other hardware to [wrongdoers]; it furnished a service, not a chattel."); *D'Ambrosio* v. *Rajala*, 2025 WL 1383286, at *14 (N.D. Ill. May 13, 2025) (dismissing negligent entrustment claim because "Meta did not entrust chattels to its users, it provided a service, in this case a social media network").

The negligent entrustment claim fails for two additional reasons. First, as discussed *supra* IV.A.1, BHL did not owe a duty to protect Plaintiffs from the criminal acts of FTOs. *See, e.g.*,

*GTE Corp.*, 347 F.3d at 661 ("[N]egligent entrustment of a chattel is not a plausible description of a requirement that service providers investigate their customers' activities and protect strangers from harm."). Second, as discussed *supra* IV.A.2, BHL did not proximately cause Plaintiffs' alleged injuries. *See Bankers Standard Ins.*, 2020 WL 4698363, at *5 n.9 (D.D.C. Aug. 13, 2020) ("The negligent entrustment doctrine cannot be used to evade the direct and proximate cause requirement."). For these reasons, Plaintiffs' negligent entrustment claim must be dismissed.

## VII.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PUBLIC NUISANCE (COUNT 15).

"A public nuisance is an unreasonable interference with a right common to the general public." *B & W Mgmt., Inc.* v. *Tasea Inv. Co.*, 451 A.2d 879, 881 (D.C. 1982). In assessing a claim for public nuisance, a court is to consider the "traditional moorings" of tort liability such as "duty, proximate causation, foreseeability, and remoteness." *Beretta*, 872 A.2d at 646, 650 ("[W]e decline to relax the common-law limitations of duty, foreseeability, and direct causation so as to recognize the broad claim of public nuisance[.]").

As a preliminary matter, providing routine transaction services (*see* AC ¶ 621) is not a "nuisance," and does not fit within meaning of this cause of action. *See, e.g.*, *Tucci* v. *D.C.*, 956 A.2d 684, 696 n.11 (D.C.2008) ("Some examples of public nuisances include storing explosives in the middle of a city or maintaining a pond in which malarial mosquitoes are breeding."). In *Beretta*, the D.C. Court of Appeals rejected a similarly-expansive theory of nuisance, concluding that there was no "right of action for public nuisance applied to the manufacture and sale of guns generally[,]" and cautioning that allowing such a nuisance claim to proceed would invite "a proliferation of lawsuits" against "other types of commercial enterprises—manufacturers, say, of liquor, anti-depressants, SUVs, or violent video games—in order to address a myriad of societal problems . . . regardless of the distance between the causes of the problems and their alleged

consequences." 872 A.2d at 651; *Kent Grp. Partners, LLC* v. *Citizens Bank, NA*, 688 F. Supp. 3d 608, 615 (N.D. Ohio 2023) (dismissing nuisance claim premised on bank's AML/KYC failures because "neither the Bank Secrecy Act nor the Patriot Act create a legal duty flowing to those victimized by fraudulent account holders" and "banks have no generalized duty to seek out thieves and terrorists; banks are not, by way of statute, guarantors of the integrity of the deals of their customers"), *aff'd sub nom. Kent Grp. Partners, LLC* v. *Citizens Bank, NA*, 2024 WL 945239 (6th Cir. Mar. 5, 2024).

Moreover, as discussed *supra* IV.A, the Amended Complaint fails to establish that BHL owed a duty to Plaintiffs or that BHL's conduct proximately caused Plaintiffs' alleged injuries. Therefore, Plaintiffs' nuisance claim fails on those bases well.

**CONCLUSION**

For these reasons, the Court should grant BHL's motion to dismiss the Amended Complaint.

Dated: August 29, 2025        Respectfully submitted,

          *Angela F. Collins*
          **CAHILL GORDON & REINDEL LLP**
          Angela F. Collins (DC Bar No. 473891)
          900 16th Street N.W., Suite 500
          Washington, D.C. 20006
          (202) 862-8930
          acollins@cahill.com

          Samson A. Enzer (*pro hac vice*)
          Anirudh Bansal (*pro hac vice*)
          Sesi Garimella (*pro hac vice*)
          32 Old Slip
          New York, NY 10005
          (212) 701-3125
          SEnzer@cahill.com
          ABansal@cahill.com
          SGarimella@cahill.com

*Attorneys for Binance Holdings Limited*
*d/b/a Binance.com*