# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIAT ATZILI, AVIVA SIEGEL, DAVID SIEGEL, GAL SIEGEL LEE SIEGEL, KEITH SIEGEL, SHAI SIEGEL, SHIR SIEGEL, LUCY SIEGEL, ELAN TIV, <br><br> *Plaintiffs*, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> HARAKAT AL-MUQAWAMA AL-ISLAMIYA A/K/A/ HAMAS, <br><br> BINANCE HOLDINGS LIMITED, D/B/A BINANCE.COM, <br><br> BAM MANAGEMENT US HOLDINGS, INC., <br><br> BAM TRADING SERVICES INC. D/B/A BINANCE.US, <br><br> AND <br><br> CHANGPENG ZHAO, <br><br> *Defendants*. | Civil Action No. <u>1:24-cv-033f65</u> <br><br><br> **ORAL ARGUMENT REQUESTED** |

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BINANCE HOLDINGS LIMITED D/B/A BINANCE.COM'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ..........................................................................................................1

BACKGROUND ...........................................................................................................2

    I.   Facts ............................................................................................................2

    II.  Legal Standard ...........................................................................................2

        1.   Personal Jurisdiction ...........................................................................2

        2.   12(b)(6) Standard ................................................................................3

ARGUMENT ..............................................................................................................3

    I.   Plaintiffs Plead Sufficient Facts to Establish Personal Jurisdiction....................3

        3.   The Court has jurisdiction under the long-arm statute.............................3

        4.   In the alternative, the Court has jurisdiction under Fed. R. Civ. P. 4(k)(2) ....6

    II.  Plaintiffs Adequately Alleged Strict Products Liability Claims ....................14

        5.   The Binance Platform is a Product ......................................................14

        6.   The Binance Platform is Not a Service .................................................18

    III.  Plaintiffs Adequately Alleged Negligent Design Defect Claims ....................19

    IV.  Plaintiffs Adequately Alleged ATA Claims .............................................20

        1.   Plaintiffs State a Viable Primary Liability Claim Under the ATA ...............20

        2.   Plaintiffs State a Viable Aiding-and-Abetting Claim Under JASTA ..........25

    V.   Plaintiffs Adequately Alleged Negligence ...............................................30

        1.   BHL and BAM had a duty to refrain from affirmative risk-creating conduct.............30

        2.   Plaintiffs were within the foreseeable class of persons to be harmed........................33

    VI.  Plaintiffs Adequately Alleged Negligent Infliction of Emotional Distress.................36

    VII.  Plaintiffs Adequately Alleged Negligent Entrustment ................................36

        1.   Plaintiffs Plausibly Allege Defendant BHL Made a Chattel Available to Hamas ........36

        2.   Plaintiffs Establish that BHL Owed a Duty to Plaintiffs Through the Regulatory Statutes BSA and IEEPA ..........................................................................37

    VIII.  Plaintiffs Adequately Alleged Public Nuisance .........................................38

    IX.  BHL Proximately Caused Plaintiffs' Injuries ...........................................39

    X.   Plaintiffs Adequately Alleged Loss of Consortium .....................................43

CONCLUSION ...........................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457 (D.C.Cir. 1991) ...................................................... 3

*Alkanani v. Aegis Defense Servs., LLC*, 286, F.R.D. 67 (D.D.C. 2012).................................... 14

*Alsoucha v. Dehan*, LCA 444/87 [1990] (Isr.) ......................................................................... 45

*Ameer v. Lyft, Inc.*, 711 S.W.3d 643 (Mo. App. 2025) (same) ................................. 15, 17, 18

*Aristotle Int.'l Inc. v. Acuant, Inc.*, 2023 WL 1469038 (D.D.C. Feb. 2, 2023)........................... 7

*Averbach v. Cairo Amman Bank*, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022)......... 22, 23, 25, 29

*B&W Management, Inc. v. Tasea Inv. Co.* 451 A.2d 879 (D.C. App. 1982)............................ 38

*Bernhardt v. Islamic Republic of Iran,* 4 F.4th 856 (D.C. App. 2022)................................... 10

*Bhatia v. Silvergate Bank,* 725 F.Supp.3d 1079 (S.D. Cal. 2024).......................................... 31

*Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172 (D.D.C. March 18, 2004) .... 24

*Boykin v. D.C.*, 484 A.2d 560 (D.C. App. 1984)................................................................. 33, 41

*Brooks v. iSECUREtrac Corp.*, 2014 WL 12489670 (D. Md. Mar. 26, 2014)...................... 16, 42

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ................................................................. 3

*Casper v. Barber & Ross Co.,* 288 F.2d 379 (D.C. Cir. 1961)................................................. 44

*Cherry-El v. Blount,* 2025 WL 2336431 (D.D.C. Aug. 13, 2025) ............................................ 44

*Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182 (D.D.C. 1984) ................................ 5

*Crane v. New York Zoological Soc.*, 894 F.2d 454 (D.C. Cir. 1989)........................................ 3

*Crowley v. North American Telecommunications Assn.*, 691 A.2d 1169 (D.C. 1997)................ 44

*D.C. v. Carlson,* 793 A.2d 1285 (D.C. 2002)....................................................... 33, 35, 39, 41

*Democracy Prs. v. Project Veritas Action Fund*, 285 F.Supp.3d 109 (D.D.C. 2018) ................ 39

*Diehl v. 3M Co.,* 2019 WL 4412976v(Minn. Ct. App. 2019) ................................................... 35

*Dist. Of Columbia v. Meta Platforms, Inc.*, 2023 WL 11921682 (D.C. Super. Sept. 9, 2024) ..... 14

*Dixon v. Midland Mortg. Co.*, 719 F. Supp. 2d 53 (D.D.C. 2010).......................................... 36

*Doe v. Lyft, Inc.*, 765 F.Supp.3d 1110 (D. Kan. 2024) (same) .......................... 15, 17, 18

*Doe 1 v. Deutsche Bank Aktiengesellschaft,* 671 F. Supp. 3d 387 (S.D.N.Y. 2023)......... 31, 32, 41

*Elkin Valley Baptist Church v. PNC Bank, N.A,* 748 F.Supp.3d 293 (W.D. Pa. 2024) ............... 31

*Erony v. Alza Corp.*, 913 F. Supp. 195 (S.D.N.Y. 1995) ........................................................ 43

*\*Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.,* 2025 WL 218830, (E.D.N.Y. Jan. 16, 2025),
r ......................................................................................................................................... 29

*Estate of Alex through Coker v. T-Mobile US, Inc.,* 313 F.Supp.3d 723 (N.D. Tex. 2018)........... 19

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017 (2021)................................... 13

*Galloway v. Martorello*, No. 3:19-CV-314, 2023 WL 5183204 (E.D. Va. Aug. 11, 2023)............. 8

*Garcia v. Character Techs., Inc.*, 2025 WL 1461721 (M.D. Fla (May 21, 2025) ........... 15, 17, 19

*Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678 (D. Md. 2011)......................... 37

*Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36 (2d Cir. 2000) .............................................. 42

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011)............................................ 45

*Helmer v. Doletskaya*, 393 F.3d 201 (D.C. Cir. 2004) .......................................................... 4

*Hill v. Medlantic Health Care Grp.*, 933 A.2d 314 (D.C. 2007)............................................. 44

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ................................................. 11, 24

*Holland v. TD Ameritrade, Inc,* 2012 WL 592042 (E.D. Cal. Feb. 22, 2012) ............................ 18

*IMark Mkty. Servs. LLC v. Geoplast S.p.A.*, 753 F.Supp.2d 141 (D.D.C. 2010) ........................ 5

*In re Fort Totten Metrorail Cases*, 895 F. Supp. 2d 48 (D.D.C. 2012)................................ 42, 43

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809 (N.D. Cal. 2023) 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024) .................................................. 14, 16

\*In re Uber Techs., Inc., Passenger Sexual Assault Litig. ,(N.D. Cal. July 8, 2025) ........... passim

*In re ZF-TRW Airbag Control Units Prods. Liability Litig.*, 601 F.Supp.3d 625 (C.D. Cal. 2022) 7

\*Kaplan v. Lebanese Bank, SAL, 999 F.3d 842 (2d. Cir. June 9, 2021)……………..….26, 27, 28, 29

*Kelly v. M. Trigg Enters., Inc.*, 605 So. 2d 1185 (Ala. 1992)................................................. 35

*Lacy v. D.C.*, 424 A.2d 317 (D.C. App. 1980) ...................................................... 33, 39

*LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985 (5th Cir. 1980) ..................................... 43

*Levi v. Brown & Williamson Tobacco Corp.*, 528 F. App'x 4 (D.C. Cir. 2013) .......................... 43

\*Licht v. Binance Holdings Ltd., 2025 WL 625303, at *31 (D. Mass. Feb. 5, 2025, *report and recommendation adopted* 2025 WL 624025 (D. Mass. Feb. 25, 2025)................................. 9, 13

*McDougal v. CRC Indus. Inc.*, 523 F. Supp. 3d 1061 (D. Minn. 2021)...................................... 41

*Murray v. Motorola, Inc.*, 982 A.2d 764 (D.C. 2009)...................................................... 44

*Sotloff v. Qatar Charity*, 674 F. Supp. 3d 1279 (S.D. Fla. 2023), *vacated on other grounds*, No. 22-CV-80726, 2023 WL 6471413 (S.D. Fla. Sept. 29, 2023) ...................................... 21

*O'Sullivan v. Deutsche Bank*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ...................... 21, 23

*Payne v. Soft Sheen Prods., Inc.*, 486 A.2d 712 (D.C. App. 1985) ........................................ 42

*Poling v. Farah*, 131 F.Supp.2d 191 (D.D.C. 2001) ........................................................... 7

*Quality Air Servs., LLC v. Milwaukee Valve Co., Inc.*, 567 F.Supp.2d 96 (D.D.C. 2008)............. 4

*Raanan v. Binance Holdings, Ltd.*, 2025 WL 605594 (SDNY Feb. 25, 2025 ) ................... passim

*Rardon v. Falcon Safety Prods., Inc.*, 2021 WL 2008923 (W.D. Mo. May 4, 2021)............. 35, 41

*Reeve v. Monex Inc.*, 2024 WL 3566133, at *4 (D.D.C. July 29, 2024)................................... 12

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ........................................... 37

*Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4 (D.D.C. 1997).............................................. 42

*Schansman v. Sberbank of Russia PJSC*, 565 F.Supp.3d 416 (S.D.N.Y. 2021)........................ 21

*Selig v. Taliban*, 774 F. Supp. 3d 129 (D.D.C. 2025)........................................................ 7

*Shaffer v. George Washington Univ.*, 27 F.4th 754 (D.C. Cir. 2022) ..................................... 8

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000)........................................ 5

*Smith &Wesson v. Mexico*, 605 U.S. 280 (2025) .......................................................... 27

*South Central Bell Telephone Co. v. Barthelemy*, 643 So.2d 1240 (La. 1994).......................... 37

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1997) ........................................... 43

*Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19 (3d. Cir. 1975)......................................... 41

*T.V. v. Grindr*, 2024 WL 4128796 (M.D. Fla. Aug. 13, 2024) ...................................... 15, 19

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)........................................................ 25, 27

*U.S. Dominion, Inc. v. Powell*, 554 F.Supp.3d 42 (D.D.C. 2021)........................................ 3

*Wagshal v. D.C.*, 216 A.2d 172 (D.C.1966) ................................................................ 35

## Statutes

18 U.S.C. § 2331 ................................................................................. 20, 21, 22, 24

18 U.S.C. § 2333(a) ........................................................................................ 20

18 U.S.C. § 2339B(a)(1) .................................................................................. 20

31 U.S.C.A § 5311 ......................................................................................... 42

50 U.S.C. § 1701(a) ....................................................................................... 42

D.C. Code § 13-423(a)(1) .................................................................................. 3

D.C. Code § 13-423(b).................................................................................... 5

## Other Authorities

Restatement (2d) of Torts § 448 ................................................................................. 40
Restatement (2d) of Torts § 882B ............................................................................... 38
Restatement (2d) of Torts §§ 302A ....................................................................... 33, 39
Restatement (3d) of Torts, § 302 ................................................................................ 32
Restatement (3d) of Torts: Phys. & Emot. Harm § 19 ........................................... 32, 39
Restatement (3d) Prod. Liab. § 19(a) ..................................................................... 15, 18

**Rules**

Fed. R. Civ. P. 8(a)(3) ................................................................................................. 8
Fed. R. Civ. P. 12(b)(2) ............................................................................................... 2
Fed. R. Civ. P. 12(b)(6) ............................................................................................... 3

## INTRODUCTION[1]

In the early hours of October 7, 2023, Plaintiffs' lives were forever changed when terrorists broke into their homes, burned their houses, took them hostage, starved and tortured them, and terrorized their families. Defendants, who recently pled guilty to crimes that resulted in an unprecedented $4 billion payment to the United States government for their unlawful behavior and failure to implement programs to prevent terrorism financing on their Platform, have the chutzpah to call them opportunists. ECF 64-1 at 11.

Binance Holdings Limited (BHL) along with BAM Management US Holdings, Inc. and BAM Trading Services, Inc. (collectively BAM) operate the Binance Platform, which is a mobile- and web-enabled application through which users can exchange cryptocurrency with individuals across the globe. AC ¶¶ 116-17. Users can access the Binance Platform through either of two access points, Binance.com, operated by BHL and ostensibly restricted to users outside the United States, and Binance.US, which is operated by BAM. *Id.* ¶¶ 150-54. Starting in 2019, Iran, the "leading state sponsor of terrorism," Hamas, a terrorist organization with the stated goal of waging "violent jihad against Israel," and Palestine Islamic Jihad ("PIJ") (*Id.* ¶¶ 4, 25) began using the Binance Platform to transfer cryptocurrency to fund terrorist activities, including specifically the October 7 attacks.

BHL knew as early as 2019 that the Binance Platform was used for illegal activities—and specifically that it was used by Hamas. *Id.* ¶¶ 191-93. But it placed its desire for growth ahead of its obligations to refrain from terrorist financing and made affirmative choices to facilitate use of the Binance Platform for illicit activities including terrorist funding. Among other things, it chose

---

[1] Plaintiffs hereby dismiss their claims against BHL for negligence per se and manufacturing defect.

1

to forgo an adequate anti-money laundering (AML), Know-Your-Customer (KYC), and compliance program; flouted the Bank Secrecy Act and Anti-Money Laundering Act regulations designed to prevent terrorist financing; and chose to exclude automated geofencing, sanctions monitoring, and identification verification functions from the design of the Binance Platform when it coded the Platform. *Id.* ¶¶ 180-83, 261, 273, 283-84, 287, 406-13, 463, 471, 493, 508.

BHL attempts to sidestep the well-pleaded allegations in the Amended Complaint by arguing that the attacks against Plaintiffs were the acts of a third party, unforeseeable to BHL—but Plaintiffs' allegations are based on BHL's own affirmative, risk-creating conduct in, *inter alia*, designing a defective product, failing to appropriately manage risk through effective staffing and compliance programs, and knowingly violating federal law. BHL further argues that regardless of its liability on the merits, the Court cannot exercise personal jurisdiction over it, but this argument ignores BHL's extensive contacts with the United States and this District specifically.

## BACKGROUND

### I.    Facts

Plaintiffs have set forth facts that apply equally to both BHL and BAM in their concurrently filed Opposition to BAM's Motion to Dismiss. Plaintiffs incorporate their Memorandum in Opposition to BAM's Motion to Dismiss by reference to avoid duplicative reading for the Court.

### II.    Legal Standard

#### 1.    Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P 12(b)(2), "the plaintiff must make a *prima facie* showing of the pertinent jurisdictional facts." *Associated Prod. LTD v. Vanderbilt Univ.*, 76 F.Supp.3d 154, 161 (D.D.C. 2014) (quotations omitted). In making its determination, "factual discrepancies appearing in the record must be resolved in favor of the

plaintiff." *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1989). Further, "the Court must 'treat the complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *U.S. Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 56 (D.D.C. 2021) (Nichols, J.) (quotations omitted).

### 2. 12(b)(6) Standard

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must "grant plaintiffs the benefit of all inferences that can be derived from the facts alleged," *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir. 1994) and accept the factual allegations as true" liberally construing the complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In reviewing a motion to dismiss, the Court's role is not to determine "the truth of what is asserted or determin[e] whether a plaintiff has any evidence to back up what is in the complaint" but rather determine "whether the claimant is entitled to offer evidence to support the claims." *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 467 (D.C.Cir. 1991). Therefore, the "complaint should not be dismissed unless plaintiff[] can prove no set of facts in support of their claim which would entitle them to relief." *Kowal*, 16 F.3d at 1276.

### ARGUMENT

### I.    Plaintiffs Plead Sufficient Facts to Establish Personal Jurisdiction[2]

### 3.    The Court has jurisdiction under the long-arm statute

The D.C. long-arm statute permits the exercise of personal jurisdiction over "a person who acts directly, or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). Under the "transacting business"

---

[2] In the alternative, if the Court finds Plaintiffs have not established personal jurisdiction, Plaintiffs respectfully request permission to conduct jurisdictional discovery. Plaintiffs incorporate by reference their Memorandum in Opposition to Defendants BAM Management US Holdings, Inc., BAM Trading Services Inc. d/b/a Binance.US's Motion to Dismiss, filed contemporaneously.

section of the long-arm statute, Plaintiffs must show (1) BHL transacted business in the District; (2) there was a nexus between the claim and BHL's contacts; (3) exercising personal jurisdiction would not offend traditional notions of fair play and substantial justice. *Material Supply Intern., Inc. v. Sunmatch Indus. Co., Ltd.*, 62 F.Supp.2d 13, 18 (D.D.C. 1999).

The transacting business prong is "coextensive with the due process clause," such that the first and third prongs are analyzed together. *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004). Even "single act" in D.C. is enough to constitute transacting business and "a defendant need not ever be physically present in the District" to satisfy this requirement. *Material Supply*, 62 F.Supp.2d at 18. The test is whether the contacts with the D.C. are "voluntary and deliberate, rather than fortuitous." *Quality Air Servs., LLC v. Milwaukee Valve Co., Inc.*, 567 F.Supp.2d 96, 100 (D.D.C. 2008) (quotations omitted). BHL's contacts with D.C. are extensive such that the exercise of jurisdiction comports with constitutional due process.

*First*, while no physical presence is required, BHL maintains a physical presence through its key employees located in the District at all relevant times. AC ¶¶ 126-27. BHL employed District residents in roles including Global Head of intelligence and Investigations, Global money Laundering Reporting Officer, Vice President of Global Intelligence and Investigations, and at least one member of its Global Advisory Board. *Id.* These are "the precise type of positions" with "decision-making capability surrounding the issues that form the basis for this Amended Complaint." *Id.* BHL joined the D.C.-based Chamber of Digital Commerce and the BlockChain Association. *See id.* ¶ 134 n.36; Goldenberg Decl., Ex. F.

*Second*, BHL undertook substantial business activities in the District that were specifically aimed at promoting and defending the company's growth. For example, BHL, along with BAM, joined the D.C.-based Chamber of Digital Commerce and the BlockChain Association. *See* AC

¶ 134 n.36; Goldenberg Decl., Ex. F. Through its membership in these trade groups, BHL sought to expand use of the Binance Platform and, consequently, its profits. *Id.*[3] BHL also relied on D.C.-based law firms, compliance consultants, and other vendors to support the company and its District-based employees, to ensure it could continue to grow unimpeded. *Id.* ¶ 129. In support of those relationships, BHL necessarily executed contracts and transferred funds to entities in D.C.

*Third,* there were Hamas-associated transactions on the Binance Platform in 2019, involving the Binance.com access point. *Id.* ¶¶ 192-93. Specifically, the United States Department of Justice District of Columbia office seized crypto assets affiliated with Hamas following transactions that occurred on the Binance Platform. *Id.*

Plaintiffs also satisfied the nexus prong. Under this prong, claims must "aris[e] from" the defendant's contacts with the forum. D.C. Code § 13-423(b). Courts in the District have "eschewed narrower nexus requirements adopted by other jurisdictions, including cause-in-fact or proximate cause standards" instead requiring only a discernible relationship. *IMark Mkgt. Servs. LLC v. Geoplast S.p.A.*, 753 F.Supp.2d 141, 157 (D.D.C. 2010). For example, in *Shoppers Food Warehouse v. Moreno*, the court found a "discernible relationship" between a newspaper advertisement for a Maryland grocery store and a slip-and-fall. 746 A.2d 320, 336 (D.C. 2000). Here, Plaintiffs' claims are directly related to BHL's contacts with D.C. Plaintiffs' claims arise out

---

[3] To the extent these organizations also have lobbying functions, BHL's membership does not run afoul of the government contacts exception to personal jurisdiction; these memberships can be used to establish personal jurisdiction even though government contacts themselves may not. *Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182, 1205 (D.D.C. 1984) ("[Defendant's] participation in certain national and local private organizations need not be so precluded in this Court's view. Were those to be excluded, as [Defendant] urges, this District could never exercise personal jurisdiction over a defendant who had availed itself of the private organizations which have sprouted to be near the seat of government and have flourished precisely because this is the center of government.").

of BHL's decisions to forgo adequate KYC, AML, and sanctions programming—decisions made by the high-level BHL employees based in D.C. In deliberately choosing to manufacture and market a Platform for transactions without exactly the systems meant to prevent and interrupt terrorist financing, it was foreseeable that terrorist financing would occur. In other words, the decisions of BHL's D.C.-based employees proximately and directly caused Plaintiffs' injuries. AC ¶¶ 127, 137. Relatedly, the BHL employees specifically tasked with preventing illicit uses of cryptocurrency, including for terrorism financing, were based in Washington, D.C., including key members of the investigations and compliance team. *Id.*; Goldenberg Decl., Ex. K. Key decisions that enabled terrorism funding to occur through the Binance Platform occurred in D.C.

This is well-beyond the "discernible relationship" requirement of the long-arm statute. BHL's additional activities directed toward the District, including relationships with compliance consultants and industry trade groups, were all directed toward assuring the growth of the Binance Platform for the purpose of expanding the customer base and attracting more customers to its under-regulated Platform—including those like the terrorist defendants.

### 4. In the alternative, the Court has jurisdiction under Fed. R. Civ. P. 4(k)(2)

"For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). These requirements are satisfied here and warrant the exercise of personal jurisdiction over BHL and CZ.

#### a. *Plaintiffs asserted federal claims against BHL, who was served and is not subject to jurisdiction in a court of general jurisdiction*

The first three elements for Rule 4(k)(2) jurisdiction are satisfied. First, Plaintiffs assert claims arising under federal law, specifically, Counts I, II, XI, XII, and XIII. AC ¶¶ 425-40, 563-

600. The Court may also exercise jurisdiction over the common law claims based on pendent jurisdiction. *Poling v. Farah*, 131 F.Supp.2d 191, 194 (D.D.C. 2001); *see also Aristotle Int.'l Inc. v. Acuant, Inc.*, 2023 WL 1469038, *5 (D.D.C. Feb. 2, 2023) (holding court had pendent jurisdiction over state tort claims based on Rule 4(k)(2) jurisdiction over federal claims).

Second, BHL objects that it was "not served," but "filing a waiver of service" also satisfies the Rule. Fed. R. Civ. P. 4(k)(2). The Parties filed a stipulation containing a waiver of service: BHL "waive[d] objections to the absence of a Summons or of service of a Summons and Complaint in this action and any defense based upon the sufficiency of service of process." ECF 19 at 2. This filing comports with the Rule. In *Raanan v. Binance Holdings, Ltd.*, the court rejected BHL's identical argument. 2025 WL 605594, at *5 n.4 (SDNY Feb. 25, 2025 ). It would be unfair to penalize the plaintiffs for the parties' efforts to streamline service in this case. If the defendants had their way, the plaintiffs would in effect be forgoing their ability to rely on Rule 4(k)(2) to establish personal jurisdiction over foreign defendants simply by virtue of entering into this Stipulation.); *see also In re ZF-TRW Airbag Control Units Prods. Liability Litig.*, 601 F.Supp.3d 625, 698 (C.D. Cal. 2022) ("The Stipulation simply places Defendants in the same position as if service had been effected…Therefore, it does not foreclose Plaintiffs' argument that there is personal jurisdiction over the foreign Defendants under Rule 4(k)(2).

Third, BHL has not identified another state court of general jurisdiction in which it is subject to personal jurisdiction. In this Circuit, courts apply a burden shifting framework to this element. *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C.Cir. 2005). Under this framework, "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Id.* (quotations omitted); *Selig v. Taliban*, 774 F. Supp. 3d 129, 134 (D.D.C. 2025)

(same).[4] BHL fails to identify any other state with personal jurisdiction. *See generally* ECF 64-1. While BHL claims this element is not satisfied because *Plaintiffs* plead jurisdiction under D.C.'s long-arm statute, ECF 65-1 at 11 n.1, BHL "cannot have it both ways." *Galloway v. Martorello*, No. 3:19-CV-314, 2023 WL 5183204, at *3 (E.D. Va. Aug. 11, 2023).

The D.C. Circuit specifically adopted a test putting the burden on the foreign *Defendant* to identify another state with personal jurisdiction. *Mwani*, 417 F.3d at 11. In any event, it is well established that Plaintiffs may plead in the alternative, including with respect to jurisdictional allegations. Fed. R. Civ. P. 8(a)(3). *Shaffer v. George Washington Univ.*, 27 F.4th 754, 768-69 (D.C. Cir. 2022); *see also Galloway,* 2023 WL 5183204, at *3 (rejecting BHL's exact argument). The Court should therefore find these elements are satisfied.

### b. *Exercising jurisdiction over BHL comports with due process*

Finally, the exercise of personal jurisdiction over BHL is consistent with due process. "Whether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation *as a whole* to satisfy due process." *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (emphasis added). The issue is then whether "the defendant has purposefully directed his activities at residents of the United States and whether the litigation results from injuries that arise out of or relate to those activities." *Citadel Inv. Grp. LLC v. Citadel Capital Co.*, 699 F.Supp.2d 303, 314 (D.D.C. 2010) (citations and quotations omitted).

In *Licht v. Binance Holdings Ltd.*, the court concluded it could exercise personal jurisdiction over BHL and CZ under Fed. R. Civ. P. 4(k)(2). 2025 WL 625303, at *31 (D. Mass.

---

[4] In *Raanan*, the court held that it was "premature" to make a determination as to this element where the plaintiffs pled jurisdiction under the New York long-arm statute and Fed. R. Civ. P. 4(k)(2) in the alternative; however, in the Second Circuit, the *plaintiff* is required to certify that there is no jurisdiction in any U.S. state. 2025 WL 605594, at *5, which is a different standard than applies in the D.C. Circuit. *Mwani*, 417 F.3d at 11.

Feb. 5, 2025, *report and recommendation adopted* 2025 WL 624025 (D. Mass. Feb. 25, 2025). In reaching this conclusion, the *Licht* court specifically relied on the statements in the plea agreements BHL and CZ entered, given that both Defendants had agreed those statements were "true and correct." *Id.* at *3. Accordingly, the Court concluded that BHL (and CZ) had not only "sufficient minimum contacts" with the United States, but "ample" contacts, such that the jurisdictional question was "not close." *Id.*[5] For example, as demonstrated by the plea agreements (that are also part of the record in the instant case),[6] the *Licht* court found that BHL employed at least 100 people in the U.S., used U.S.-based servers, and between August 2017 and October 2022, earned at least $1.6 billion in fees for transactions involving U.S.-based users. *Id.* As in *Licht*, the minimum contacts prong is satisfied here—and for the same reasons. AC ¶¶ 124-36, 226 n.80-81; Decl. Ex. A at ¶48, Ex. B at ¶ 48, Ex. C at 8, 12; Ex. E.[7]

So, too is the purposeful availment prong satisfied. BHL "purposefully directed" activities at United States residents. *Mwani v. bin Laden*, 417 F.3d at 12. At all relevant times, U.S.-based users accounted for a significant portion of BHL's business. AC ¶ 124. In September 2020, the same year Hamas began planning and training for the October 7 attack, *see id.* ¶ 90, BHL attributed 16% of its total registered user base to the United States, which was more than any other country according to an internal monthly report. BHL Plea Agreement, Goldenberg Decl. Ex. A, at ¶ 47.[8] BHL's own transaction data shows that between August 2017 and October 2022, U.S. users conducted trillions of dollars of transactions on the Binance Platform resulting in at least

---

[5] Plaintiffs here should similarly be permitted to cite to and base allegations on portions of these plea agreements in their Complaint.

[6] *Compare* Ex. A (plea agreement linked in AC ¶ 226 n.80, n.81) *with* Ex. E (plea agreement attached to Plaintiffs' Opposition to Motion to Dismiss in *Licht*). Exhibits A and E are identical.

[7] *Id.*

[8] *Id.*

$1,612,031,763 in profit for BHL. Goldenberg Decl., Ex. A, ¶ 48. This was not happenstance. BHL and CZ specifically targeted U.S. users and sought to track (and grow) its U.S. user base. CZ received periodic reports of the nature and location of BHL customers and the sources of BHL revenue which contained information about BHL's efforts to capture the U.S. market. AC ¶ 125. At all relevant times, and through the present, BHL derived substantial revenue from transactions in the U.S. AC ¶ 133. It is well-established that when a defendant solicited business or investment from U.S. residents, it "purposefully sought meaningful contacts, ties, or relations with the United States." *Citadel*, 699 F.Supp.2d at 315 (quotations omitted); *see also Licht*, 2025 WL 625303, at *32 (finding BHL and CZ purposefully availed themselves of the U.S. when they sought revenue from U.S. customers, amounting to $1.6. billion in fees).

BHL relies on *Bernhardt v. Islamic Republic of Iran* to assert that its admissions related to circumventing U.S. AML and sanctions laws cannot be a basis for personal jurisdiction. ECF 65-1 at 23 (citing 4 F.4th 856, 864 (D.C. App. 2022). *Bernhardt* is distinguishable. There, the Plaintiffs alleged that banks in *one* foreign country did business with banks in *another* foreign country and that terrorists also did business with the other banks. *Id.* at 862-63. By contrast, Plaintiffs allege that foreign terrorist organizations *themselves* used the Binance Platform to transfer funds to support training, materials, and execution of the October 7 attacks. AC ¶¶ 123, 190-93, 208-20, 225, 494. Here, unlike *Bernhardt*, there is no middleman banking entity. *Id.* As the *Bernhardt* court explained, plaintiffs need not "identify specific dollars spent on the terrorist attack," 47 F.4th at 866 (the burden BHL seeks to impose on Plaintiffs) but only to allege "*some relation*" between the conduct and the injuries suffered. *Id.* (emphasis added). Because Plaintiffs' claims arise out of specific decisions BHL made not to implement adequate KYC and AML procedures or to design the Platform to preclude misuse by terrorists, *and not merely the transactions*, the locations of

users making transactions with terrorist groups is not determinative. BHL employed numerous employees, including the employees who would have had the decision-making authority for the issues in this case, in the U.S. and D.C. specifically. AC ¶¶ 124-36. These are the precise, jurisdiction-specific allegations BHL ignores in its motion.

Even so, Plaintiffs *can* prove transactions between U.S. users and FTOs.[9] Because courts recognize "money is fungible" and "terrorists do not maintain firewalls" between the purposes for which funds are raised, Plaintiffs need not trace a particular transaction to a specific terroristic act or attack. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31, 130 (2010). BHL's *own data* (confirmed by public reports) demonstrates that US-based users transacted extensively with the terrorist defendants, for example by exchanging millions of dollars with Iran through the Binance Platform using both Binance.com and Binance.US. Goldenberg Decl., Ex. A at ¶ 48; Goldenberg Decl. Ex B at 8, 12; AC ¶¶ 90, 123 n.35, ¶ 74 n.5. Moreover, Plaintiffs allege that BHL knew Hamas was one of the terrorist groups using its Platform to illegally transfer funds as early as 2019 and that rather than attempting to fix the problem, BHL encouraged it. AC ¶¶ 210, 255-57, 263.

BHL also availed itself of the U.S. labor market. At all relevant times, it employed more than 100 employees in the U.S., including senior personnel. AC ¶ 126. These included the chief Business Officer, Chief Strategy Officer, Chief Technology Officer, Global Director of Brand Marketing, and the Vice President of Global Expansion Operations. *Id.* These employees are significant and took actions that directly led to Plaintiffs' injuries. For example, these employees were specifically involved in decision-making related to BHL's defective design and manufacture

---

[9] BHL claims, without support, that Plaintiffs must prove a "transaction involving a D.C.-based user funded the attacks or was connected with the attacks." ECF 64-1 at 22. That is not the standard. Jurisdiction under Rule 4(k)(2) is based on contacts with the "United States as a whole." *Citadel*, 699 F.Supp.2d at 314.

of the BHL Platform. *Id.* Additional employees, including the Global Head of Intelligence and Investigations, Global Money Laundering Reporting Officer, Vice President of Global Intelligence and Investigations, and at least one member of its Global Advisory Board resided in the U.S. and this District specifically. AC ¶ 127. These employees were responsible for decision-making surrounding BHL's Anti-Money Laundering (AML), Know Your Customer (KYC), and sanctions policies and procedures, including but not limited to how transactions with sanctioned entities could or should be identified, monitored, or investigated. *See id.*

In addition to its own employees, BHL retained consultants and participated in industry and trade groups throughout the U.S. and in this District specifically. AC ¶¶ 128-29, 134. Among other things, these individuals have consulted on compliance matters, including specifically related to the AML, KYC, and sanctions deficiencies that form the basis of Plaintiffs' Complaint. *See id.* They, further, have retained such consultants and attorneys to represent their interests in connection with investigations, litigation, and criminal inquiries involving *the very allegations that form the basis of this Complaint*, including in this District. AC ¶ 134.

Relying on *Reeve v. Monex Inc.*, BHL contends that retaining U.S.- or D.C.-based employees is insufficient to establish personal jurisdiction. ECF 64-1 at 21. This reliance is misplaced. *Reeves* is an employment discrimination case in which the discrimination was alleged to have taken place in D.C., but the factual record demonstrated this was untrue. 2024 WL 3566133, at *4 (D.D.C. July 29, 2024). More importantly, *Reeve* was decided based on the long-arm statute *not* Rule 4(k)(2). *Id.* Here, Plaintiffs allege that key decision-makers with authority over the KYC, AML, and sanctions policies and functions of the Binance.com platform made those decisions in the U.S. (and in D.C. specifically), which is sufficient under the Rule 4(k)(2) standard.

AC ¶¶ 129, 26-137. By contrast, the presence of BHL's 100 plus employees *has* been found sufficient to establish personal jurisdiction. *Licht*, 2025 WL 625303, at *32.

Finally, Plaintiffs' injuries "arise out of or relate" to BHL's U.S. activities. *Mwani v. bin Laden*, 417 F.3d at 11. It is not necessary to demonstrate "a strict causal relationship between the defendant's domestic activity and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1026 (2021) (rejecting causation-only approach). Nevertheless, the nexus between BHL's U.S. activities and Plaintiffs' injuries is clear. BHL sought to aggressively grow its Platform, including in the U.S. and this District, with the express understanding that this behavior included allowing bad actors, including Hamas specifically, to use the Platform to transfer money in ways they could not through traditional banks. AC ¶¶ 74 n.5, 124-25, 190-93, 210-20, 279. Indeed, within the time period that the October 7 attack was being planned, *Id.* ¶ 90, BHL "processed $8 billion worth of Iranian crypto transactions in a four-year period" beginning in 2018. *Id.* ¶ 74 n.5, 123, 123 n.35. Its U.S.- and D.C.-based employees, with responsibility for AML, KYC, sanctions, and compliance programs failed to implement appropriate policies and procedures to ensure the Platform would not be used for terrorism financing, instead doing all they could to work *against* such programming. *See*, *e.g.*, *id.* ¶¶ 127-29, 184, 201, 270, 273, 282-84, 287, 406, 415, 471, 496, 508, 522. Yet the very reason companies like BHL are required to have KYC, AML, sanctions, and compliance programs is to prevent terrorist funding attacks exactly like this one. BHL's U.S.-directed activities, are ths sufficiently "relate[d]" to Plaintiffs' claims. *Mwani v. bin Laden*, 417 F.3d at 11. The Court may exercise personal jurisdiction over BHL under Fed. R. Civ. P. 4(k)(2).

### c. *Alternatively, there is personal jurisdiction over BHL as BAM's alter ego*

An alter ego's contacts with a forum may be imputed to a defendant to establish personal jurisdiction. *Alkanani v. Aegis Defense Servs., LLC*, 286, F.R.D. 67, 71 (D.D.C. 2012) Plaintiffs incorporate their alter ego arguments in response to BAM's Motion to Dismiss.

## II.    Plaintiffs Adequately Alleged Strict Products Liability Claims

### 5.  The Binance Platform is a Product

> "A product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in this Restatement."

Restatement (3d) of Torts, Prod. Liab. § 19(a). To date, District of Columbia courts have not weighed in on the question of whether web-enabled platforms are products, but several courts in other jurisdictions have. In circumstances such as these, courts in the District apply Maryland law. *Conesco Indus., Ltd. v. Conforti & Eisele, Inc.*, 627 F.2d 312,315 (D.C. Cir. 1980). Fortunately, the issue *has* been resolved in a Maryland case involving the Uber application. *In re Uber Technologies, Inc., Passenger Sexual Assault Litigation, 2025 WL 1892390*, at *1, *8-9 (N.D. Cal. July 8, 2025) (Slip Op.) (applying Maryland law).[10] There, the court concluded that the Uber rideshare application *is* a product, because it was analogous to tangible personal property. *Id.* The court allowed the Maryland plaintiff's product liability claims rooted in defects in a specific gender-matching feature to proceed. *Id.*

BHL claims the Binance Platform cannot be a product because it is intangible. However, tangibility is not required for something to be a product. BHL appears to stop reading the

---

[10] *See also Dist. Of Columbia v. Meta Platforms, Inc.*, 2023 WL 11921682, at *7 (D.C. Super. Sept. 9, 2024) ("This court thus looks to persuasive case law from other jurisdictions') (citing *Social Media*, 702 F.Supp.3d 809 in Section 230 context).

Restatement (3d) Prod. Liab. § 19(a) after the first sentence, only to ignore the rest, which provides additional bases upon which something may be classified as a product. In support of its strained reading, it relies on an outdated line of cases that have more recently been rejected as "wanting" because they "offered minimal, if any rationale for such classification." *In re Soc. Media Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.Supp.3d 809, 843 (N.D. Cal. 2023) (rejecting *Jacobs, Jackson, and Ziencik*). There is no rationale for ignoring an entire part of the definition. As the Restatement provides, something can be a product if it satisfies either provision below.

A mobile or web-based app or platform can be a "product" if its use and distribution is sufficiently "analogous to tangible personal property." Restatement (3d) of Torts, Prod. Liab. § 19(a); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 841 (N.D. Cal. 2023), *motion to certify appeal denied*, No. 4:22-MD-03047-YGR, 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024). Courts do not evaluate whether a platform *as a whole* is a product but rather apply a "defect-specific approach" that analyzes whether the functionalities challenged are sufficiently "analogous to tangible personal property" to be products. *Id.* at 849; *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, 745 F.Supp.3d 869 (N.D. Cal. Aug. 15, 2024) (same); *Doe v. Lyft, Inc.*, 765 F.Supp.3d 1110, 1120 (D. Kan. 2024) (same); *Ameer v. Lyft, Inc.*, 711 S.W.3d 643, 541 (Mo. App. 2025) (same); *Garcia v. Character Techs., Inc.*, 2025 WL 1461721, at *14 (M.D. Fla (May 21, 2025) (same); *T.V. v. Grindr*, 2024 WL 4128796, at *22 (M.D. Fla. Aug. 13, 2024) (same). This approach evaluates whether the platform functionalities plaintiffs challenge, either because they are defective or absent, are "user interface/experience choices" rather than services or content. *Id.*

As an initial matter, the Binance Platform was structured to mimic the real world. Developers coded the Binance Platform so users could take "coins" out of their "wallets" and

engage in transactions (including sending money directly to other individuals who have "wallets") on an "exchange," borrowing not only the language but the relational structure of in-person transactions occurring in stock exchanges and stores throughout the world. *See e.g.*, AC ¶¶ 208, 233-34, 658, 608. Defendants deliberately had to code the Binance Platform on the backend to mimic this structure. *Id.*; AC ¶¶ 239-40. Additionally, they made specific design choices in designing, coding, and updating the Binance Platform (accessible via Binance.US or Binance.com) that affected how users, when interacting with the interface of the Binance Platform, could engage in transactions and send money to others.[11] These choices, likewise, have tangible analogues.

Plaintiffs alleged the following defects which are analogous to tangible personal property and the result of user interface/experience choices, *id.*:

- **Verification Function:** Plaintiffs alleged the Binance Platform was defective because it lacked any functionalities to collect and verify data from users during the sign-up process, which could operate in conjunction with and facilitate an effective KYC program. AC ¶ 493(a). A **Verification Function** has numerous real-world analogues, including ID cards, which must be presented to engage in any transaction posing a danger to society, including purchasing alcohol, cigarettes, or firearms. Additionally, this functionality would be analogous to scanners used to confirm that people entering a location (in this case, a platform) are who they say they are, such as a CLEAR biometric scanner at an airport or a verification scanner is analogous to a lock because it is intended to keep out those who are not meant to enter a place (or, in this case, a platform). *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 849 (N.D. Cal. 2023), *motion to certify appeal denied,* No. 4:22-MD-03047-YGR, 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024) (holding age verification feature was a product analogous to locks).
- **Sanctions List Checking Function:** Plaintiffs alleged the Binance Platform was defective because it lacked the functionality that would automatically check users' information against international sanctions lists verify that users were not prohibited individuals. AC ¶ 493(a). A **Sanctions Checking Function** would be analogous to a traditional bank ledger; indeed, this

---

[11] Relying on *McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997) and *Brooks v. iSECUREtrac Corp.*, 2014 WL 12489670 (D. Md. Mar. 26, 2014), BHL contends "criminal misuse" of a product cannot form the basis of a strict products liability claim. ECF 64-1 at 52. But the standard is not criminal versus legal use, it is foreseeable versus unforeseeable use. Moreover, for these cases to be helpful to BHL, the product would have needed to be "misused." Plaintiffs alleged, however, that the Platform was used exactly as the Binance Defendants intended: to transfer money. AC ¶¶ 233–35. Plaintiffs further alleged that the Binance Defendants were aware that the Platform was being used for terrorism financing. AC ¶¶ 190–93, 203–04, 280–81.

kind of functionality is little more than an automated version of that. Relatedly, this function would be analogous to a bouncer checking identification at a bar or club to prevent prohibited individuals (e.g., problematic patrons) from entering; indeed, many establishments use physical, handheld ID scanners to automate this process to avoid human error and ensure accuracy. *See Garcia*, 2025 WL 1461721, at *1176 (analogizing AI platform to a vendor prohibited from selling beer to persons between 18–21).

- **Location Tracking Function:** Plaintiffs alleged the Binance Platform was defective because it lacked a function to identify location by IP address and block IP addresses in sanctioned territories, such as Iran. AC ¶ 493(c). Such a **Location Tracking Function** is analogous to a GPS or an Apple Air Tag. *In re Uber*, 745 F.Supp.3d at 905 (holding location-based safety tracking analogous to GPS or Apple Air Tags).

- **Geofencing Function:** Plaintiffs alleged the Binance Platform was defective because it was not coded to include adequate geofencing measures that would detect users' locations (e.g., by IP address, phone number, or cell phone carrier) to automatically detect user location and preclude those in certain sanctioned locations from accessing the platform. AC ¶¶ 493(d), 494. That a **Geofencing Function** is analogous to tangible personal property could not be plainer. Such functionalities are based on, and intended to mimic, the most basic physical barrier (a fence) to ensure that certain areas or items are off-limits without permission. *In re Uber*, 745 F.Supp.3d at 905 (finding failure to incorporate location-tracking was analogous to tangible personal property and therefore a product); *Ameer*, 711 S.W.3d at 541, 546 (Mo. App. 2025) (holding app manufacturer's failure to employ adequate GPS coordination technology was a product defect).

- **Identity Verification Function:** Plaintiffs alleged the Binance Platform was defective because it was not coded to include an identity verification function in the sign-up flow before users could open accounts, send, or receive funds on the platform. AC ¶ 493(e).    An Identity Verification Function is analogous to an ID badge scanner at an office, a CLEAR biometric terminal at an airport, or even parental controls on a TV. *See Doe*, 756 F.Supp.3d at 1120 (holding failure of app to identify that biometric information at login was constituted a product defect which was sufficiently analogous to a tangible product); *Ameer*, 711 S.W.3d at 541, 546 (holding app manufacturer's failure to employ adequate identity verification was a product defect).

- **Suspicious Transaction Flagging Function:** Plaintiffs allege the Binance Platform was defective because it was not programmed to flag or automatically block suspicious transactions. AC ¶ 493. As a company with swaths of data concerning transactions and its users, the Binance Defendants had enough information to build features that would have detected transactions like others which they knew were suspicious or illegal. However, these features were not built into the Platform. A **Suspicious Transaction Flagging Function** is no different than tangible products designed to sense and respond to risky behaviors based on predefined criteria, including but not limited to telematics devices inserted into vehicles that use sensors to track risky driving behaviors as part of insurance companies' safe driving programs.

The Binance Platform is a product under the defect-specific approach endorsed by the federal courts that have recently evaluated this issue. *Doe*, 756 F.Supp. 1110 (collecting cases); *Ameer*, 711 S.W.3d at 546-47.

17

### 6. The Binance Platform is Not a Service

BHL claims that because the Binance Platform provides "transaction services" it is a service, not a product. ECF 64-1 at 50. BAM relies on *Holland v. TD Ameritrade, Inc.*, a 2012 magistrate opinion that predates its existence by five years and does not address the product-services distinction as applied to online platforms at all. 2012 WL 592042, *7 (E.D. Cal. Feb. 22, 2012). BHL's reliance on *Legal Tender Services, PLLC v. Bank of American Fork* is similarly misplaced. 506 P.3d 1211, 1220 (Utah App. 2022). That case applies a different definition of product because Utah borrows a definition of "product" from the Uniform Commercial Code, *id.*, but D.C. does not define product. Even if the "product" (goods) and "services" distinction in *Legal Tender* was the same as in this case, *Legal Tender* is factually distinguishable because it concerns custom software, coded for the plaintiff's use to create a payment portal with the plaintiff's branding. *Id.* at 1216. It is well established that "software that was developed specifically for the customer is a service." Restatement (3d) of Torts, Prod. Liab. § 19, cmt. d (collecting cases). This case, however, involves a mass-marketed app. AC ¶¶ 35, 230-31, 485-86, 503-04, 603, 621.

In recent years, courts have recognized that the manufacturers of online platforms are hybrid product-service providers. *In re Uber*, 745 F.Supp.3d at 905-06; *see also Garcia* 2025 WL 1461721, at *14 (rejecting argument that AI program was merely a "service" and holding that plaintiff could maintain product liability claim based on harmful interactions with AI character that "were only possible because of the alleged design defects"). That is, they provide services—in this case "the service of facilitating transactions"—but they do so through a product that users "are required to use in order to provide or receive these services." *Doe,* 756 F.Supp.3d at 1120; see also *Ameer.*, 711 S.W.3d at 544 (same); *Garcia v. Character Techs. Inc.,* 2025 WL 1461721, at 14 (M.D.

Fla. May 21, 2025) (Slip Op.) (finding absence of age verification function and reporting functions as product defects which were "related to the design choices" of the defendant); *T.V. v. Grindr, LLC,* 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024 (Slip Op.) ("T.V. alleges not merely that Grindr offers the Grindr app as a service but also that Grindr designed and distributed the Grindr app, making Grindr's role different from a mere service provider, putting Grindr in the best position to control the risk of harm… and rendering Grindr responsible for any harm caused by its design choices in the same way designers of physically defective products are responsible"); *Estate of Alex through Coker v. T-Mobile US, Inc.,* 313 F.Supp.3d 723, 732 (N.D. Tex. 2018) (concluding plaintiffs "plausibly alleged a products liability claim" based on mobile software through which emergency services were provided).[12] Here, Plaintiffs alleged that the Binance Platform was the product through which BAM and BHL offered their services. AC ¶¶ 159, 289, 624-26. Plaintiffs' products claims arise out of the product offered, specifically, the user interface and design choices BAM, CZ, and BHL made with respect to the Binance Platform.

**III.    Plaintiffs Adequately Alleged Negligent Design Defect Claims**

BHL's challenges to Plaintiffs' negligent design defect claims are identical to the arguments raised in response to Plaintiffs' strict products liability claims, specifically, that the Binance Platform is a service and that its defects did not proximately cause Plaintiffs' injuries. ECF 64-1 at 12. For the foregoing reasons, *see supra* section III, these arguments fail. Plaintiffs also incorporate their negligent design defect arguments from their Opposition to BAM's Motion to Dismiss.

---

[12] That BHL staffed up to implement some of these changes is immaterial and does not transform its tech features into services. This would be like saying that the fact that an airplane manufacturer hired more engineers to build a better engine made airplanes services rather than products. BHL's suggestion is as absurd as it sounds.

IV.    **Plaintiffs Adequately Alleged ATA Claims**

1.    **Plaintiffs State a Viable Primary Liability Claim Under the ATA**

BHL's attempt to escape liability under the ATA also fails. ECF 64-1 at 16-19. The ATA provides a civil remedy for "[a]ny national of the United States injured...by reason of an act of international terrorism." 18 U.S.C. § 2333(a). An "act of international terrorism" is defined as activities  that (1) involve "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States" that (2) "appear to be intended...to influence the policy of a government by intimidation or coercion" or "affect the conduct of a government by...kidnapping" and that (3) "occur primarily outside" the United States. 18 U.S.C. § 2331(1)(A). BHL does not dispute the third element.

*a.    BHL's Conduct Involved Acts "Dangerous to Human Life"*

BHL argues "providing ordinary transaction services" cannot qualify as "violent acts" or an "acts dangerous to human life." ECF 64-1 at. 26-27. But BHL's actions were anything but ordinary.[13] Plaintiffs allege BHL deliberately violated 18 USC §§ 2333(a) and § 2339B(a)(1) by funneling cryptocurrency to Hamas, a designated Foreign Terrorist Organization (FTO), despite repeated notice of terrorist use of its platform. AC ¶¶ 6, 180–83, 190–93, 203–04, 208–20, 257.

Courts have repeatedly held that providing financial services to FTOs is itself an "act dangerous to human life" because it foreseeably leads to violence. In *Boim v. Holy Land Found.*

_____

[13] BHL relies on a line of cases in which courts held that routine transaction services with legitimate charities, *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 162–63 (2d Cir. 2021) or in countries with legitimate businesses, *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018), did not amount to acts "dangerous to human life," where there was no evidence any transactions the defendants processed funded the at-issue attacks. BHL's reliance on *Raanan v. Binance Holdings, Limited*, 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) is additionally misplaced because the *Raanan* court misapplied these same decisions in which the defendant bank did not process the funds which were themselves used in the attacks.

*for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (Posner, J.) (en banc), the Seventh Circuit likened donating to Hamas is "like giving a loaded gun to a child," holding that financing terrorism is inherently life-endangering. 549 F.3d 685, 690 (7th Cir. 2008) (en banc). Other courts agree. *See also In re Chiquita Brands Intl., Inc.*, 284 F. Supp. 3d 1284, 1308 (S.D. Fla. 2018).

BHL relies on *Weiss*, *Kemper*, and *O'Sullivan*, but those cases involved routine financial services to legitimate entities where plaintiffs failed to allege that the funds at issue actually reached the terrorists who carried out the attacks. Here, Plaintiffs specifically allege Hamas and its affiliates used Binance accounts to transfer funds that financed the October 7th attacks. AC ¶¶ 208–20, 420–21. That "direct connection" satisfies § 2331(1)(A).

While the Second Circuit decided that many banking cases are generally more appropriately addressed through JASTA than ATA claims, D.C. courts and the Fourth Circuit have not. BHL also cites *King v. Habib Bank Ltd.,* No. 20 CIV. 4322 (LGS), 2022 WL 4537849, at *5 (S.D.N.Y. Sept. 28, 2022) which suggested that claims for banking services provided to terrorist groups are generally more properly analyzed under JASTA's aiding-and-abetting provision. Plaintiffs respectfully submit that this Court should not go out of its way to adopt *King's* restrictive view on ATA claims, which represents a novel, minority opinion that has not been adopted in this Circuit or by the Fourth Circuit. Other Courts, including the Seventh Circuit and district courts in terrorism financing cases, take the view that financially supporting a known terrorist organization, as Binance did with Hamas and Iran, is an "act dangerous to human life" under the ATA. *Boim,* 549 F.3d at 690; *see also In re Chiquita Brands Intl., Inc.*, 284 F. Supp. 3d at 1308 (relying on same); *Sotloff v. Qatar Charity,* 674 F. Supp. 3d 1279, 1317 (S.D. Fla. 2023), *vacated on other grounds*, No. 22-CV-80726, 2023 WL 6471413 (S.D. Fla. Sept. 29, 2023) (adopting *Boim*); *cf. Schansman v. Sberbank of Russia PJSC*, 565 F.Supp.3d 416 (S.D.N.Y. 2021) (holding that even if

providing "routine" financial services is "not so akin" to providing a loaded gun to a child, "rout[ing] payments and maintain[ing] accounts" does rise to the level of "acts dangerous to human life").[24] If ever there was a case for holding a company responsible for providing financial services to FTOs under the ATA, it is this one.

### b. BHL's Conduct Appeared Intended to Intimidate or Coerce

Plaintiffs also adequately allege the intent element of § 2331(1)(B). Here, too, Plaintiffs alleged that BHL knew users affiliated with Hamas were using the Binance Platform and alleged that funds transferred through the Binance Platform were used to fund the October 7 attacks—exactly the kind of "direct connection" that renders an activity "dangerous to human life." *See*, *e.g., In re Chiquita Brands*, 284 F. Supp. 3d at 1308; *see* AC ¶¶ 420-21 (citing BHL blog post about use of Binance Platform to fund October 7 attacks).

Plaintiffs plead that BHL's material assistance to Hamas was provided with, at minimum, reckless disregard of the risk that it would "intimidate or coerce the civilian populations of Israel and the United States, and/or affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping." AC ¶ 582. Congress' designation of Hamas as an FTO, and Hamas' own stated goals, confirm that its primary mission is aimed at terrorizing civilians and influencing governments. AC ¶¶ 6, 25.

BHL insists that Plaintiffs must allege that BHL processed transactions that were "explicitly identified as payments for terrorist activities", ECF 64-1 at 28, but this misstates the law. In *Averbach v. Cairo Amman Bank*, on which BHL relies, the court explained that the intent inquiry in prong 2 is a question of "what the defendant's 'intent objectively appeared to be', which 'depends on whether the consequences of the defendant's activities were reasonably foreseeable'." 2022 WL 2530797, at *18 (S.D.N.Y. Apr. 11, 2022) (quoting *Weiss,* 993 F.3d at 161). The claims

in *Averbach*, and other cases cited by BHL fail because the plaintiffs alleged no facts connecting the bank defendants' customers to any of the attacks. *Id.* at \*21 (noting there were no allegations that the sole bank customer who planned an attack used his bank account to fund it); *O'Sullivan v. Deutsche Bank*, 2019 WL 1409446, at \*6 (S.D.N.Y. Mar. 28, 2019) ("Plaintiffs' argument... only alleges direct connections between Defendants and various Iranian banks, airlines, shipping and oil companies that Plaintiffs characterize as part of the 'Iranian terrorist apparatus' despite the fact that they also provide a variety of legitimate services"); *Raanan*, 2025 WL 605594, at \*16 (misapplying foregoing authorities).

Here, Plaintiffs allege that Binance objectively intended terrorists to use its platform, ignored repeated compliance warnings, and even created ways for them to create new accounts when existing accounts were at risk for being flagged due to terrorism financing. AC ¶¶ 182-83, 210, 264, 411-12. Plaintiffs allege in great detail that Binance was expressly aware that Hamas is a FTO that targets Jews and Israelis but, once the company received notice that Hamas was using Binance's platform to launder money, the company decided not to fix it, but instead to create loopholes for bad actors, including Hamas, to continue using Binance and even made jokes about purchasing AK-47s. AC ¶¶ 191-93, 203, 208-20, 254-57, 279 454. Courts have recognized that providing support to a known terrorist group with no legitimate purpose creates, at minimum, a jury question on intent. *See In re Chiquita.*, 284 F. Supp. 3d at 1320 ("Where support is given to a known terrorist group that has only violent organizational goals—with no philanthropical, educational, or other socially useful purposes—certainly there is at least a jury question as to whether the payments were made with the requisite 'knowing or intending' *mens rea...*"). As the Seventh Circuit held, providing funds to an FTO is intentional misconduct where "one either knows that the [FTO] engages in such acts or is deliberately indifferent to whether it does or not,

meaning that one knows that there is a substantial probability that the [FTO] engages in terrorism, but one does not care." *Boim*, 549 F.3d at 693. Plaintiffs' allegations more than suffice; *see*, *e.g.*, AC ¶ 191 (joking about Hamas transactions on Binance Platform to purchase weapons).

### c. This Conduct Occurred Primarily Outside the United States

The third prong of § 2331(1) is undisputed. BHL operated its platform abroad, and the October 7th attacks occurred outside the United States. AC ¶¶ 50, 233, 486, 504.

### d. Plaintiffs Adequately Plead Proximate Cause

Finally, Plaintiffs plausibly allege proximate cause. The ATA's "by reason of" requirement incorporates proximate cause, which includes foreseeability. *Boim*, 549 F. 3d at 691-98; *Biton v. Palestinian Interim Self-Government Auth.*, 310 F. Supp. 2d 172, 183 (D.D.C. March 18, 2004). Courts have made clear that plaintiffs do not need to trace specific dollars to a particular bomb or attacker. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31, (2010) (describing fungible nature of money).

Plaintiffs allege that BHL knowingly processed and concealed millions of dollars in cryptocurrency transactions for Hamas and that funds processed through the Binance Platform were used to plan and organize the October 7th attacks, and that BHL should have known these individuals would use their funds to plan that (and other) attacks because their plan to commit those attacks was widely publicized *as was their plan to fund attacks with cryptocurrency*. AC ¶¶ 74, 114, 191-93, 203-04, 208-20, 225. BHL was aware and even posted on its own blog about the correlation between violence between Israel and Gaza and crypto funding to Hamas and PIJ. AC ¶ 420-422. Because Hamas exists to carry out violent attacks on civilians, it was foreseeable that providing a financial infrastructure for its members to launder money would enable Hamas to carry out mass casualty terrorist attacks. Indeed, as BHL concedes, there is a difference between

providing services to entities who interact with organizations that fund terrorists and "providing services directly to terrorists." ECF 64-1 at 28. The latter is *precisely* what Plaintiffs allege. AC ¶¶ 191-93, 203-04, 208-20, 225. Here, Plaintiffs demonstrated that the consequences of BHL's actions were "reasonably foreseeable" to constitute terroristic intent. *Averbach*, 2022 WL 2530797, at *18. Those allegations satisfy proximate cause under § 2333(a).

BHL's conduct satisfies all three statutory elements of "international terrorism" and proximately caused Plaintiffs' injuries. Plaintiffs therefore adequately plead primary liability under the ATA.

### 2. Plaintiffs State a Viable Aiding-and-Abetting Claim Under JASTA

To state a claim under JASTA, Plaintiffs must allege (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486-87, 143 S. Ct. 1206, 1219, 215 L. Ed. 2d 444 (2023). Whether assistance is "substantial" is assessed using the *Halberstam* six-factor test:  (1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relationship to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given. *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983) (emphasis deleted). As *Halberstam* also makes clear, an aider and abettor may be liable not only for the act itself but also "for other reasonably foreseeable acts done in connection with it." *Id.* at 487.  (internal citations omitted).

### a. Plaintiffs Alleged a Wrongful Act

BHL does not dispute that the parties assisted by Defendants Iran and Hamas committed a wrongful act. Hamas, with Iran's support, carried out the October 7th attacks, which constituted acts of international terrorism under the ATA. AC ¶¶ 77-115.

### b. BHL Was Generally Aware of its Role in Hamas' Terrorist Activities

BHL argues that Plaintiffs have not pleaded that BHL was "generally aware" of playing a role in Hamas' terrorist activities, relying on *Twitter*. That argument fails.

"General awareness" requires only that the defendant recognize it is assuming a role in an unlawful or tortious enterprise, not that it know of a particular attack or transaction. *Halberstam*, 705 F.2d at 484; *Kaplan v. Lebanese Bank, SAL,* 999 F.3d 842, 863-64 (2d. Cir. June 9, 2021). "'General' awareness is a more permissive standard than full awareness. The latter 'normally denotes full recognition of the existence or qualities of an object or circumstance,' while 'general awareness' carries 'a connotation of something less than full, or fully focused, recognition' and does not require that the defendant '*knowingly* and *intentionally* supported' the terrorist organization in perpetrating the attacks." *King v. Habib Bank Ltd.* 2022 WL 4537849, at *7 (S.D.N.Y. Sept. 28, 2022), *citing Kaplan*, 999 F.3d at 863-64.

Here, Plaintiffs allege far more than passive nonfeasance. The Amended Complaint sets forth that BHL was repeatedly warned that Hamas and other foreign terrorist organizations were using its platform, yet BHL deliberately chose not to act. AC ¶¶ 9, 27, 72, 123, 148, 187-213, 258-291. BHL affirmatively concealed transactions, failed to implement adequate AML/KYC controls, and profited from the illicit business. *Id.* ¶¶ 40, 180-83, 190-93, 261-62, 270, 410-13, 493. BHL's invitation for terrorists and their funders to use the Platform was so blatant that its employees even

joked about it in internal chats and emails. AC ¶¶ 204, 279-281. That is affirmative evidence of knowledge and deliberate indifference to terrorist financing.

### c. *BHL Knowingly and Substantially Assisted Hamas*

In arguing Plaintiffs failed to allege a nexus between Binance's assistance and the October 7th attacks, BHL mischaracterizes Plaintiffs' pleadings. Plaintiffs allege that BHL gave special treatment to Hamas and Iran by helping them circumvent sanctions, that Hamas-affiliated wallets operated openly on BHL's platform, and that the Binance Platform was specifically used to fund the October 7 attacks. AC ¶¶ 180-84, 189-93, 203-04, 218-20. This is the kind of "special treatment" the Second Circuit found sufficient in *Kaplan.* 999 F.3d at 850. (holding defendant bank aided and abetted terrorists when it gave "special treatment" to terrorists including assisting them in exploiting sanctions laws).

BHL's reliance on *Twitter, Ashley v. Deutsche Bank Aktiengesellschaft,* 144 F.4th 420, 441 (2d Cir. 2025), and *Smith & Wesson v. Mexico,* 605 U.S. 280 (2025)[14] is misplaced. As an initial matter, while BHL contends *Twitter* set out a "demanding" nexus requirement, the Supreme Court in *Twitter* cautioned against "overstat[ing]" the nexus requirement and explained that "even more remote support can still constitute aiding and abetting in the right case." 598 U.S. at 495-96.

In *Twitter,* the defendant social media platforms' relationship with ISIS was "the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent". *Id.* at 500. There, the plaintiffs failed to allege that ISIS used defendants' social media platforms in connection with the at-issue attack. *Id.* at 498. By contrast here, Plaintiffs expressly allege BHL

---

[14] *Smith & Wesson*, which is not an ATA/JASTA case by victims of terrorism but rather a Protection of Lawful Commerce in Arms Act (PLCAA) case brought by Mexico, does not change the analysis. 605 U.S. at 290. There, Mexico never alleged that "a given manufacturer aided a given firearms dealer" in any way, let alone that a given manufacturer engaged misfeasance, as opposed to simply passive nonfeasance. *Id.* at 290, 294.

affirmatively enabled terrorist transactions, allowed Hamas and Iran to circumvent sanctions, and profited from it. BHL even had special policies directing employees to find ways to retain customers who should have been kicked off due to terrorism concerns. AC ¶¶ 180-85, 195-97, 411-13. With knowledge that Hamas and Iran were using its Platform to engage in terroristic activities, BHL promoted their involvement and aided them in circumventing sanctions to fund activities, specifically the October 7 attacks. AC ¶¶ 190–93, 203–04, 208–220, 255–57.

Similarly, in *Ashley*, the bank provided only "basic commercial services" and "never … did anything positive" to support terrorists.114 F.4th at 441. The court contrasted the conduct in *Ashley* with that in *Kaplan* where the defendant bank gave terrorists "special treatment including allowing its customers to 'deposit large sums in various accounts at different [bank] branches ... without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity.'" *Id.* (quoting *Kaplan*, 999 F.3d 842, 866). Plaintiffs here allege the latter.

BHL further challenges the "nexus" of its activities and the October 7 attacks on the basis that Plaintiffs allege individuals "associated with Hamas" used the Platform. ECF 64-1 at 32-33. But Plaintiffs' allegations rest on BHL's own identification of its customers as "Hamas" or "Hamas-affiliated". AC ¶¶ 180–83, 190–93, 203–04, 208–20; Goldenberg Decl., Ex. J.  BHL's attempt to reframe its own admissions cannot undo its actions.

Courts analyzing aiding-and-abetting liability under JASTA apply the six Halberstam factors as a case-by-case framework. No factor is dispositive; what matters is whether, taken together, the considerations plausibly establish that a defendant substantially assisted the terrorist acts that harmed plaintiffs. *Kaplan*, 999 F.3d at 856; *Halberstam*, 705 F.2d 472, 483-84, 488. These factors confirm substantial assistance.

- **Nature of the Act:** *Halberstam* explains that liability is stronger where the nature of the act assisted is particularly offensive. 705 F.2d at 484 n. 13. Routing funds to terrorists

satisfies this prong. *Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.,* No. 19-CV-5394 (BMC), 2025 WL 218830, *9 (E.D.N.Y. Jan. 16, 2025), *reconsideration denied,* No. 19-CV-5394 (BMC), 2025 WL 622546 (E.D.N.Y. Feb. 26, 2025). This is particularly true where, as here, the defendant took *affirmative steps* to facilitate transactions with terrorists. *Kaplan*, 999 F.3d at 860. Plaintiffs allege BHL facilitated Hamas and Iran's financing by helping them evade sanctions, maintaining Hamas-affiliated wallets, and processing transactions used to fund the October 7th attacks. AC ¶¶ 180-84, 189-93, 203-04.

- **Amount of Assistance:** *Halberstam* instructs courts to consider the quantity and type of aid, including whether repeated or systemic acts add up to substantial support. 705 F.2d at 488; *see also Averbach,* 2022 WL 2530797, at *58-59 (support substantial where bank moved millions for Hamas-affiliated entities over time). Plaintiffs allege BHL processed millions of dollars in cryptocurrency transactions linked to Hamas and Iran, including through Hamas-affiliated wallets, and affirmatively created avenues for terrorists to evade detection.  AC ¶¶ 123, 187-219, 255-91.

- **Presence:** *Halberstam* emphasized that absence from the physical scene does not preclude liability. 705 F.2d at 484. Courts applying JASTA have agreed that substantial assistance can be found even without direct interaction with terrorists. *Ashley*, 144 F.4th at 441. Plaintiffs allege that while BHL was not at the scene of the October 7th attacks, it deliberately enabled Hamas's financial infrastructure which made the attacks possible.

- **Relation to Tortious Actor:** A defendant's relationship to the tortfeasor should be considered but is not determinative. *Halberstam*, 705 F.2d at 484. Later cases confirm that preferential treatment of FTO-linked customers demonstrate a culpable connection. *Kaplan,* 999 F.3d at 866 (bank gave Hezbollah-linked customers "special treatment"); *Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S., No. 19-CV-5394 (BMC),* 2025 WL 218830, *9 (sustained support reflects awareness of relationship). BHL cultivated a non-arm's length relationship with Hamas by affirmatively shielding Hamas-linked accounts, ignoring regulatory warnings, and profiting from their activities. AC ¶¶ 204, 279-81.

- **State of Mind:** *Halberstam* emphasized that knowing assistance reflects a deliberate long-term intent to participate in an illicit enterprise. 705 F.2d at 488. Willful blindness suffices; Defendants need not intend the specific attacks so long as they knowingly facilitated transactions for terrorist customers. *Estate of Henkin*, 2025 WL 218830, at *9. This Plaintiffs allege BHL acted with willful blindness, if not actual knowledge, demonstrated by ignoring repeated government findings and internal red flags while openly joking about Hamas buying weapons with laundered money on its Platform. AC ¶¶ 204, 279-81.

- **Duration:** *Halberstam* recognized that the length of involvement magnifies culpability, as it supports an ongoing relationship and reveals defendant's state of mind. *Halberstam*, 705 F.2d at 484. Courts have held that years of continued assistance, as was the case here, weigh heavily in favor of liability. *Id.* at 484; *Ashley,* 144 F.4th at 441. *See also* AC ¶¶ 180-83, 190-93, 255-57, 420-21 (describing assistance from at least 2019–October 7, 2023).

Taken together, these allegations establish knowing and substantial assistance. Plaintiffs plausibly allege that BHL was generally aware of its role in terrorist financing and knowingly provided substantial assistance to Hamas. Under *Halberstam* and JASTA, those allegations are more than sufficient to state a claim for aiding and abetting.

## V.     Plaintiffs Adequately Alleged Negligence

To avoid responsibility for the choices it made, BHL mischaracterizes the duty at issue as "a duty of care to the public at large, including Plaintiffs, by virtue of having offered generally available transaction services." ECF 64-1 at 41; *see also* ECF 63-1 at 37. In reality, Plaintiffs allege BAM and BHL's duty arises out of their *affirmative choices* and extends to *foreseeably injured persons*, like Plaintiffs. AC ¶¶ 80-81, 149, 186-206, 450-57, 459-60, 463.

### 1.     BHL and BAM had a duty to refrain from affirmative risk-creating conduct

BHL and BAM argue banks generally do not owe a duty of care to non-customers. ECF 64-1 at 41-42; ECF 63-1 at 37-38. But outside of this litigation setting, BHL and BAM have gone far out of their way *not* to be classified as banks, and in fact BHL pled guilty to failing to comply with regulations applicable to financial institutions. AC ¶¶ 460-61, 535; Goldenberg Decl., Ex. A. But in this limited instance, where Defendants potentially stand to benefit from a few factually distinguishable cases, they have allegedly magically transformed into a "bank."[15] Ex. G. BHL is

---

[15] FinCEN distinguishes between Money Services Businesses and banks. They are not the same. See https://www.fincen.gov/money-services-business-definition ("Notwithstanding the previous discussion, the term "money services business" does not include…A bank, as that term is defined in 31 CFR 1010.100(d) (formerly 31 CFR 103.11(c))".)

not even licensed to operate within the United States and yet now seeks the protections of regulations it pled guilty to not following. AC ¶¶ 460-61, 535; Goldenberg Decl., Ex. A. Binance.US fares no better in this argument. Its own website states, "Binance.US is considered a non-bank financial institution." Goldenberg Decl., Exs. F, G, H. But even assuming arguendo that BHL and BAM are "banks," their duty stems from their own risk-creating conduct—not simply the use of their "bank" by Iran or Hamas.

In *Elkin Valley Baptist Church v. PNC Bank, N.A.*, the court explained that the rule banks owe no duty to non-customers applies only in cases that "do not involve substantial affirmative risk-creating conduct." 748 F.Supp.3d 293, 349-50 (W.D. Pa. 2024). That is, even banks have a duty in cases of misfeasance. *Id.* Banks *do* owe a duty to noncustomers to avoid affirmative acts that "create or increase: risk. *Id.* at 352. Courts have applied this same principle to other cases in which the plaintiff is not a customer of the defendant. *Bhatia v. Silvergate Bank*, 725 F.Supp.3d 1079, 1110 (S.D. Cal. 2024) (holding a bank that was used by a cryptocurrency exchange owed a duty to the customers of the cryptocurrency exchange based on affirmative actions of bank, which included taking steps to promote quick onboarding of new customers and "facilitate[ing] instantaneous crypto transactions for existing customers.").

This duty applies even when the risks associated with the bank's affirmative conduct are criminal or terroristic acts committed by third parties. In *Doe 1 v. Deutsche Bank Aktiengesellschaft,* the plaintiffs sued sex-trafficker Jeffrey Epstein's banks, for negligence arguing that the banks "enabled Epstein to access the large quantities of cash that fueled his operation," structured his withdrawals to "elude suspicion," and failed to timely file SARs to alert authorities to his activities. 671 F. Supp. 3d 387, 397 (S.D.N.Y. 2023). The banks "*like everyone else* owed both Jane Does the ordinary duty of reasonable care" which "can extend to actions undertaken by

third parties." *Id.* at 414 (emphasis added). "The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party." *Id.* (quoting Restatement (3d) of Torts: Phys. & Emot. Harm § 19)); *see also* Restatement (3d) of Torts, § 302 cmt. a ("anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm arising out of the act."). Because the plaintiffs alleged the banks "set in motion" the sex-trafficking venture "by providing the cash that fueled it" they plausibly asserted that the banks owed them a duty. *Doe 1*, 671 F.Supp.3d at 414.[16] Here, as in *Doe 1*, BHL's affirmative conduct, including its deliberate choice to not to implement programs and features designed to prevent terrorism funding from occurring on its Platform, AC ¶¶ 273, 283, 293, to allow and even encourage terrorists to access to its Platform, *id.* at 180–83, 203–04, 208–20, and its deliberate choice not to remove known bad actors from its Platform and to permit the use of its Platform by users affiliated with Iran and Hamas, *id.* at ¶¶ 190–93, 255–57, "set in motion" the October 7 attacks "by providing the cash that fueled" them. 671 F. Supp. 3d 387 at 415; AC ¶¶ 31, 180-83, 233, 279, 415, 449, 456, 568-70, 611-15.[17] BHL and BAM controlled access to the Binance Platform—and therefore to funds exchanged. *Id.* BHL and BAM had actual knowledge that Iran and Hamas affiliated individuals

---

[16] *See also Doe v. Uber*, 2020 WL 2097599, at *3 (N.D.Cal. May 1, 2020) (holding Uber owed a duty of care to person injured by criminal impersonating Uber driver, who was not affiliated with the company, based on Uber's affirmative actions); *cf. Ranaan v. Binance Holdings Ltd.*, 2025 WL 605594, at *20–21 (S.D.N.Y. Feb. 25, 2025) (Slip Copy) (finding BHL's misfeasance gave rise to duty of care in anti-terrorism context in October 7 case).

[17] BAM asserts that it did not engage in such conduct because it was established to be "regulatory compliant" with U.S. law. ECF 63-1 at 25. It disregards Plaintiffs' allegations that the *reason* BAM was established was to appear as a regulatorily compliant U.S. entity to serve as a shield from regulatory inquiries into BHL. AC ¶¶ 152–154. In this way, BAM actively worked to divert regulatory attention from the unlawful transfers occurring through the Binance Platform by users accessing it through Binance.Com. AC ¶¶ 174–75. Still millions of dollars in transactions were recorded involving Iran—the main funder of the October 7 attacks. AC ¶¶ 74 n.5.

were using the Binance Platform and even *allowed Hamas and Iran affiliated users to take funds when that connection was expressly acknowledged by BHL*. AC ¶¶ 74 n.5, 190-93, 203-04, 208-20, 279. BHL also conveniently glosses over another crucial distinction between a crypto exchange and a bank: all transactions that occur are documented on the blockchain, giving crypto exchanges greater ability and access to information about who is using the platform and where the money is going. In other words, BHL and BAM controlled the terrorist defendants' relationship to funding and, through their own affirmative acts, promoted use of the Binance Platform in such a way as to increase risk of harm. *Doe*, 2020 WL 2097599, at *3.

### 2. Plaintiffs were within the foreseeable class of persons to be harmed

It is well established that any entity can and does owe a duty of care to a third party like Plaintiffs when the harm is foreseeable. For decades, D.C. courts have held that "[A] defendant will be responsible for the damages which result, despite the intervention of another's act in the chain of causation, '[i]f the danger of an intervening negligent or criminal act should have been reasonably anticipated and protected against.'" *D.C. v. Carlson,* 793 A.2d 1285, 1290 (D.C. 2002) *citing Lacy v. D.C.*, 424 A.2d 317, 323 (D.C. App. 1980) and Restatement (2d) of Torts §§ 302A, 302B (1965). There are no "definite rules" as to when such a duty will apply, but D.C. courts "'balanc[e] the magnitude of the risk against the utility of the actor's conduct'" by considering "'the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take.'" *Boykin v. D.C.*, 484 A.2d 560, 565 n.4 (D.C. App. 1984) (quoting Restatement (2d) of Torts § 302b, cmt.f).  Here, that BHL owed a

duty to Plaintiffs is clear: the gravity of the harm (a violent terrorist attack) was as severe as it gets. The character, conduct, and tendencies of Hamas and its affiliates and funders were also clear and well-known to Binance: Hamas publicly, consistently, and repeatedly stated that its goal was to wipe out every member of the class to which Plaintiffs belong (Jews and Israelis). AC ¶¶ 25, 80-81, 255-57, 453-55, 490, 494. Given the gravity of such harm, its past actions, and Plaintiffs' position squarely within that target, it cannot be doubted that the harm to Plaintiffs was foreseeable.

BHL next erroneously argues that Plaintiffs seek to impose a duty of care relating to "*any* terrorist attack in Israel," as if BHL could not foresee exactly this. ECF 64-1 at 42. But, while it would in fact be perfectly justifiable under these circumstances for Plaintiffs to impose liability on Binance for any terror attack in Israel in light of everything BHL knew and did, Plaintiffs' allegations are more targeted: Plaintiffs identified the primary, specific groups that BHL knew were likely to commit these attacks (Iran, Hamas, and Palestinian Islamic Jihad); Plaintiffs identified the type of harm they were likely to inflict (terrorist attacks), and Plaintiffs identified the specific period during which these groups used the Binance Platform to transfer the funds needed for this specific attack. AC ¶¶ 4, 26, 64, 436, 453-55, 463, 490, 494. Plaintiffs further identified the specific area in Israel most likely to be impacted, and indeed, Binance identified the same area. *Id.* ¶¶ 80-81. As BHL itself wrote, "wallets associated with the Palestinian Islamic Jihad (PIJ) seem to coincide with periods of heightened conflict between Israel and militants in the West Bank and Gaza." *Id.* ¶¶ 420-21. Plaintiffs all resided immediately next to the Gaza border, just as Binance predicted Hamas' victims would. Goldenberg Decl., Ex. J.

BHL's claim that Israelis are too broad a group is inconsistent with jurisprudence from this District, as well as others around the country. Courts in D.C., as well as others across the country have found that defendants owed duties of care to third parties for the criminal acts of others in

circumstances where large but specific populations were the potential victims. *See, e.g., Carlson,* 793 A.2d at 1291 (duty of care owed to any potential victim passing through an intersection with a broken traffic signal); *Wagshal v. D.C.,* 216 A.2d 172, 175 (D.C.1966) (similar); *Rardon v. Falcon Safety Prods., Inc.,* 2021 WL 2008923, at *3-5 (W.D. Mo. May 4, 2021) (duty of care owed to victim of car crash after product user got high off of defendant's dust remover product); *Diehl v. 3M Co.,* 2019 WL 4412976, at *3-4 (Minn. Ct. App. 2019) (similar); *Kelly v. M. Trigg Enters., Inc.,* 605 So. 2d 1185, 1190-91 (Ala. 1992) (duty of care owed to car crash victim where driver had gotten high off of manufacturer's air freshener, where it was foreseeable to the manufacturer that product users would inhale the product to get high). While D.C. courts and courts around the country have imposed duties on manufacturers to protect third parties from dangers that could impact any motorist or passenger on the road in a densely populated area, it would be no more burdensome on Binance to impose a duty to protect residents along a tiny area along the Gaza border. AC ¶¶ 80-81, 213, 270, 283, 293, 414, 420-21, 549, 558, 602, 609–11. Notably, regardless of the size of the targeted group, these actions would have had a protective effect by stemming the flow of cash to Hamas to fund the attacks. *Id.*

These courts recognized a duty of care owed to any member of the public near the actor who committed the criminal act; so too is it reasonable to find BHL owed a duty of care to those within a very distinct geographical area (Israel and specifically the portion along the Gaza border), which Hamas, in its publicly available and well-known charter, targets for complete destruction. Goldenberg Decl., Ex. J; AC ¶¶ 25, 80-81, 490, 494. BHL itself recognized there was increasing violence in this discrete subregion of Israel. Goldenberg Decl., Ex. J. On even a more granular level, it is even more foreseeable that Hamas would target the people and homes that resided immediately next to the easily accessible Gaza border, which is exactly who Plaintiffs are. AC

35

¶¶ 83, 90. Indeed, even BHL's own blog acknowledged that "wallets associated with the Palestinian Islamic Jihad (PIJ) seem to coincide with periods of heightened conflict between Israel and militants in the West Bank and Gaza." AC ¶ 420-21. The same article discusses in detail Hamas' use of crypto to fund its terrorist activities, stating that the activity dated back to 2019. *Id.* But there is more. The Wall Street Journal also published an article in 2021, well before the October 7 attacks, discussing a direct link between cryptocurrency fundraising by Hamas and terrorist activity in Israel. This information was widely available and was subsequently republished in other media sources, such that BHL either knew or should have known that this was occurring on its platform. AC ¶ 422. Indeed, BHL's own data confirms it was entirely predictable. AC ¶¶ 74 n.5, 190-93, 203-04, 208-10, 279.

## VI.    Plaintiffs Adequately Alleged Negligent Infliction of Emotional Distress

BHL's sole challenge to Plaintiffs' NIED claim is that Plaintiffs cannot establish an underlying negligence claim. ECF 64-1 at 45-46. For the foregoing reasons, *supra* § VII, this argument fails.

## VII.    Plaintiffs Adequately Alleged Negligent Entrustment

### 1.    Plaintiffs Plausibly Allege Defendant BHL Made a Chattel Available to Hamas

Chattel is "movable or transferrable property; personal property … or a physical object." *Dixon v. Midland Mortg. Co.*, 719 F. Supp. 2d 53, 56 (D.D.C. 2010) (emphasis added). Plaintiffs allege both that the Binance Platform consists of movable, transferrable property, and that it consists of physical objects without which the Binance Platform could not exist or operate, including BHL's physical servers and the computer program itself. AC ¶¶ 605-07. Either is sufficient to render the Binance Platform chattel. As Plaintiffs allege, the Binance Platform is a computer program or software that can be downloaded as a mobile application that is tangible and takes up physical space on their mobile device or computer. AC ¶¶ 231-32, 486, 504, 606-07. The data from which this program is composed necessarily takes up physical space on the device and,

36

further, affects other physical elements around it. *Id.* In *South Central Bell Telephone Co. v. Barthelemy*, the court explained the physical nature of software and computer programs:

> [S]oftware ... is physically manifested in machine readable form by arranging electrons, by use of an electric current, to create either a magnetized or unmagnetized space... The computer reads the pattern of magnetized and unmagnetized spaces... This machine readable language or code is the physical manifestation of the information in binary form.

643 So.2d 1240, 1246 (La. 1994). Thus, when BHL made the Binance Platform available to the public, users (including Hamas- and Iran-affiliated users) were able to download the Binance.com or Binance.US mobile applications onto their phones, which took up physical space and therefore were transferrable, movable property. *See id.* While D.C. courts do not appear to have yet analyzed whether software or computer programs are chattels, courts in Maryland and elsewhere have recognized computer systems are a chattel. *Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678, 697 (D. Md. 2011) (applying Maryland law) (finding "websites and domain names and computer networks" are chattels for purposes of a related trespass to chattels claim); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (same). As a product housed in computer software and programming, the Binance Platform is subject to negligent entrustment because it is tangible as a package of computer software that is downloaded and stored physically on users' devices. *Id.* Thus, Plaintiffs have plausibly alleged that the Binance Platform is deemed a chattel for purposes of negligent entrustment and BHL's Motion should be denied.

## 2. Plaintiffs Establish that BHL Owed a Duty to Plaintiffs Through the Regulatory Statutes BSA and IEEPA

The BSA and IEEPA impose a duty on BHL. In *Raanan*, the court found that the "defendants ... had an independent duty to act that was not present in *Twitter*." *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594, at *21 (S.D.N.Y. Feb. 25, 2025). This duty to act imposed on the Binance Defendants resulted from "United States laws and regulations requir[ing] Binance to

implement robust anti-money laundering programs, perform due diligence on its customers, and file SARs with regulators flagging suspected illicit activity, all to prevent terrorists from accessing the United States financial system through the Binance exchange." *Id.* Plaintiffs therefore adequately alleged negligent entrustment and BHL's Motion should be denied.

**VIII.  Plaintiffs Adequately Alleged Public Nuisance**

In Washington, D.C., there is a private right of action for public nuisance claims, where the defendant's conduct is "an unreasonable interference with a right common to the general public" and the plaintiff suffers a "distinct" injury. *B&W Management, Inc. v. Tasea Inv. Co.* 451 A.2d 879, 882 (D.C. App. 1982). Implicit in this standard are traditional negligence principles. *Id.* On this basis, BHL fails to challenge any other element of Plaintiffs' public nuisance claims in favor of rehashing its same negligence arguments. ECF 64-1 at 44-45. However, as discussed *supra* § VII, these elements are satisfied. *See also* AC ¶ 618.

The Binance Defendants' sole remaining argument is that "providing routine transaction services" is not a "nuisance." ECF 64-1 at 54-55; ECF 63-1 at 52. BAM relies on out-of-circuit precedent in which banks did not protect customers from *fraud* to suggest that terrorist financing is not a public nuisance. ECF 63-1 at 52 (citing *Kent Grp. Prs., LLC v. Citizens Bank Nat'l ss'n*, 688 F.Supp.3d 608, 615 (N.D. Ohio, 2023)). However, whether something is a "nuisance" is determined on a case-by-case basis; there are not pre-defined categories of "nuisances" that an activity must satisfy under the standard. *See* Restatement (2d) of Torts § 882B. Further, as discussed, *supra* § VII, BHL and BAM did not provide "routine transaction services" but rather created and marketed a product through which users not only *could* transfer cryptocurrency to terrorists, but where company employees *knew* it was happening, did nothing to stop it, and instead joked about it, in violation of federal regulations and statutes meant to prohibit exactly that. AC

¶¶ 9, 74, 123, 190-93, 208-25, 276, 418-20, 460. The Binance Defendants' Motions should be denied in their entirety.

**IX.    BHL Proximately Caused Plaintiffs' Injuries**

BHL alleges Plaintiffs failed to plead proximate cause regarding their ATA claims (ECF 64-1 at 29-30) negligence claims, (*id.* 44-45; *see also* ECF 63-1 at 41), product liability claims (*id.* at 42; *see also* ECF 63-1 at 50), negligent entrustment (*id.* at 54), and public nuisance (*id.* at 55). In the interest of efficiency, Plaintiffs address all BHL's proximate cause arguments (which overlap substantially) together. Beyond the fact that this issue is premature at the motion to dismiss phase,[18] even at the pleading stage, Plaintiffs' Amended Complaint is filled with the exact type of allegations that survived this analysis even at later stages in the case.

"Proximate cause has two components: 'cause-in-fact' and a 'policy element' which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or 'highly extraordinary in retrospect.' *D.C. v. Carlson,* 793 A.2d 1285, 1288 (D.C. 2002) (*citing Lacy v. D.C.*, 424 A.2d 317, 320-21 (D.C.1980)). In the context of negligence and other state-law tort claims, a "defendant will be responsible for the damages which result, despite the intervention of another's act in the chain of causation, '[i]f the danger of an intervening negligent or criminal act should have been reasonably anticipated and protected against.'" *Id.* and Restatement (2d) of Torts §§ 302A, 302B (1965)). "When an intervening act is criminal, this court demands a more heightened showing of foreseeability than if it were merely negligent...The defendant will be liable

---

[18] "[I]t is well-established that under District of Columbia law that proximate cause is generally a fact question to be resolved by the jury." *Democracy Prs. v. Project Veritas Action Fund*, 285 F.Supp.3d 109, 117 (D.D.C. 2018) (quotations omitted) (denying motion to dismiss negligence claims where plaintiff alleged her damages occurred "as a result" of defendant's conduct); *Carlson*, 793 A.2d at 1291 ("[P]roximate cause, including the foreseeability component, is "nearly always" a question of fact for the jury").

only if the criminal act is so foreseeable that a duty arises to guard against it."); *Id.* (citing Restatement (2d) of Torts § 448 (1965)).

BHL argues no one could have foreseen that "providing routine transaction services" to terrorists would result in terrorists funding a terrorist attack. ECF 64-1 at 44. This defies both reason and the well-pleaded allegations in the Complaint. It was entirely foreseeable that terrorist organizations, using the Binance Platform to transfer funds, who had a history of committing terrorist attacks against Israeli and American Jews in Israel and a stated goal to do so again, would in fact do so again when given the resources. AC ¶¶ 25, 67, 74 n.5, 255-57, 264, 275, 454, 473, 509-10, 611-14. BHL and BAM had actual knowledge that Iran and Hamas affiliated individuals were using its Platform as early as 2019, *id.* ¶¶ 210, 215-20, 421, and further that BHL employees openly discussed the Platform being used for both drug money and terrorism financing. *Id.* ¶¶ 190-93, 203-04, 280-81.

BHL and BAM also knew that what they were doing was illegal and risky. *Id.* ¶¶ 149-50, 188, 223, 453-55.  When Binance found out that certain bad actors were using its platform for illicit purposes, rather than kicking them off, high-level Binance employees instructed those users on how to create new accounts that would not be detected. *Id.* ¶ 189-91, 195-96 (citing BHL's former Chief Compliance officer advising Binance employees, "Don't need to be so strict. Offboarding = bad in cz's eyes."); *Id.* ¶ 196, 280 (CCO telling compliance colleagues to handle an account with transactions sourced from questionable sources, "He can come back with a new account...But this current one has to go, it's tainted.").

BHL and BAM's provision of those resources, namely a Platform to engage in transactions without the regulatory oversight to stop the flow of funds, ensured that Iran and Hamas could successfully fund their activities, which included years of planning, training, and accumulating

weapons. *Id.* ¶¶ 81, 289. Given the magnitude of the harm, the known tendencies of the criminal actors, and the minimal burden on BHL and BAM to act (implementation of AML/KYC/sanctions protocols and features that would cut off terrorists' access to funding), under D.C. law, the attacks were foreseeable. *Boykin v. D.C.*, 484 A.2d 560, 565 n.4 (D.C. 1984).

1.  **Plaintiffs Adequately Alleged Proximate Cause as to their Terrorism and State-Law Tort Claims**

Courts have held that defendants proximately cause criminal acts when they can cut off access to the means of committing such acts, but do not do so. In *Doe 1*, the court held that the plaintiffs plausibly alleged the defendants "should have known that their banking services sustained Jeffrey Epstein's sex-trafficking venture." *Doe 1 v. Deutsche Bank Aktiengesellschaft,* 671 F. Supp. 3d 387, 415 (S.D.N.Y. 2023). Thus, it was "a natural and foreseeable consequence of a circumstance created by the defendant" as required to establish proximate cause." *Id.* (quotations omitted); *see also Carlson,* 793 A.2d at 1291 (holding the District's failure to repair a traffic light satisfied the foreseeability requirement that some member of the public who drove on the streets could cause an accident); *Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19, 24 (3d. Cir. 1975) (holding defendant manufacturer's knowledge that its product would be used illegally satisfied the foreseeability requirement of duty); *McDougal v. CRC Indus. Inc.*, 523 F. Supp. 3d 1061, 1071-72 (D. Minn. 2021) (holding defendant's affirmative conduct in manufacturing and marketing "duster" product, which it knew was used illegally by some customers to get high created a duty and rendered injuries to plaintiffs from illegal use by third parties foreseeable); *Rardon v. Falcon Safety Prods, Inc.*, 2021 WL 2008923, at *3-5 (W.D. Mo. May 4, 2021) (same).

Here, Plaintiffs allege BHL should have known the Binance Platform sustained Iran and Hamas' terrorist operations because it deliberately chose to design a Platform that circumvented KYC, AML, and sanctions protocols, such that terrorists were expressly permitted to use the

Platform for terrorism financing. AC ¶¶ 270-73, 282-86, 293, 493. Preventing terrorist attacks by cutting off terrorism funding is the whole point of the AML, KYC, and sanctions laws BHL deliberately violated. *See* 31 U.S.C.A § 5311(4)(B); 50 U.S.C. § 1701(a). BHL cannot now feign surprise that in doing exactly what those laws prohibited resulted in a well-funded terrorist attack.

### 2. Plaintiffs Adequately Alleged Proximate Cause as to Their Product Liability Claims

Manufacturers are liable for foreseeable uses of their products. *Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4, 10 (D.D.C. 1997). Under D.C. law, "product 'misuse' is defined as use of a product in a manner that could not reasonably be foreseen by the defendant." *Payne v. Soft Sheen Prods., Inc.*, 486 A.2d 712, 725 (D.C. App. 1985).[19] "[W]here harmful consequences are brought about by intervening, independent forces…whose operation could have been foreseen, the chain of causation" is then "treated as the proximate cause." *Id.* at 726. This means, manufacturers are liable for *foreseeable* criminal uses of their products, but not for *unforeseeable* criminal uses of their products. *Id.*; *see also In re Fort Totten Metrorail Cases*, 895 F. Supp. 2d 48, 70 (D.D.C. 2012) (stating original actor is liable for subsequent foreseeable negligent, intentional or criminal acts).[20] Because, as Plaintiffs allege, BHL was aware terrorists (and specifically members of

---

[19] *Brooks* is therefore unhelpful, as the court concluded it was "highly extraordinary and certainly not normal" for a person wearing an ankle monitor to commit a shooting, injuring a bystander such that "Defendant could not have anticipated" any "collateral damage to a bystander" resulting from defects to its product. *Brooks* v. *iSECUREtrac Corp.*, 2014 WL 12489670, *8 (D. Md. Mar. 26, 2014).

[20] *McCarthy* is inapposite. There, the court explained that because all bullets are deadly, the propensity of a bullet to cause a death cannot be a design defect. *McCarthy v. Olin Corp.*, 119 F.3d 148, 154–55 (2d Cir. 1997). Proximate cause was never addressed. *See generally id.* On the other hand, courts are clear that when defendants know their products are or will be used by those in illegal markets, it is foreseeable that they will be used to commit criminal acts. *Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36, 43 (2d Cir. 2000) (explaining that *McCarthy* involved allegations manufacturers owed a duty to sell firearms only to law-enforcement, despite being legal, whereas *Hamilton* involved an *illegal* firearms market). This is precisely the case here, where Plaintiffs allege BHL's duty stems from its deliberate decisions to permit *illegal* uses of the Binance Platform. *See, e.g.*, AC ¶¶ 190–93, 280–81.

Hamas and users in Iran) were using the Platform to transport funds, there is absolutely nothing unforeseeable about these uses of its Platform. AC ¶¶ 74 n.5, 190-93, 203-04, 255-57, 264, 275, 280-81; *see In re Fort Totten Metrorail Cases*, 895 F. Supp. 2d at 70; *see also LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985, 989 (5th Cir. 1980) (finding that speeding is a foreseeable, though illegal and not routine, use of a sports car for which manufactures are liable in tort); *Erony v. Alza Corp.*, 913 F. Supp. 195, 201 (S.D.N.Y. 1995) (finding that if defendants knew opiate patches were used to get high, the intentional, criminal act of decedent using the patch to get high would be a foreseeable criminal use supporting liability); *cf. In re Uber Techs. Passenger Sexual Assault Litig.*, 2025 WL 1892390, *10 (N.D. Cal. July 8, 2025) (finding plaintiffs satisfied proximate causation requirements in products liability case premised on crime of sexual assault); *see also Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1997) (holding airline owed a duty to passengers of *another airline* and proximately caused them to be injured in a terrorist attack when it permitted terrorists to board its flight and after a connecting flight to another airline, commit a terrorist attack). Because BHL and BAM purposely created a safe haven for terrorism financing on the Platform, Plaintiffs' injuries were all too predictable, and proximate cause has been sufficiently pled.

## X.    Plaintiffs Adequately Alleged Loss of Consortium

BHL's primary challenge to Plaintiffs' loss of consortium claims is that the claims they are predicated on fail. For all the reasons articulated herein, Plaintiffs' claims survive, and so too to their loss of consortium claims. *See Levi v. Brown & Williamson Tobacco Corp.*, 528 F. App'x 4, 5 (D.C. Cir. 2013) ("loss of consortium depends upon the success of the underlying claims for injury").

BHL is also incorrect that loss of consortium claims must be predicated only on negligence claims.[21] The court in *Crowley v. North American Telecommunications Association* discussed this issue evaluating whether a physical injury is required for a loss of consortium claim and determined that an emotional injury was sufficient to sustain a loss of consortium claim, relying on several cases where loss of consortium claims were rooted in non-negligence claims, including libel. 691 A.2d 1169, 1175 (D.C. 1997) ("Given the purpose underlying a loss of consortium claim, we are persuaded that the better reasoned approach is that which allows recovery where the plaintiff proves an actual loss of services or affection ***as a result of an actionable tort*** against his or her spouse even though the latter has suffered no physical injury.") (emphasis added).[22]

BHL relies on *Cherry-El* v. *Blount* to suggest Plaintiffs must allege which law applies, or their claims should be dismissed, but *Cherry-El* says nothing of the sort. The case, involving a pro se plaintiff, does not involve loss of consortium claims or choice of law issues at all. 2025 WL 2336431 (D.D.C. Aug. 13, 2025).

BHL further suggests in that D.C. law may not apply to these claims but does not raise a choice of laws argument outside of falsely stating that Plaintiffs do not allege the domicile of Keith and Aviva Siegel's marriage. *See e.g.,* AC ¶¶ 341-47 (describing Keith and Aviva Siegel's marriage

---

[21] To the extent BHL conflates loss of consortium with Plaintiffs' federal solatium claims, courts also routinely permit loss of consortium claims in terrorism cases where the primary causes of action stem from FSIA claims. *See generally Przewozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1, 16 (D.D.C. 2024) (loss of consortium claims brought by Israeli and US national parents, siblings, and children of decedent in terror attack in Israel).

[22] BHL relies on an erroneously narrow reading of *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 331 (D.C. 2007) take a broader approach and note that loss of consortium clams can instead be rooted more broadly in the "underlying claims for injury." *Murray v. Motorola, Inc.,* 982 A.2d 764, 771 (D.C. 2009), *as amended on reh'g* (Dec. 10, 2009) (discussing *Hill*). BHL further miscites *Casper v. Barber & Ross Co.*, which actually stated not that consortium claims must be rooted in negligence, but instead that the plaintiff's loss of consortium claim "must stand or fall with [the injured plaintiff]'s claim based on ***personal injuries.***" 288 F.2d 379, 381 (D.C. Cir. 1961) (emphasis added).

and home in Israel). The governing law for consortium claims may depend on several factors, but those determinations involve a fact-intensive analysis not fully raised or briefed by BAM and not suitable for resolution on a motion to dismiss.[23]

## CONCLUSION

Stripped down, BHL's motion is filled with contradictions. BHL can't have it both ways. It cannot claim to be a bank when it wants regulatory protections but flout the laws that govern them. BHL's behavior was illegal and resulted in the company and its CEO pleading guilty to several violations of US law and its CEO going to prison. This case goes well beyond misfeasance. BHL's actions were deliberate, purposeful, and done with full knowledge of the fact that Hamas, Iran, and the PIJ were using its Platform to fund their operations, and that those operations were designed to cause exactly this type of attack on this exact population in this exact location. Every part of the October 7 attack was foreseeable to BHL. BHL now must answer for its deliberate decisions to create a safe haven for terrorism financing that forever changed Plaintiffs' lives. Plaintiffs respectfully request that the Court deny BHL's Motion in its entirety or, alternatively, permit Plaintiffs to amend their Complaint and conduct discovery to cure any deficiencies the Court deems necessary.

---

[23] To the extent D.C. law does apply, *Hedgepeth v. Whitman Walker Clinic* speaks to loss of consortium in the context of the marital relationship, but nowhere in the opinion does the court bar claims by other relatives. To the extent Israeli law applies to Plaintiffs' loss of consortium claims, because Keith Siegel is a resident of Israel, *see* AC ¶¶ 341-44, Israeli law, specifically the Civil Wrongs Ordinance (now called the Tort Ordinance) plainly permits loss of consortium claims for first-degree relatives. *Alsoucha v. Dehan*, LCA 444/87, at 18 [1990] (Isr.), Goldenberg Decl. Ex. L. Again, choice of law was not fully raised or briefed by BHL and thus should not be addressed, much less used as a reason to dispose of claims, at this stage.

Dated: September 29, 2025

| | |
|---|---|
| */s/ Marlene J. Goldenberg* | */s/ Amanda Fox Perry* |
| Marlene J. Goldenberg (D.C. Bar No. 166040) | Amanda Fox Perry (D.C. Bar No. 230024) |
| **NIGH GOLDENBERG RASO & VAUGHN PLLC** | **FOX MCKENNA PLLC** |
| 14 Ridge Square | 14 Ridge Square |
| Third Floor | Third Floor |
| Washington, D.C. 20016 | Washington, D.C. 20016 |
| Phone: (202) 978-2228 | Phone: (202) 852-2000 |
| Fax: (202) 792-7927 | Fax: (202) 915-0244 |
| mgoldenberg@nighgoldenberg.com | amanda@foxmckenna.com |
| | |
| Samantha V. Hoefs *(pro hac vice)* | Elyse McKenna *(pro hac vice forthcoming)* |
| **NIGH GOLDENBERG RASO & VAUGHN PLLC** | **FOX MCKENNA PLLC** |
| 60 South 6th Street | 14 Ridge Square |
| Suite 2800 | Third Floor |
| Minneapolis, MN 55402 | Washington, D.C. 20016 |
| Phone: (612) 445-0202 | Phone: (202) 852-2000 |
| Fax: (202) 792-7927 | Fax: (202) 915-0244 |
| shoefs@nighgoldenberg.com | elyse@foxmckenna.com |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following:

<u>Served electronically via ECF:</u>
Binance Holdings Limited, D/B/A Binance.com,
Bam Management Us Holdings, Inc.
Bam Trading Services Inc. D/B/A Binance.US
Changpeng Zhao

<u>Served via Mail:</u>
Islamic Republic of Iran
Harakat Al-Muqawama Al-Islamiya A/K/A/ Hamas

Dated: September 29, 2025                                    /s/ Marlene J. Goldenberg
                                                                          Marlene J. Goldenberg