## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LIAT ATZILI, KEITH SIEGEL, ADRIENNE SIEGEL, SHAI SIEGEL, SHIRT SIEGEL, ELAN TIV, GAL SIEGEL, LUCY SIEGEL, DAVID SIEGEL, LEE SIEGEL, <br><br> Plaintiffs, <br><br> vs. <br><br> ISLAMIC REPUBLIC OF IRAN, HARAKAT AL-MUQAWAMA AL-ISLAMIYA A/K/A/ HAMAS, BINANCE HOLDINGS LIMITED, D/B/A BINANCE.COM, BAM MANAGEMENT US HOLDINGS INC., BAM TRADING SERVICES INC. D/B/A BINANCE.US, AND CHANGPENG ZHAO, <br><br> Defendants. | Case No. 1:24-cv-03365 (CJN) <br><br> **ORAL ARGUMENT REQUESTED** |

## BINANCE HOLDINGS LIMITED'S REPLY
## <u>IN FURTHER SUPPORT OF ITS MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................1

ARGUMENT............................................................................................................................2

I.   THE AMENDED COMPLAINT FAILS TO PLEAD PERSONAL JURISDICTION OVER BHL.......2

    A.   Plaintiffs Do Not Adequately Plead Any Statutory Basis for Jurisdiction...............................2

    B.   The AC Fails to Plead Sufficient Suit-Related Contacts with the Forum. ...............................3

    C.   Plaintiffs Do Not Sufficiently Allege Alter Ego as a Basis for Personal  Jurisdiction..............7

    D.   Plaintiffs Are Not Entitled to Jurisdictional Discovery..............................................7

II.   THE AMENDED COMPLAINT FAILS TO STATE AN ATA PRIMARY  LIABILITY CLAIM

(COUNTS 12 & 13)..............................................................................................................8

III.   THE AMENDED COMPLAINT FAILS TO STATE AN AIDING-AND- ABETTING CLAIM

(COUNT 11). ....................................................................................................................11

    A.   Plaintiffs Fail to Adequately Allege BHL's Knowing and Substantial Assistance................11

    B.   Plaintiffs Fail to Adequately Allege BHL's General Awareness. ........................................16

IV.   THE AMENDED COMPLAINT FAILS TO STATE A NEGLIGENCE-BASED  CLAIM

(COUNTS 4, 5, 14 & 16).....................................................................................................16

    A.   BHL Did Not Owe Plaintiffs a Duty of Care. .......................................................17

    B.   BHL Did Not Proximately Cause Plaintiffs' Alleged Injuries. ...............................20

V.   THE AMENDED COMPLAINT FAILS TO STATE A PRODUCTS LIABILITY  CLAIM

(COUNTS 6 & 9)...............................................................................................................20

    A.   The Binance Platform Is Not a Product...............................................................21

    B.   The Binance Platform Did Not Proximately Cause Plaintiffs' Alleged Injuries.....................24

VI.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PUBLIC  NUISANCE

(COUNT 15). ....................................................................................................................25

CONCLUSION........................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akhmetshin* v. *Browder*,
761 F. Supp. 3d 1 (D.D.C. 2024) ................................................................................................. 5

*Ashley* v. *Deutsche Bank Aktiengesellschaft et al.*,
144 F.4th 444 (2d Cir. 2025) ............................................................................................. *passim*

*Averbach* v. *Cairo Amman Bank*,
2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022) ........................................................................... 10

*Bernhardt* v. *Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) ..................................................................................... 4, 6, 17

*Boim* v. *Holy Land Foundation for Relief and Dev.*,
549 F.3d 685 (7th Cir. 2008) ...................................................................................................... 9

*Bristol-Myers Squibb Co.* v. *Superior Ct. of California, San Francisco Cnty.*,
582 U.S. 255 (2017) .................................................................................................................... 5

*Brooks* v. *iSECUREtrac Corp.*,
2014 WL 12489670 (D. Md. Mar. 26, 2014) ........................................................................... 25

*Burke* v. *Air Serv Int'l, Inc.*,
775 F. Supp. 2d 13 (D.D.C. 2011) ............................................................................................ 17

*Burnett* v. *Al Baraka Inv. & Dev. Corp.*,
274 F. Supp. 2d 86 (D.D.C. 2003) ..................................................................................... 19, 20

*Byrd* v. *United States*,
485 A.2d 947 (D.C. Cir. 1984) ................................................................................................... 3

*Byrne* v. *Clinton*,
410 F. Supp. 3d 109 (D.D.C. 2019) .......................................................................................... 10

*In re Chiquita Brands Int'l, Inc.*,
284 F. Supp. 3d 1284 (S.D. Fla. 2018) ...................................................................................... 9

*Cockrum* v. *Donald J. Trump for President, Inc.*,
319 F. Supp. 3d 158 (D.D.C. 2018) ....................................................................................... 3, 4

*Doe 1* v. *Deutsche Bank Aktiengesellschaft*,
671 F. Supp. 3d 387 (S.D.N.Y. 2023) ...................................................................................... 18

*D.C.* v. *Beretta, U.S.A., Corp.*,
  872 A.2d 633 (D.C. 2005) ................................................................................................. 19, 25

*D.C.* v. *Carlson*,
  793 A.2d 1285 (D.C. 2002) ..................................................................................................... 20

*Diehl* v. *3M Co.*,
  2019 WL 4412976 (Minn. Ct. App. Sept. 16, 2019) ............................................................ 20

*Doe* v. *Uber Technologies, Inc.*,
  2020 WL 13801354 (Cal. Super. Nov. 30, 2020) ...................................................... 22, 23, 24

*Erony* v. *Alza Corp.*,
  913 F. Supp. 195 (S.D.N.Y. 1995) ......................................................................................... 24

*Fraenkel et al.* v. *Standard Chartered Bank*,
  2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025) ........................................................................ 12

*In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*,
  895 F. Supp. 2d 48 (D.D.C. 2012) ......................................................................................... 24

*Hakimyar* v. *Habib Bank Ltd.*,
  2025 WL 605575 (S.D.N.Y. Feb. 25, 2025) ....................................................................... 9, 10

*He* v. *Oath Holdings, Inc.*,
  2020 WL 12115482 (D.D.C. Dec. 16, 2020) ........................................................................... 8

*Honickman* v. *BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ........................................................................................................ 9

*Hopkins* v. *Women's Div., Gen. Bd. of Glob. Ministries*,
  238 F. Supp. 2d 174 (D.D.C. 2002) .............................................................................. 2, 3, 20

*Jackson* v. *Airbnb, Inc.*,
  639 F. Supp. 3d 994 (C.D. Cal. 2022) .................................................................................... 22

*Jacobs* v. *Meta Platforms, Inc.*,
  2023 WL 2655586 (Cal. Super. Mar. 10, 2023) ............................................................... 21, 22

*Kaempe* v. *Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ................................................................................................ 10

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) .................................................................................................... 13

*Kelly* v. *M. Trigg Enters., Inc.*,
  605 So. 2d 1185 (Ala. 1992) ................................................................................................... 20

*King* v. *Habib Bank Ltd.*,
  2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ....................................................................... 14

iii

*LeBouef* v. *Goodyear Tire & Rubber Co.*,
  623 F.2d 985 (5th Cir. 1980) ..................................................................................... 24

*Licht* v. *Binance Holdings Ltd*,
  2025 WL 625303 (D. Mass. Feb. 5, 2025) .................................................................. 4, 5

*Linde* v. *Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ...................................................................................... 8, 10

*Millers Cap. Ins., Co.* v. *Hydrofarm, Inc.*,
  340 F.R.D. 198 (D.D.C. 2022) ....................................................................................... 21

*Newman* v. *Associated Press*,
  758 F. Supp. 3d 1357 (S.D. Fla. 2024)........................................................................... 16

*O'Sullivan* v. *Deutsche Bank AG*,
  2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)................................................................ 14

*Raanan* v. *Binance Holdings, Ltd.*,
  2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) .................................................................. 17

*Rardon* v. *Falcon Safety Prods., Inc.*,
  2021 WL 2008923 (W.D. Mo. May 4, 2021)................................................................. 20

*Schansman* v. *Sberbank of Russia PJSC*,
  565 F. Supp. 3d 405 (S.D.N.Y. 2021) .............................................................................. 9

*Siegel* v. *HSBC North America Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) .................................................................................... 14, 16

*Sigmund* v. *Starwood Urb. Inv.*,
  475 F. Supp. 2d 36 (D.D.C. 2007) .................................................................................. 18

*Social Media Cases*,
  2023 WL 6847378 (Cal. Super. Oct. 13, 2023) ...................................................... 22. 23

*Sotloff* v. *Qatar Charity*,
  2023 WL 6471413 (Sept. 29, 2023) .................................................................................. 9

*Trump* v. *Comm. on Ways & Means, United States House of Representatives*,
  415 F. Supp. 3d 98 (D.D.C. 2019) ................................................................................ 4, 7

*Twitter* v. *Taamneh*,
  598 U.S. 471 (2023) ...............................................................................................*passim*

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*,
  2025 WL 1892390 (N.D. Cal. July 8, 2025) .................................................................. 22

*Urquhart-Bradley* v. *Mobley*,
  964 F.3d 36 (D.C. Cir. 2020)............................................................................................ 2

iv

*Wagshal* v. *D.C.*,
    216 A.2d 172 (D.C. 1966) ...................................................................................................... 20

*Washington* v. *Washington Hosp. Ctr.*,
    579 A.2d 177 (D.C. 1990) ...................................................................................................... 16

*Weiss* v. *Nat'l Westminster Bank, PLC.*,
    993 F.3d 144 (2d Cir. 2021) ................................................................................................ 8, 9

*Webster* v. *Pacesetter, Inc.*,
    259 F. Supp. 2d 27 (D.D.C. 2003)........................................................................................ 20

*Youming Jin* v. *Ministry of State Sec.*,
    335 F. Supp. 2d 72 (D.D.C. 2004)........................................................................................... 6

*Ziencik* v. *Snap, Inc.*,
    2023 WL 2638314 (C.D. Cal. Feb. 3, 2023) ........................................................................ 22

**Statutes**

18 U.S.C. § 2331(1) ...................................................................................................................... 9

**Rules**

Federal Rule of Civil Procedure 44........................................................................................... 17

Federal Rule of Civil Procedure 4(k) ................................................................................*passim*

**Other Authorities**

Restatement (3d) of Torts, Prod. Liab. § 19(a) ......................................................................... 21

Restatement (Second) of Torts § 402A (1965) ......................................................................... 21

**PRELIMINARY STATEMENT**[1]

First and foremost, Plaintiffs' Opposition (ECF No. 83) ("Opp.") confirms that the Amended Complaint fails to plead jurisdiction over BHL, and should be dismissed on that basis alone. While Plaintiffs try to salvage their claims by seeking jurisdictional discovery, they fail to meet the requirements for it, and the fact that Plaintiffs seek responses to more than 150 separate discovery requests proves that they have no colorable theory of jurisdiction and are fishing.

Beyond the threshold failure to plead jurisdiction, each of the AC's claims suffer from equally fatal pleading deficiencies that independently require dismissal. Plaintiffs themselves seem to recognize they have over-pled their case, abandoning three of the AC's sixteen claims: manufacturing defect (Count 7), negligence *per se* (Count 8), and negligent manufacturing (Count 10). But their remaining claims—for violations of the ATA and JASTA, various negligence-based claims, products liability claims, and public nuisance—are no more viable. Each of these claims seeks to hold BHL liable for failing to stop users with alleged (but unspecified) ties to FTOs from accessing its exchange, in the same way that countless users across the globe did. Plaintiffs contend that this failure—for which BHL has already paid billions of dollars in fines to various federal regulators—makes BHL liable for the horrific October 7 Attacks. But Plaintiffs' claims are based on a flawed understanding of the law that would, if adopted, make any multinational provider of financial services liable for terrorist acts, even when those acts are not remotely connected to that provider or its business—a result courts have consistently rejected. BHL strongly condemns the Attacks, but is not responsible for them and cannot lawfully be held accountable for them. The AC should be dismissed with prejudice.

---

[1] Capitalized terms not defined herein have the same definitions as in the Amended Complaint (ECF No. 47) ("AC") and BHL's Moving Brief (ECF No. 64-1) ("Br."). Unless otherwise noted, emphasis and alterations are added, and internal citations and quotations are omitted.

## ARGUMENT

### I.    THE AMENDED COMPLAINT FAILS TO PLEAD PERSONAL JURISDICTION OVER BHL.

Plaintiffs' Opposition cannot explain away the AC's failure to plead facts establishing personal jurisdiction. Nor does the Opposition or Plaintiffs' Motion to Compel (ECF No. 80) provide a permissible basis for jurisdictional discovery. Because Plaintiffs cannot satisfy the threshold requirement of personal jurisdiction, all of their claims against BHL should be dismissed.

### A.    Plaintiffs Do Not Adequately Plead Any Statutory Basis for Jurisdiction.

Plaintiffs cannot invoke any statutory basis for jurisdiction, which alone is fatal to the AC. *See Urquhart-Bradley* v. *Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020) (to establish personal jurisdiction, plaintiff must show jurisdiction is proper under the forum's long-arm statute and comports with due process). First, Plaintiffs have not pled that jurisdiction is proper under Section 13-423(a)(1) of the District of Columbia long-arm statute, which provides for jurisdiction over a defendant "transacting any business in the District of Columbia." (*See* Opp. at 3-6). As BHL explained in its Moving Brief, Plaintiffs must demonstrate that the business BHL transacted in the District was *suit-related*, which neither the AC nor the Opposition does. (*See infra* Part I.B; *see also* Br. at 6-7). Because the Opposition does not address the other portions of the D.C. long-arm statute, Plaintiffs have waived any argument that those sections provide a basis for jurisdiction. *See Hopkins* v. *Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (a "court may treat those arguments that the plaintiff failed to address as conceded").

As BHL's Moving Brief explained, Plaintiffs also cannot invoke Federal Rules of Civil Procedure 4(k)(1)(C) or 4(k)(2) as a basis for jurisdiction because Plaintiffs have not served BHL in the forum, which is required by both rules. (*See* Br. at 7-9). The Opposition makes no attempt to rebut BHL's argument that Plaintiffs failed to satisfy the requirements of Rule 4(k)(1)(C), and

2

thus Plaintiffs have waived any argument that BHL is subject to jurisdiction under that rule. *See Hopkins*, 238 F. Supp. 2d at 178. As to Rule 4(k)(2), Plaintiffs first claim BHL "was served" (Opp. at 6), but as Plaintiffs expressly stipulated, they did *not* serve BHL. (*See* ECF No. 20 (stipulation expressly providing, in part, that "BHL does not concede that service has been effectuated within the District of Columbia (or anywhere else)"). Plaintiffs argue that—unlike under Rule 4(k)(1)— a plaintiff can invoke Rule 4(k)(2) by filing a *waiver* of service. (Opp. at 7). But BHL merely declined to insist on service before moving to dismiss the AC, and Plaintiffs' argument directly breaches their own stipulation that they "agree[d] not to argue that the waiver affects any of Defendants' other rights, defenses, or objections (including but not limited to defenses based upon lack of personal [] jurisdiction . . . )." (ECF No. 20). Plaintiffs cannot back out of a stipulation they signed, which was expressly designed to—and expressly does—foreclose this very argument. *Byrd* v. *United States*, 485 A.2d 947, 949 (D.C. Cir. 1984) (reaffirming that "stipulations fairly entered into are controlling and courts are bound to enforce them"). Because Plaintiffs do not and cannot plead any statutory basis of jurisdiction, the Court need not proceed further, and should dismiss the AC on this basis alone.

**B.      The AC Fails to Plead Sufficient Suit-Related Contacts with the Forum.**

Even if Plaintiffs could clear the threshold requirement of pleading a statutory basis for jurisdiction, their failure to plead sufficient suit-related contacts between BHL and the District would be an independent basis for dismissal. In arguing otherwise, Plaintiffs rely on the wrong legal standard, arguing that they need only show a "discernible relationship" between their claims and BHL's alleged contacts with the forum. (Opp. at 5). Courts in this District have repeatedly held that the "discernible relationship" test is outdated; instead, plaintiffs must "show a more exacting nexus between a defendant's contacts and the plaintiff's claims to support a finding of specific jurisdiction." *See Cockrum* v. *Donald J. Trump for President*, *Inc.*, 319 F. Supp. 3d 158,

3

176-77 (D.D.C. 2018) (Huvelle, J.) ("the discernible relationship test is not the applicable standard for complying with the due process limitations on this Court's exercise of specific jurisdiction"); *see also Bernhardt* v. *Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022) (plaintiffs must show that their "alleged injuries arise out of or relate to" defendant's purposeful contacts with the forum).

In any case, the AC's allegations fail to satisfy either standard.[2] *First*, as BHL explained in its Moving Brief, allegations that BHL employed individuals in the District or the United States as a whole are not sufficiently suit-related, because the AC does not (and cannot) link those employees to the AC's claims. (*See* Br. at 11-12). The Opposition barely addresses this dispositive point, and instead, merely restates the AC's conclusory allegations. For example, Plaintiffs claim that BHL employees based in the forum "were specifically involved in decision-making related to BHL's defective design and manufacture" and that "high-level" BHL employees based in the District or the United States had "decision-making capability surrounding the issues that form the basis for [the] Amended Complaint." (Opp. at 4, 5-6, 11 (citing AC ¶¶ 126-27, 137)). But Plaintiffs do not plead *any* facts supporting these conclusory allegations, including any specific decisions delegated to employees in the forum that contributed to their injuries. Courts routinely reject as insufficient these types of "conclusory statements or bare allegations regarding the defendant's actions in a selected forum." *See Trump* v. *Comm. on Ways & Means, United States House of Representatives*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019) (Nichols, J.).

Plaintiffs' reliance on the out-of-District decision in *Licht* v. *Binance Holdings Ltd.* does not alter the analysis. (Opp. at 13 (citing 2025 WL 625303 (D. Mass. Feb. 5, 2025)). Plaintiffs

---

[2] Because Plaintiffs rely on the same types of contacts in support of jurisdiction under either the District long-arm statute or Rule 4(k), respectively, we use the term "forum" in this section to mean either the District or the United States as a whole.

4

claim that *Licht* held "the presence of BHL's 100 plus employees [in the United States] sufficient to establish personal jurisdiction." (*Id.*).  *Licht* held that victims of unknown scammers engaged in so-called "pig butchering" scams failed to state a claim against BHL, but found personal jurisdiction proper under Rule 4(k)(2). *See* 2025 WL 625303, at \*32-33, \*38-42.    BHL respectfully submits that *Licht*'s Rule 4(k)(2) analysis is flawed because it did not sufficiently consider the lack of "relatedness" between BHL's contacts with the U.S. and the plaintiffs' injuries.  Simply put, even if the analysis concerns contacts with the U.S. as a whole, plaintiffs must still demonstrate that their claims "***arise out of or relate to*** the defendant's contacts with the forum." *Bristol-Myers Squibb Co.* v. *Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017).  Here, as noted, the AC does not allege a single transaction in the U.S. that furthered the Attacks.

Plaintiffs also fail to allege a nexus between their claims and BHL's retention of unnamed "law firms, compliance consultants, and other vendors" in the forum.  (Opp. at 5, 12).  As BHL's Moving Brief explained, these types of contacts are not suit-related.  (*See* Br. at 11 (citing *Akhmetshin* v. *Browder*, 761 F. Supp. 3d 1, 11-13 (D.D.C. 2024))).  Plaintiffs claim that "these individuals have consulted on compliance matters, including specifically related to the AML, KYC, and sanctions deficiencies that form the basis of Plaintiffs' Complaint." (Opp. at 12 (citing AC ¶¶ 128-29, 134)).  But the portions of the AC on which Plaintiffs rely for this assertion do not say anything of the sort.  Instead, the AC claims only that unnamed Binance employees or agents "interacted with U.S.-based institutional customers" (AC ¶ 128); that "Binance has procured professional services from U.S.-based law firms, compliance consultants, and other vendors" (*id.* ¶ 129); and that "[u]pon information and belief . . . Binance was a member of the DC-based

Chamber of Digital Commerce" (*id.* ¶ 134). There is nothing in the AC or the Opposition to suggest that any of these contacts are connected to the Attacks, nor could they plausibly be.

Nor can Plaintiffs rely on the August 2020 seizure of crypto assets from accounts affiliated with Hamas by the U.S. Attorney's Office for the District of Columbia, as a suit-related contact. (Opp. at 5). Plaintiffs allege "[u]pon information and belief" that "at least some of [the transactions linked to the seized assets] occurred on the Binance Platform." (AC ¶ 193).[3] But they fail to allege any connection between Binance and the District, and likewise fail to explain how the seizure of assets by a prosecuting office in the District somehow amounts to a relevant jurisdictional contact for their claims concerning the Attacks. U.S. Attorneys' Offices seize assets all over the world, and the involvement of a particular Office in a seizure does not mean that ***suit-related conduct*** occurred in the District where that Office is located.

Finally, Plaintiffs' allegation that BHL's U.S. users transacted directly with users in Iran (Opp. at 11) is also not a relevant suit-related contact. In *Bernhardt* v. *Islamic Republic of Iran*, the D.C. Circuit rejected nearly identical allegations as insufficiently suit-related to support personal jurisdiction. *See* 47 F.4th at 865. *Bernhardt* was an ATA case arising out of al-Qaeda's attack on a CIA base in Afghanistan. *Id.* at 860. The plaintiffs alleged that foreign bank defendants "purposefully directed their conduct at U.S. markets by coordinating with [the bank's] domestic affiliates to evade the OFAC filter and to facilitate financial transactions [with Iran] in violation of U.S. sanctions." *Id.* at 864. But, as the Circuit explained, those transactions were not suit-related merely by virtue of the fact that they involved Iran (which is the only supposedly "suit-related" contact Plaintiffs rely on here). *Id.* at 865 (transactions with a state sponsor of terrorism

---

[3] This Court need not credit allegations made upon information and belief for purposes of resolving a motion to dismiss for lack of personal jurisdiction. *See Youming Jin* v. *Ministry of State Sec.*, 335 F. Supp. 2d 72, 81 (D.D.C. 2004) (Urbina, J.).

"does not reduce the need for evidence of a substantial connection between the defendant and a terrorist act or organization").  Instead, the Court reasoned that "aid to Iran could just as plausibly benefit its otherwise legitimate operations."  *Id.*  This is especially true where, as here, the transactions alleged in the AC do not even directly involve the government of Iran, but instead involve Iranian users of a digital assets exchange widely used across the globe.

Because Plaintiffs have not alleged suit-related contacts with either the District or the United States as a whole, they cannot invoke either the District's long-arm statute or Rule 4(k).  All claims against BHL should be dismissed for lack of personal jurisdiction.

### C.    Plaintiffs Do Not Sufficiently Allege Alter Ego as a Basis for Personal Jurisdiction.

As BHL explained in its Moving Brief, Plaintiffs cannot demonstrate that jurisdiction over BHL is proper by trying to impute BAM's contacts to BHL under an alter ego theory.  (Br. at 13-15).  In response, Plaintiffs incorporate by reference their arguments addressing the same topic in their opposition to BAM's motion to dismiss.  (ECF No. 81; *see also* Opp. at 14).  To avoid duplicative briefing, BHL incorporates BAM's arguments in response here.  (*See* BAM Reply Br. at Section II.D).   In brief, nothing in the Opposition carries the heavy burden of piercing the corporate veil between BHL and BAM, and jurisdiction is not supported on an alter-ego theory.

### D.    Plaintiffs Are Not Entitled to Jurisdictional Discovery.

In a footnote, Plaintiffs argue that if the Court finds that personal jurisdiction over BHL is lacking, it should nevertheless permit jurisdictional discovery.  (Opp. at 3 n.2 (incorporating by reference Plaintiffs' arguments in opposition to Defendants' Motion to Stay Discovery, ECF No. 78)).  But Plaintiffs are not entitled to jurisdictional discovery unless and until they make "a detailed showing" as to what they "think[] such discovery would produce" and how it will support their theory of jurisdiction. *Trump*, 415 F. Supp. 3d at 111-12.  As Defendants explained in support

of their Motion to Stay Discovery (ECF No. 71-1 at 7) and in Opposition to Plaintiffs' separate motion to compel (ECF No. 84 at 5-6) (both of which BHL incorporates here by reference), Plaintiffs have not even attempted to make that showing. Instead, Plaintiffs have moved to compel responses to more than *150* separate discovery requests, claiming without a basis that this type of expansive discovery will lend support to some unidentified theory of jurisdiction, and that responding to 41 requests for production and 110 requests for admission will not be burdensome for BHL. (ECF No. 80-1 at 1-2). But the fact that Plaintiffs must employ such a scattershot approach to obtaining information they speculate might support jurisdiction only confirms that Plaintiffs actually have no viable theory of jurisdiction. Courts declined to allow much narrower discovery requests so as not to waste the parties' and the court's resources, and this Court should do the same here. *See He* v. *Oath Holdings, Inc.*, 2020 WL 12115482, at \*2 (D.D.C. Dec. 16, 2020) (given the "pending dispositive motion, proceeding with discovery on even a limited basis could subject the parties to an unnecessary burden").

## II.     THE AMENDED COMPLAINT FAILS TO STATE AN ATA PRIMARY LIABILITY CLAIM (COUNTS 12 & 13).

The AC asserts primary liability against BHL based on its supposed "material support" of Hamas and other FTOs, but does not, and cannot, make the essential allegation that **BHL committed** an act of international terrorism that caused Plaintiffs' injures. (*See* Br. at 15-19). That is fatal to Plaintiffs' primary liability claim, and their Opposition does nothing to cure the defect.

As an initial matter, the AC does not, and cannot plausibly allege that BHL committed an act that is violent or dangerous to human life, the first prerequisite of an ATA primary liability claim. *See Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018); 18 U.S.C. § 2331(1). The routine exchange services BHL offered to the public—on which Plaintiffs' allegations rest entirely—obviously are not violent or dangerous to human life. *See Weiss* v. *Nat'l Westminster*

8

*Bank, PLC.*, 993 F.3d 144, 162-63 (2d Cir. 2021) ("[T]he provision of banking services, in and of itself, is insufficient . . . to show that the services involved an act of violence or threat to human life."). (*See also* Br. at 16-17). Plaintiffs' reliance on *Boim* v. *Holy Land Foundation for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008), for the proposition that merely "[g]iving money to Hamas" is "an act dangerous to human life" (Opp. at 20-21) is unpersuasive. Simply put, "liability for banking services[,]" even if it is alleged that they were "provided to support a terrorist group's mission[,] should be analyzed under the [aiding-and-abetting] provision of JASTA," rather than as a primary liability claim. *See Hakimyar* v. *Habib Bank Ltd.*, 2025 WL 605575, at *5 (S.D.N.Y. Feb. 25, 2025) (collecting cases). *Boim* preceded the 2016 passage of JASTA, which created aiding-and-abetting liability under narrow circumstances that—as discussed below—are not present here. *See Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 499 n.14 (2d Cir. 2021) (rejecting *Boim* as "inapposite" to a primary liability claim because it was decided before JASTA). Moreover, whereas the *Boim* defendants affirmatively made donations to Hamas, Plaintiffs here allege only that Defendants operated a generally available cryptocurrency exchange, and, at most, did not prevent users with alleged but undefined links to Hamas from using the exchange. *Boim* has no relevance to these facts.[4]

Nor does the Opposition cure the AC's failure to plausibly allege a criminal act—the second element of ATA primary liability—because it fails to allege that BHL provided material support to FTOs "knowing or intending" that such support would be used in connection with the

---

[4] Nor are any of Plaintiffs' citations to cases relying on *Boim* relevant here. *See Schansman* v. *Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 411 (S.D.N.Y. 2021) (citing to *Boim* in case involving primary liability claim only); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1308 (S.D. Fla. 2018) (same); *Sotloff* v. *Qatar* Charity, 2023 WL 6471413, at *1 (Sept. 29, 2023) (vacating the decision on which Plaintiffs here rely "due to newly discovered information bearing on the credibility of certain factual allegations that were central to [the court's] analysis.").

9

Attacks.  *Hakimyar*, 2025 WL 605575, at \*5; *Linde*, 882 F.3d at 325-26.  (*See also* Br. at 17-18).

Instead, the Opposition merely repeats the AC's conclusory allegation that BHL violated the

material support statute.  But that is not sufficient.  *Byrne* v. *Clinton*, 410 F. Supp. 3d 109, 116

(D.D.C. 2019), *aff'd sub nom. Byrne* v. *Brock*, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) (court

is not "bound to accept as true a legal conclusion couched as a factual allegation").  Moreover, the

AC, and documents it incorporates by reference, confirm that BHL *offboarded* users that it had

reason to believe were connected to FTOs (*see* AC ¶ 210) and "proactively cooperated with global

law enforcement and blockchain vendors to combat terrorism financing," including "cooperat[ing]

with Israeli law enforcement in numerous seizures."  (*See* ECF No. 64-4 (FinCEN Consent Order)

at 46).  *See also Kaempe* v. *Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (court need not "accept as

true the complaint's factual allegations insofar as they contradict exhibits to the complaint or

matters subject to judicial notice").  These facts belie any assertion that BHL had the requisite

*mens rea*, as well as any notion of "terroristic intent," the third element Plaintiffs must prove for

ATA primary liability.  *Linde*, 882 F.3d at 326.

As for proximate cause, the final element of a primary liability claim (*see id.* at 325-26); (*see*

*also* Br. at 19), Plaintiffs merely repeat their conclusory assertion that BHL's actions were a "but-

for" cause of the Attacks, because Hamas allegedly used funds that flowed through Binance to

commit the Attacks.  (Opp. at 24-25).  This is insufficient.  "Without a more direct connection

between" Defendants' conduct and the Attacks, "the provision of financial services to individuals

and organizations on its own is insufficient to support a plausible inference that [those] financial

services . . . proximately caused the Attacks."  *Averbach* v. *Cairo Amman Bank*, 2022 WL

2530797, at \*21 (S.D.N.Y. Apr. 11, 2022).

10

### III.    THE AMENDED COMPLAINT FAILS TO STATE AN AIDING-AND-ABETTING CLAIM (COUNT 11).

As shown in BHL's Moving Brief, Plaintiffs' JASTA aiding-and-abetting claim (Count 11) fails because the AC does not plausibly allege that BHL (1) knowingly and substantially assisted the Attacks, or (2) was generally aware it was involved in terrorists' violent activities. *Twitter* v. *Taamneh*, 598 U.S. 471, 486, 488-89, 503 (2023).

#### A.    Plaintiffs Fail to Adequately Allege BHL's Knowing and Substantial Assistance.

As BHL explained in its Moving Brief, the AC does not sufficiently allege knowing and substantial assistance because it fails to plead that (1) there was a definable nexus between BHL's conduct and the Attacks, and that (2) BHL's alleged participation in the Attacks was conscious, voluntary, and culpable. (*See* Br. at 20-29).  The Opposition does nothing to rescue the AC from these failures.  (*See* Opp. at 27-30).

Plaintiffs barely even attempt to argue that the AC pleads a discernable nexus between BHL's conduct and the Attacks.  They claim only that the AC's allegations that Hamas-linked users transacted on the Binance Exchange and that "the Binance Platform was specifically used to fund the October 7 attacks" are sufficient.  (Opp. at 27 (citing AC ¶¶ 180-84, 189-93, 203-04, 218-20)).  But the most that the AC alleges is that in 2019—***four years*** before the Attacks—BHL received information about "Hamas transactions," or "Hamas-associated" transactions (AC ¶¶ 191-92, 203); that "around the same period" the DOJ seized assets belonging to members of Hamas, some of which "upon information and belief" could be linked to transactions on the Binance Platform in some unspecified way (AC ¶ 193); and that between December 2021 and July 2023, the National Bureau for Counter Terror Financing of Israel seized funds from Binance accounts, which included accounts for individuals associated with Hamas (AC ¶ 217).  Individually

11

or together, these allegations fail to link any transaction on the Binance Platform, or any BHL customer, with the October 7 Attacks, and that forecloses Plaintiffs' nexus argument.

As the Supreme Court made clear in *Twitter*, alleging that a defendant gave "assistance to [the principal wrongdoer's] activities in general[]" is not enough. 598 U.S. at 503 ("[T]he question is whether defendants gave substantial assistance to [the FTO that carried out the attack] ***with respect to the [specific] attack***. The focus thus must remain on the [specific] attack[.]"). The Court of Appeals for the Second Circuit recently reaffirmed this point in *Ashley* v. *Deutsche Bank Aktiengesellschaft et al.*, 144 F.4th 444 (2d Cir. 2025), the first Circuit decision to substantively apply *Twitter's* requirements for pleading JASTA aiding-and-abetting claims. In *Ashley*, the Court affirmed the dismissal of JASTA aiding-and-abetting claims against several bank defendants, reasoning that "the complaint offer[ed] no discernable nexus between [defendants'] money laundering and the attacks committed against [p]laintiffs," because although "it [wa]s possible that some of the [defendant]s' transactions in the money laundering schemes produced money that was transferred to the [FTO] and used to facilitate bombings in Afghanistan during the relevant time … ***the complaint fail[ed] to plead with specificity*** allegations from which this Court could draw adequate inferences to support a claim of aiding-and-abetting liability." *Id.* at 444. For the very same reasons, the AC's allegations that several transactions involving FTO-linked accounts occurred on the widely available BHL exchange are insufficient to allege the "discernable nexus" required by *Twitter*. *Ashley*, 144 F. 4th 444 (citing *Twitter*, 598 U.S. at 503).[5]

---

[5] Recently, in *Fraenkel et al.* v. *Standard Chartered Bank*, the Southern District of New York dismissed JASTA aiding-and-abetting claims where the plaintiffs had similarly failed to allege a "concrete nexus" between the defendant bank's actions and the attacks that injured plaintiffs. 2025 WL 2773251, at *9-10 (S.D.N.Y. Sept. 26, 2025). The *Fraenkel* plaintiffs argued that a sufficient nexus was established by the defendant bank's provision of services to terrorist fronts under the control of the Islamic Revolutionary Guard Corps ("IRGC"), and that the IRGC "systematically used such fronts to finance the attacks that killed or injured [p]laintiffs." *Id*. at *10. But the Court disagreed: "Far from demonstrating a concrete nexus . . . , [p]laintiffs' theory of liability would

Because Plaintiffs have not pled a definable nexus between BHL's conduct and the Attacks, Plaintiffs must plausibly allege that BHL consciously and "culpably associate[d] [itself] with the [A]ttack[s], participate[d] in [them] as something that [it] wishe[d] to bring about, or sought by [its] action to make it succeed." *Twitter*, 598 U.S. at 498 (second alteration added); (*see* Br. at 23). Plaintiffs' sole argument on this point is that BHL's AML lapses amounted to giving Hamas "special treatment" sufficient to support a finding of knowing and substantial assistance (Opp. at 27). This is simply wrong, for several reasons.

As the regulatory settlements on which Plaintiffs rely make clear, BHL's historical AML lapses were platform-wide, and were in no way aimed at giving FTOs special treatment. In other words, BHL offered the same services to all of its hundreds of millions of users worldwide and, regardless of any noncompliance with AML obligations, Plaintiffs do not (and cannot) allege that BHL sought to treat FTOs in a manner different than any other user of the platform. *See Twitter*, 598 U.S. at 498 (social media companies did not culpably participate in their users' wrongdoing where the companies did not provide those users with any special treatment or words of encouragement compared to other users); *cf. Kaplan* v. *Lebanese Canadian Bank, SAL*, 999 F.3d 842, 865-866 (2d Cir. 2021) (allowing JASTA claim to proceed where plaintiffs were injured by Hizbollah attacks and plausibly alleged that the defendant bank (i) was aware that certain of its customers were "integral" to Hizbollah, and (ii) gave them "special treatment" by exempting them from "submitting cash transaction slips" disclosing the sources of cash deposits and restrictions on depositing certain amounts in Lebanese currency).

'hold [the bank] liable for all the torts of an enterprise,' but without the corresponding 'pervasive and systemic' support of terroristic activities that *Twitter* demands." *Id.* at \*10.

Moreover, the U.S. government acknowledged that BHL actively sought to keep terrorists off its platform and cooperated with law enforcement, which, again, belies any allegation of conscious and intentional participation in acts of terrorism. (*See* Br. at 5 (citing FinCEN Consent Order)). Simply put, just because a defendant fails in its AML duties does not make it liable as an aider-and-abettor under JASTA. *See, e.g.*, *Siegel* v. *HSBC North America Holdings, Inc.*, 933 F.3d 217, 225-26 (2d Cir. 2019); *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446, at \*10 (S.D.N.Y. Mar. 28, 2019); *cf. King* v. *Habib Bank Ltd.*, 2022 WL 4537849, at \*3 (S.D.N.Y. Sept. 28, 2022) (denying motion to dismiss aiding-and-abetting claim where defendant was alleged to have had AML systems in place that it intentionally avoided in order to "whitelist" and "wire-strip" on behalf of FTOs).

*Ashley* is again instructive on this point. Unlike BHL, the defendants in *Ashley* **were** alleged to have given "special treatment" to bad actors, even after being notified by the U.S. government that such actors were utilizing their services; not only did those defendants continue to provide banking services to specific customers after being explicitly told by the U.S. military that those services were facilitating terrorism, the defendants were also alleged to have actively engaged in terrorist financing, by "custom build[ing]" and "operat[ing]" money laundering schemes known to fund terrorism. 144 F.4th at 429-31. Still, the Second Circuit found that such allegations did not support a JASTA aiding-and-abetting claim, because defendants' continued services did not amount to "interested cooperation" with the FTOs. *Id.* at 443. By contrast, BHL's alleged passive nonfeasance here (*i.e.*, a failure to halt or report illegal activity on the Binance platform) comes nowhere close to the conduct the *Ashley* court rejected as insufficient.[6]

---

[6] Plaintiffs have not sought to rely on the narrow exception recognized in *Twitter* for extraordinary circumstances where a "defendant[] so systemically and pervasively assisted" the terrorist group that it can "be said to aid and abet every single . . . attack." *Twitter*, 598 U.S. at 501. Nor could they, as this exception requires allegations "that defendants *intentionally associated themselves*

14

Finally, as explained in the Moving Brief, the *Halberstam* factors weigh heavily in favor dismissing of the aiding-and-abetting claim.  (*See* Br. at 28-29).

- **Nature of the Act**.  Plaintiffs argue that BHL took affirmative steps to facilitate transactions with terrorists (Opp. at 29), but as BHL has explained (Br. at 28), this does not establish a link between BHL and the Attacks, and ignores that FTOs rely on a wide range of funding sources, and that (despite its historical lapses), BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorist financing."  (ECF No. 64-4 (FinCEN Consent Order) at 46).

- **Amount of Assistance**.  Plaintiffs also allege that "BHL processed millions of dollars in cryptocurrency transactions linked to Hamas" and "affirmatively created avenues for terrorists to evade detection" (Opp. 29), but do not, and cannot, allege that BHL processed *any* particular transaction linked to the Attacks (*see* Br. at 28).

- **BHL's Presence**.  Plaintiffs do not dispute that BHL was not present during the Attacks.

- **BHL's Relation to the FTO**. Plaintiffs argue that BHL "cultivated a non-arm's length relationship with Hamas" (Opp. at 29), once again ignoring that any AML lapses applied equally to all users, and that BHL did not single FTOs out for any sort of special treatment. (*See* ECF No. 64-4 (FinCEN Consent Order) at 53 (noting platform-wide violations)).

- **BHL's State of Mind**.  Plaintiffs incorrectly argue that BHL "need not intend the specific attacks" (Opp. at 29), once again ignoring the nexus analysis describe above.  As noted, Plaintiffs must plausibly plead that BHL consciously and culpably "associate[d] [themselves] with the . . . [A]ttack, participate[d] in it as something that [they] wishe[d] to bring about, or sought by [their] action to make it succeed," *Twitter*, 598 U.S. at 498, which Plaintiffs have not (and could not) do here.  And even if Plaintiffs' lesser standard applied, Plaintiffs do not allege that BHL knowingly facilitated transactions for terrorist customers. Rather, Plaintiffs allege that BHL prioritized profits over compliance and that its lapses enabled users associated with FTOs to transact on Binance, which does not establish conscious and culpable participation *in the Attacks*.

- **Duration of the Assistance**. Although Plaintiffs allege "years of continued assistance" to Hamas and other FTOs (Opp. at 30), Plaintiffs do not temporally connect any of this to the Attacks, nor do Plaintiffs suggest that the duration somehow led to an increased amount of aid for the FTOs, nor that the FTOs used any Binance services in furtherance of the Attacks.

In short, the *Halberstam* factors make clear that BHL lacked the requisite culpability and connection to the Attacks to be held accountable for them on an aiding-and-abetting theory.

---

with [the FTO's] operations** or **affirmatively gave aid that would assist each of [the FTO's] terrorist acts**" or otherwise "*formed a near-common enterprise*" with the FTO.  598 U.S. at 502. Plaintiffs have not alleged that BHL's routine services were provided "in an unusual way" nor that BHL's services were "inherently dangerous" in some way.  *See id.*

### B. Plaintiffs Fail to Adequately Allege BHL's General Awareness.

Plaintiffs' failure to plead BHL's general awareness that it was "playing a 'role' in an FTO's violent or life-endangering activities" is an independent basis for dismissal of Count 11. *Newman* v. *Associated Press*, 758 F. Supp. 3d 1357, 1368 (S.D. Fla. 2024). Plaintiffs argue that BHL "affirmatively concealed transactions, failed to implement adequate AML/KYC controls, and profited from the illicit business" (Opp. at 26), but they do not explain how any of those allegations demonstrate BHL was aware it was "playing a role" in the FTOs' activities. (*See* Br. at 29-31). What Plaintiffs allege (at most) is that BHL was aware users affiliated with FTOs used its platform in some capacity, years prior to the October 7 Attacks. But as discussed, the AC's acknowledgement that BHL *offboarded* suspicious users in July 2020 (AC ¶ 210) undercuts any inference of general awareness. *See Siegel*, 933 F.3d at 224 (2d Cir. 2019) (dismissing JASTA complaint where defendant ceased doing business with the customer with alleged terrorist ties ten months prior to the attacks at issue).

### IV. THE AMENDED COMPLAINT FAILS TO STATE A NEGLIGENCE-BASED CLAIM (COUNTS 4, 5, 14 & 16).

In their Opposition, Plaintiffs voluntarily dismiss their negligence *per se* claim (Count 8). (*See* Opp. at 1 n.1). Plaintiffs' remaining claims sounding in negligence—negligence, negligent infliction of emotional distress, loss of consortium,[7] and negligent entrustment—all fail to plead the required elements of duty and causation, and should be dismissed as well. (Br. at 31-38).

---

[7] As BHL explained in its Moving Brief, even if Plaintiffs could state a claim for loss of consortium (which they cannot), the claim would be limited to Keith and Aviva Siegel, the only Plaintiffs that seek to recover based on injuries to their spouse. (*See* Br. at 36). Plaintiffs' Opposition incorrectly claims that "other relatives" may bring claims for loss of consortium. (Opp. at 45 n.23). But D.C. law explicitly forecloses that argument. *See Washington* v. *Washington Hosp. Ctr.*, 579 A.2d 177, 179 n.1 (D.C. 1990) ("[T]he decision of the United States Court of Appeals for the District of Columbia Circuit . . . forecloses claims for loss of consortium in favor of a parent or child of the injured party."). To the extent Plaintiffs intend to assert this claim under Israeli law (*see* Opp. at 45 n.23), this too fails because Plaintiffs have failed to timely provide notice of an intent to rely

### A.  BHL Did Not Owe Plaintiffs a Duty of Care.

The AC's remaining negligence-based claims should be dismissed based on Plaintiffs' failure to plausibly allege that BHL owed the Plaintiffs any duty.  Plaintiffs claim that BHL owed a duty to Plaintiffs arising from alleged violations of the BSA and IEEPA.  (Opp. 37-38).  But as BHL explained in its Moving Brief, "these statutes do not provide for a private right of action— the only duty owed is to the government—and therefore a violation of these statutes does not give rise to a duty of care to Plaintiffs."  (Br. at 37-38 (collecting authority)).  Plaintiffs do not engage with any of BHL's cited authority on this point.  Instead, they falsely claim that the district court's decision in *Raanan* supports the existence of a duty to Plaintiffs here.  (*See* Opp. at 37 (citing *Raanan* v. *Binance Holdings, Ltd.*, 2025 WL 605594, at \*21 (S.D.N.Y. Feb. 25, 2025)).  It does not.  In *Raanan*, a district court in the Southern District of New York observed that BHL had a duty to comply with sanctions laws that the defendants in *Twitter* did not have.  *Raanan*, 2025 WL 605594, \*22.  This distinction formed part of the *Raanan* court's conclusion that the JASTA aiding-and-abetting claims against BHL were distinguishable from the ones that failed in *Twitter*.[8] But the court did *not* suggest that the obligation to comply with these statutes could support the existence of a tort duty to a private plaintiff.  Nor have Plaintiffs cited any authority supporting that proposition.

---

on foreign law in accordance with Federal Rule of Civil Procedure 44.  *See Burke* v. *Air Serv Int'l, Inc.*, 775 F. Supp. 2d 13, 18 n.4 (D.D.C. 2011), *aff'd*, 685 F.3d 1102 (D.C. Cir. 2012) (declining to consider foreign law where "no party has given notice of intent to raise an issue of foreign law").

[8] As discussed in BHL's Moving Brief, BHL contends that *Raanan* was wrongly decided in this respect.  (Br. at 30 (explaining that *Raanan's* reasoning on the JASTA aiding-and-abetting claim conflicts with the D.C. Circuit's analysis in *Bernhardt*, 47 F.4th at 867-68, 870, and the Second Circuit's decision in *Ashley*, 144 F.4th at 438, which was issued after *Raanan* was decided)).

17

Plaintiffs next claim that service providers may owe a duty of care to the general public when they undertake "affirmative conduct" to facilitate the wrongdoing at issue, and therefore set the wrongdoing "in motion." (Opp. at 30-33).  But Plaintiffs do not identify any such "affirmative conduct," nor do they allege in anything but the most conclusory terms that BHL had a role in causing the Attacks (*see supra* Part II (discussing causation)).  At most, Plaintiffs have alleged BHL's passive nonfeasance, *i.e.*, that BHL did not prevent potentially illicit users from accessing the Binance platform.  (*See, e.g.*, Opp. at 32 (alleging that BHL chose "not to implement programs and features designed to prevent terrorism funding" and "not to remove known bad actors from its Platform")).  This is inaction, not affirmative misconduct.[9]

Finally, Plaintiffs claim BHL owed a duty to the Plaintiffs (and indeed, anyone along the Gaza border) because the risk of criminal wrongdoing in that region was foreseeable.  (*See* Opp. at 34 ("[I]t would in fact be perfectly justifiable . . . to impose liability on Binance for any terror attack in Israel[.]"); 35 ("BHL owed a duty of care to those within a very distinct geographical area (Israel and specifically the portion along the Gaza border).")).  But as BHL explained in its Moving Brief, where, as here, the alleged injury "is caused by the intervening criminal act of a third party[,]" the plaintiff must make a "heightened showing of foreseeability[,]" which requires "proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location."  (*See* Br. at 32 (citing *Sigmund* v. *Starwood Urb. Inv.*, 475 F. Supp. 2d 36, 42 (D.D.C. 2007)).  Plaintiffs claim that they have satisfied this burden by identifying specific FTOs

---

[9] This stands in stark contrast to the "affirmative conduct" alleged in *Doe 1* v. *Deutsche Bank Aktiengesellschaft*. (*See* Opp. at 31-32 (citing 671 F. Supp. 3d 387, 397, 414 (S.D.N.Y. 2023)). There, the bank defendants allegedly provided Jeffrey Epstein with several "non-routine banking services," which included "assist[ing] Epstein with structuring his cash withdrawals so as to elude suspicion[,]" exempting Epstein from the bank's normal SAR requirements, and "us[ing] a subsidiary's private jets to transport[] young women and girls from Florida to Epstein in New York." *Doe 1*, 671 F. Supp. 3d at 397.  Nothing even approaching those facts is alleged here.

that BHL allegedly knew were likely to commit these attacks (Iran, Hamas, and Palestinian Islamic Jihad), identifying the type of harm they were likely to inflict (terrorist attacks), and identifying the "period during which these groups used the Binance Platform to transfer the funds needed for this specific attack." (Opp. at 34). But Plaintiffs miss the point. They cannot demonstrate that BHL owed a duty to protect the Plaintiffs (none of whom were BHL customers) because the AC does not explain why ***BHL*** should have foreseen that ***its own*** conduct would give rise to the Attacks. The AC does not plausibly allege that BHL had *contemporaneous* knowledge that any relevant FTO was using the Binance Exchange. At best, the AC alleges that FTO-*linked* wallets or individuals used the Exchange and that at some later point, BHL or others learned of those users' connections to FTOs. Plaintiffs also claim that the October 7 Attacks were foreseeable based on a post, appearing on BHL's blog, which purportedly relied on an analysis by research firm, Elliptic, to link digital assets to the October 7 Attacks. (*See* Opp. at 36 (citing Goldenberg Decl. Ex. J)). This is deeply misleading. First, the blog post was published by a third-party three days *after* the October 7 Attacks. Second, Elliptic later published an article seeking to "correct misinterpretations" that arose from the very analysis to which the post refers, clarifying that "***[t]here is no evidence to support the assertion that Hamas has received significant volumes of crypto donations***" and that "[t]errorist groups do make use of cryptoassets for public fundraising, but the amounts involved are tiny relative to other funding sources." (Enzer Reply Decl. Ex. 1).

At bottom what Plaintiffs have proposed is a nearly "limitless notion[] of duty and foreseeability" that has already been rejected by the D.C. Court of Appeals, and which the Court should reject here. (*See* Br. at 32-33 (citing *D.C.* v. *Beretta, U.S.A., Corp.*, 872 A.2d 633, 643 (D.C. 2005)); *see also Burnett* v. *Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) ("Plaintiffs offer no support, and we have found none, for the proposition that a bank is

liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.").[10]

### B. BHL Did Not Proximately Cause Plaintiffs' Alleged Injuries.

Plaintiffs' failure to plausibly allege that BHL was the proximate cause of their injuries is an independent basis for dismissing all of their claims sounding in negligence. In arguing that they have adequately pled proximate cause for purposes of their negligence claims, Plaintiffs rely only on their arguments concerning proximate cause related to their ATA claims (Opp. at 41-42), but as discussed, those arguments are unpersuasive. (*See supra* Part II); (*see also* Br. at 19).

### V. THE AMENDED COMPLAINT FAILS TO STATE A PRODUCTS LIABILITY CLAIM (COUNTS 6 & 9).

The Opposition abandons the AC's claims for manufacturing defect (Count 7) and negligent manufacturing (Count 10). (*See* Opp. at 1 n.1). *See also Hopkins*, 238 F. Supp. 2d at 178). Their remaining products liability claims—for design defect (Count 6) and negligent design (Count 9)—should also be dismissed because the AC does not plead the existence of a defective product or proximate causation, both of which are required to state a claim. (Br. at 39 (citing *Webster* v. *Pacesetter, Inc.*, 259 F. Supp. 2d 27, 30 (D.D.C. 2003))).

---

[10] None of Plaintiffs' cited authority saves their claims. (*See* Opp. at 35). In both *Carlson* and *Wagshal*, the D.C. Court of Appeals allowed negligence claims against the District of Columbia, where the District had failed to properly maintain a traffic signal and stop sign, respectively. *See D.C.* v. *Carlson*, 793 A.2d 1285 (D.C. 2002); *Wagshal* v. *D.C.*, 216 A.2d 172 (D.C. 1966). Unlike BHL, which has no relation to Plaintiffs, the District of Columbia has an existing affirmative "duty to keep the streets safe" for pedestrians and drivers. *Wagshal*, 216 A.2d at 173. And in *Rardon*, *Diehl*, and *Kelly*—all out-of-forum decisions—courts allowed claims to proceed against manufacturers of products inhaled as intoxicants by drivers who subsequently crashed. *Rardon* v. *Falcon Safety Prods., Inc.*, 2021 WL 2008923 (W.D. Mo. May 4, 2021); *Diehl* v. *3M Co.*, 2019 WL 4412976 (Minn. Ct. App. Sept. 16, 2019); *Kelly* v. *M. Trigg Enters., Inc.*, 605 So. 2d 1185 (Ala. 1992). In each of these cases, the manufacturer was choosing to produce an inherently dangerous product, which it had actual knowledge was being used as an intoxicant. BHL, on the other hand, provides routine transaction services, which themselves are not dangerous.

### A.  The Binance Platform Is Not a Product.

Plaintiffs' products liability claims fail at the outset because the Binance Platform is a service, not a product.  (*See* Br. at 39 (citing *Jackson* v. *Airbnb, Inc.*, 639 F. Supp. 3d 994, 1010-11 (C.D. Cal. 2022)).  Plaintiffs argue that the Court may find that the Binance Platform is a "product" because "District of Columbia courts have not weighed in on the question of whether web-enabled platforms are products."  (Opp. at 14).  But Plaintiffs' argument is foreclosed by the Restatement (Second) of Torts § 402A (1965) ("Second Restatement"), which courts in this District apply to products liability claims.  *See Millers Cap. Ins., Co.* v. *Hydrofarm, Inc.*, 340 F.R.D. 198, 224 (D.D.C. 2022).  The Second Restatement limits products liability claims to *tangible* goods, and therefore excludes digital asset exchanges like the Binance Platform, which do not provide tangible goods, but rather services.  And while Plaintiffs note that the Restatement (3d) of Torts, Prod. Liab. § 19(a) ("Third Restatement") defines "product" more broadly (*see* Opp. at 14), they have cited no authority within this Circuit that applies the Third Restatement, or its reasoning, to products liability claims.

Nor can Plaintiffs sidestep the limits on products liability claims by reframing their claims as challenging the *digital application* through which users access the Binance Platform, rather than the platform itself.  (*See* Opp. at 15 (arguing that "[a] mobile or web-based app or platform can be a product if its use and distribution are sufficient analogous to tangible personal property.")).  Plaintiffs' argument, once again, relies on the Third Restatement, which the District has not adopted.  In fact, the majority of authority on the subject concludes the opposite:  when a company (such as BHL) merely makes a service—which would otherwise not be subject to products liability claims—available online through a digital application, that service is not transformed into a product and subject to product liability claims.  *See Jacobs* v. *Meta Platforms, Inc.*, 2023 WL

21

2655586, at \*4 (Cal. Super. Mar. 10, 2023) (Facebook is a service, not a product); *Ziencik* v. *Snap, Inc.*, 2023 WL 2638314, at \*4 (C.D. Cal. Feb. 3, 2023) (Snapchat is a service, not a product); *Jackson*, 639 F. Supp. 3d at 1011 (Airbnb is a service, not a product); *see also Social Media Cases*, 2023 WL 6847378, at \*15-18 (Cal. Super. Oct. 13, 2023) (Facebook, Instagram, Snapchat, TikTok, and YouTube are services, not products); *Doe* v. *Uber Technologies, Inc.*, 2020 WL 13801354, at \*7 (Cal. Super. Nov. 30, 2020) (Uber is a service, not a product).

But even if the Court were to adopt Plaintiffs' proposed test—finding that a digital *application* can be a product—Plaintiffs' claims would still fail, because the thrust of their claims is not that there was some type of defect with the "app" itself.  What Plaintiffs challenge are BHL's systems for verifying data from users, checking user information against international sanctions lists, preventing users from prohibited jurisdictions from accessing the platform, and flagging suspicious transactions.  (Opp. at 16).  But these are not functions of the app or website that customers use to access the Platform.  Instead, they are more akin to the services performed by the compliance department of a bank.

The lead case on which Plaintiffs rely—*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 2025 WL 1892390 (N.D. Cal. July 8, 2025)—illustrates this distinction.  *Uber* considered whether plaintiffs assaulted by their Uber drivers could assert products liability claims against Uber.  *Id.* at \*8.  The District Court for the Northern District of California explained that the Uber *app* could be construed as a product, but noted that "Uber is simultaneously a rideshare *service provider*."  *Id.*  Therefore, "the key question for evaluating plaintiffs' products liability claims" was "whether the alleged defects [were] really defects in the Uber app, or . . .problems with Uber's services . . . ."  *Id.*  Ultimately, the court concluded that, plaintiffs could assert claims that challenged the Uber app's failure to include an option for passengers to match with drivers of the

22

same gender only. *Id.* at \*9 (noting that the lack of a Gender Match option was "more akin" to "'real world' parental locks" ***as distinguished from "defendants' decisions regarding their provision of services more broadly***"). But the court simultaneously held that Uber's *algorithm* for matching riders and drivers could ***not*** give rise to a product defect claim, since it was most analogous "to a dispatcher who sends drivers to riders based on convenience, *thereby performing a service.*" *Id.* at \*8. In other words, Plaintiffs could challenge Uber's failure to provide them features that they could control how they, *as customers*, used the app—but they could not challenge "back-end" features related to how Uber's algorithm matched users to drivers *behind the scenes.*

The same is true here. The alleged defects that Plaintiffs point to have nothing to do with any particular user's experience on the application that provides them with access to the BHL's exchange. Instead, Plaintiffs' claims are about the back-end functionality—who BHL allows to access its Platform and how it screens the transactions that occur therein. This conclusion is further supported by the fact that BHL's remedial measures in accordance with its regulatory settlements were effectuated purely on the backend by BHL's compliance personnel—*e.g.*, BHL's compliance staff performed more thorough Know Your Business ("KYB") screenings during onboarding— and have nothing to do with end-user "interface/experience choices" of the type that could give rise to a claim. *Id.* at \*9. *See also Social Media Cases*, 2023 WL 6847378, at \*21 (dismissing products liability claims against social media companies because "[a]llowing this case to go forward on theories of product liability would be like trying to fit a four-dimensional peg into a three-dimensional hole").[11]

---

[11] Because the Binance Platform is a service, not a product, it also does not qualify as "chattel" for purposes of Plaintiffs' negligent entrustment claim. This is an independent basis for dismissing the negligent entrustment claim. (*See supra* Part IV; *see also* Br. at 43). Plaintiffs' Opposition advances two theories for why this Court should expand the definition of chattel to encompass the Binance Platform. Neither is persuasive. *First*, Plaintiffs argue that the Binance platform "consists of physical objects" such as "physical servers." (Opp. at 36). But, of course, Plaintiffs do not

### B.  The Binance Platform Did Not Proximately Cause Plaintiffs' Alleged Injuries.

Even if Plaintiffs had sufficiently alleged that the Binance Platform qualifies as a "product" (they have not), their claim would still fail because they have not (and cannot) plausibly allege that the Platform proximately caused their injuries.  (Br. at 42).

Plaintiffs concede they were injured by terrorists, but argue they have pled proximate cause as to BHL because "manufacturers are liable for *foreseeable* criminal uses of their products" (Opp. at 42 (emphasis in original)).  But Plaintiffs' theory suffers from a fatal disconnect, as their own cases confirm.  In each case Plaintiffs cite, there was a *direct* causal link between the product at issue and the plaintiffs' injuries.  For example, in *In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, the train derailment that injured plaintiffs was *caused* by the alleged defects in the railroad tracks.  895 F. Supp. 2d 48, 68 (D.D.C. 2012).  In *LeBouef* v. *Goodyear Tire & Rubber Co.*, the car accident that injured plaintiffs was *caused* by the allegedly defective tires. 623 F.2d 985, 988 (5th Cir. 1980).  And in *Erony* v. *Alza Corp.*, the plaintiff's death was *caused* by consuming the allegedly defective medication.  913 F. Supp. 195, 197 (S.D.N.Y. 1995).

Here, by contrast, Plaintiffs allege only that BHL's AML lapses *failed to prevent* users allegedly associated with Hamas and other FTOs from accessing the Binance Platform, and that *the FTOs themselves* then used funds that passed through the platform to commit the October 7 Attacks.  (*See*, *e.g.*, AC ¶¶ 135, 137, 206, 209, 258, 265, 291).  Plaintiffs do not even allege that

---

allege that BHL entrusted FTOs with any of the physical hardware comprising the platform. *Second*, for the reasons described above, Plaintiffs argue that this Court should recognize intangible goods, such as software and websites, as chattel.  In support of this, Plaintiffs point to cases in which courts have recognized a webpage as chattel in the context of trespass; for example, when a webpage was impermissibly accessed and deleted. (*See*, *e.g.*, *id.* at 37 (citing *Ground Zero Museum Workshop* v. *Wilson*, 813 F.Supp.2d 678, 697 (D. Md. 2011)).  But even if this Court were inclined to expand the law in such a way—which it should not—this would still be inapplicable to Plaintiffs' claim, because what Plaintiffs allege was entrusted to FTOs are the transaction services made available through the Binance platform, not the webpage itself.

BHL processed a single transaction, let alone a substantial volume, directly linked to the Attacks. Without more, Plaintiffs have not come close to pleading proximate cause.  *See, e.g.*, *Brooks* v. *iSECUREtrac Corp.*, 2014 WL 12489670, at *9 (D. Md. Mar. 26, 2014) (rejecting plaintiff's "virtually limitless scope of proximate cause" which would hold ankle monitor manufacturer "liable for essentially any injury caused by [a criminal third party] once he left his specified [monitoring] area—holding up a store and shooting the owner, causing violence miles away, etc.").

## VI.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PUBLIC NUISANCE (COUNT 15).

Plaintiffs ask the Court to dramatically expand the scope of claims for public nuisance to include "terrorist financing" (*see* Opp. at 38), yet offer no supporting authority.  Nor have they grappled with the D.C. Court of Appeals decision counseling against this type of expansive liability.  (Br. at 44 (citing *D.C.* v. *Beretta, U.S.A., Corp.*, 872 A.2d 633, 651 (D.C. 2005)).  In *Beretta*, the court declined to expand the public nuisance doctrine to encompass claims against gun manufacturers because such a sprawling theory of public nuisance would "disregard[] or greatly dilute[] the liability-limiting factors" that defeated the plaintiffs' negligence claims based on the same conduct.  *Id.* at 647 (public nuisance doctrine is not a catch-all for "societal problems" better left to legislature or other tort theories)*.*  This Court should do the same here.[12]

### CONCLUSION

The Court should grant BHL's motion to dismiss the Amended Complaint with prejudice.

---

[12] Plaintiffs' failure to establish a duty of care or proximate causation are independent bases for defeating their public nuisance claim.  (*See* Br. at 45).

Dated: October 14, 2025

Respectfully submitted,

<u>*Angela F. Collins*</u>
**CAHILL GORDON & REINDEL LLP**
Angela F. Collins (DC Bar No. 473891)
900 16th Street N.W., Suite 500
Washington, D.C. 20006
(202) 862-8930
ACollins@cahill.com

Samson A. Enzer (*pro hac vice*)
Anirudh Bansal (*pro hac vice*)
Sesi Garimella (*pro hac vice*)
32 Old Slip
New York, NY 10005
(212) 701-3125
SEnzer@cahill.com
ABansal@cahill.com
SGarimella@cahill.com

*Attorneys for Binance Holdings Limited
d/b/a Binance.com*

26