**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LIAT ATZILI, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:24-cv-03365 (CJN) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

Several victims of the October 7 attacks against Israel claim here that the corporate entities

that operate the Binance cryptocurrency exchanges assisted the terrorists who carried out those

attacks.  ECF 47.  In particular, Plaintiffs contend that BAM Management US Holdings, Inc. and

BAM Trading Services Inc. (collectively, BAM), as well as Binance Holdings Limited (BHL), are

liable under federal antiterrorism statutes and state tort law because they failed to implement

adequate sanctions controls and did not report or remove terrorist-linked users despite warnings

that accounts associated with Hamas and Iran were transacting on their platforms.  Those

Defendants move to dismiss for lack of personal jurisdiction and failure to state a claim for relief.

ECF 63; ECF 64.

Although Plaintiffs suffered horribly from the October 7 attacks, and although the amended

complaint raises serious concerns about how users associated with terrorists might exploit the lack

of controls on the Binance platforms, Plaintiffs' allegations fail to establish that the assistance

BAM and BHL provided to Hamas was substantial or connected enough to the October 7 attacks

to merit liability.  The Court of Appeals's recent holding that "[a]lleging that a defendant generally

1

knew its assistance was going to a terrorist organization is insufficient" dooms Plaintiffs' claims for aiding-and-abetting liability. *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 608 (D.C. Cir. 2026); *see also* 18 U.S.C. § 2333(d)(2). Plaintiffs' primary liability claims fail because the alleged compliance defects in BAM's and BHL's operation of their cryptocurrency platforms do not constitute "activities" that "involve violent acts or acts dangerous to human life." 18 U.S.C. § 2331(1). And without a surviving federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' "novel" claims under state law. 28 U.S.C. § 1367(c). The Court accordingly grants BAM's and BHL's motions to dismiss.

## I.    Background

To resolve the pending motions to dismiss, it is helpful to understand Plaintiffs' allegations regarding the structure and conduct of BAM and BHL, the funding and execution of the October 7 attacks, and the procedural posture of this case.[1]

## A.    The Binance Entities and Operations

In July 2017, Changpeng Zhao founded BHL to operate a cryptocurrency exchange accessible at Binance.com. ECF 47 ¶ 116. This exchange now hosts millions of users conducting trillions of dollars in virtual transactions across more than 180 countries. *Id.* As of March 2018, more than a third of its users resided in the United States. *Id.* ¶ 124. Plaintiffs allege that "Zhao and [BHL] understood that they were operating Binance.com in violation of numerous U.S. laws" and that they consequently "hired several advisors to counsel them on managing their U.S. legal exposure." *Id.* ¶¶ 149, 151. When presented with a choice of a "low risk approach of active outreach to regulators [to] resolve all potential issues" and a "moderate risk approach in which

---

[1] "At the motion to dismiss stage," the Court of course "accept[s] as true all of the complaint's relevant allegations of fact." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 40 n.2 (D.C. Cir. 2020).

[BHL] would establish a U.S. entity that w[ould] become the target of all built-up enforcement tensions . . . and insulate [BHL] from legacy and future liabilities," BHL went with the latter approach. *Id.* ¶¶ 151–53 (alterations adopted) (citations and internal quotation marks omitted).

In September 2019, Zhao launched BAM to provide American users a cryptocurrency exchange accessible at Binance.US. *Id.* ¶ 117. BAM took several steps to comply with U.S. financial services regulations, such as registering Binance.US as a money services business with the Financial Crimes Enforcement Network (FinCEN). *Id.* ¶ 118. This registration obligated BAM to "develop, implement, and maintain an effective" anti-money laundering (AML) program with know your client (KYC) controls. *Id.* ¶¶ 140–43.

Plaintiffs allege that although BHL "represented to the public, U.S. regulators, and U.S. courts that Binance.[US] was the exclusive Binance trading platform for U.S. users," BHL "simultaneously engaged in a widespread and covert effort to permit U.S. customers, particularly its VIP users, to continue to use the Binance.com access point to the Binance Platform." *Id.* ¶¶ 176–77. As evidence of this deception, Plaintiffs assert that "Zhao directed [BHL] to implement a plan to encourage customers to circumvent [BHL]'s geographic blocking of US-based IP addresse[s] by using a VPN to conceal their US location." *Id.* ¶ 180. And they allege that BHL's Chief Compliance Officer drafted a "'VIP Handling' document" that "instructed [BHL] employees to make sure th[at] U.S. customers opened new accounts 'with no US documents allowed' and to inform the customer 'to keep this confidential.'" *Id.* ¶ 183 (citation omitted).

Plaintiffs also allege that, beyond having insufficient controls, BHL failed to act after learning that users associated with terrorist organizations, including Hamas, were engaged in transactions on its platform. "In April 2019, [BHL] received reports from its third-party service provider, identifying Hamas-associated transactions." *Id.* ¶ 192. But it did not file a suspicious

3

activity report (SAR) with FinCEN about this activity. *Id.* BHL "also failed to file a SAR with FinCEN on its connections to BuyCash, a money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising," despite being "aware of extensive suspicious activity involving this entity" before the formal designation. *Id.* ¶ 208. Furthermore, "[i]n one instance, in July 2020, after a third-party service provider flagged accounts associated with ISIS and Hamas, the former Chief Compliance Officer . . . instructed compliance personnel to check if he is a VIP account, if yes, to offboard the user but let him take his funds and leave." *Id.* ¶ 210 (alterations adopted) (citation and internal quotation marks omitted). And "[b]etween December 29, 2021 and July 5, 2023, the [Israeli National Bureau for Counter Terror Financing (NBCTF)] issued at least nine . . . Seizure Orders identifying and seizing funds from dozens of Binance accounts affiliated with various terrorist organizations, including individuals associated with Hamas." *Id.* ¶ 217.

Eventually, BHL's and Zhao's inadequate compliance controls caught up with them. In November 2023, the U.S. Department of Justice announced criminal settlements with BHL and Zhao. *Id.* ¶ 222. "Zhao pleaded guilty to violating federal law by failing to maintain an effective AML program and conducting an unlicensed money transmitting business." *Id.* ¶ 223. BHL "and its CEO admitted that its own data showed it caused at least $890 million in transactions between U.S. users and users [BHL] identified as Iranians between August 2017 and October 2022." *Id.* ¶ 224. BHL agreed to pay a financial penalty of more than $4.3 billion, and Zhao agreed to pay $50 million as part of his plea agreement. *Id.* ¶ 226.

**B.    The October 7 Attacks**

Plaintiffs allege that, since at least 2017, Hamas has relied on cryptocurrency exchanges to avoid sanctions controls while engaging in financial transactions. *Id.* ¶ 74. In aid of its terrorist

4

activities, Hamas has received significant support from Iran, including "tens of millions of dollars in cryptocurrency transfers" and "shared . . . expertise in rocket development and training, enabling Hamas to manufacture advanced weapons locally." *Id.* ¶¶ 74–75. This general aid eventually progressed to the support of the specific terrorist attacks at issue in this suit.

In December 2020, Hamas started training for what would become the October 7 attacks. *Id.* ¶ 81. Hamas conducted complex drills to prepare and even "built a mock Israeli military base" to practice storming buildings and taking hostages. *Id.* ¶¶ 83–84. According to later reporting, "Iranian security officials helped to plan the attack and 'gave the green light for the assault.'" *Id.* ¶ 85. "By September 2023, hundreds of Hamas militants had traveled to Iran for training, learning tactics such as using drones . . . [and] paragliders." *Id.* ¶ 78. On October 7, 2023, Hamas put this training and financial support to use, launching attacks "on several fronts throughout Israel." *Id.* ¶ 90.

Plaintiffs are victims of the October 7 attacks. Liat Atzili was captured by terrorists on October 7 and held in captivity for 54 days. *Id.* ¶¶ 303–06, 325–26. The day after her release, she learned that Hamas had killed her husband, Aviv, on the day of the attack and had taken his body to Gaza. *Id.* ¶ 331. Hamas had also killed their dog and severely damaged their house. *Id.* ¶¶ 333–34.

Keith and Aviva Siegel attempted to hide in their safe room after hearing sirens and rockets on the morning of October 7. *Id.* ¶¶ 343–44. The terrorists eventually found them, shot Keith in the hand, injured Aviva's knee, and took them to underground tunnels in Gaza. *Id.* ¶¶ 347–49, 352–53. While in captivity, the Siegels were routinely deprived of food and water. *Id.* ¶ 355. Hamas released Aviva after 51 days, but it kept Keith hostage and continued to torment him until finally releasing him after 484 days. *Id.* ¶¶ 367, 378, 380–81.

Shai Siegel, Keith and Aviva's oldest son, was trapped in a saferoom in his own house for over 24 hours. *Id.* ¶ 389. Although he was able to avoid capture, he lost his house and "is now living away from family and friends and continues to grapple with his own experience on October 7th, coupled with the experience of having both of his parents being taken hostage." *Id.* ¶ 394. The rest of Keith and Aviva's children—Elan Tiv, Shir Siegel, and Gal Siegel—and Keith's siblings—Lucy Siegel, Lee Siegel, and David Siegel—also allege that they "suffered lasting and permanent injuries, as well as tremendous pain and suffering," from witnessing their family members be taken hostage. *Id.* ¶¶ 395, 398.

## C.    Procedural History

A year after her release, Liat Atzili filed this suit against Iran, Hamas, BAM, BHL, and Zhao. ECF 1. Members of the Siegel family later joined as plaintiffs. ECF 47. Together, they raise several claims under federal antiterrorism law and state tort law for the injuries they suffered due to the October 7 attacks. *Id.* ¶¶ 425–636.

BAM and BHL moved to dismiss the amended complaint. ECF 63; ECF 64. While briefing on those motions was ongoing, they also moved to stay discovery. ECF 71. Plaintiffs opposed that request for a stay and filed their own motion to compel discovery. ECF 80. The Court held oral argument on these motions last month.[2] *See* Min. Entry of Apr. 21, 2026.

## II.    Legal Standards

Federal Rule of Civil Procedure 12(b)(2) authorizes a defendant to move for dismissal due to a "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). "[W]hen personal jurisdiction is in

---

[2] An ongoing dispute about proper service of Hamas and Zhao has been running on a parallel track to the proceedings involving BAM and BHL. The Court recently authorized Plaintiffs' request for alternative service under Federal Rule of Civil Procedure 4(f)(3) for Hamas but denied it as to Zhao. ECF 101.

question, a court must first determine that it possesses personal jurisdiction over the defendants before it can address the merits of a claim." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018). "The plaintiff has the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). "In determining whether such a basis exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Id.*

Federal Rule of Civil Procedure 12(b)(6) also permits dismissal where a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, courts "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (alterations adopted) (citation and internal quotation marks omitted). "Dismissal under Rule 12(b)(6) is appropriate where, taking all factual allegations as true and construing all inferences in the plaintiff's favor, a plaintiff's pleadings do not present 'enough facts to state a claim to relief that is plausible on its face.'" *Goodrich v. Bank of Am. N.A.*, 136 F.4th 347, 353 (D.C. Cir. 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### III.    Personal Jurisdiction

Plaintiffs advance two theories of personal jurisdiction in this case. They contend first that the Court has personal jurisdiction over both BAM and BHL under the District of Columbia's long-arm statute. ECF 81 at 15–19; ECF 83 at 3–6. Plaintiffs argue, in particular, that the Court "may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim

7

for relief arising from the person's . . . transacting any business in the District of Columbia."[3]  D.C. Code § 13-423(a)(1).  They also maintain that the Court has personal jurisdiction over BHL pursuant to Federal Rule of Civil Procedure 4(k)(2) based on a signed stipulation in which BHL agreed to waive objections to service.  ECF 83 at 6–8; *see also* ECF 20.  BAM and BHL respond that the Court lacks personal jurisdiction over them due to their minimal connections to the District and the absence of a link between their contacts in the District and Plaintiffs' injuries.  ECF 63-1 at 12–14; ECF 64-1 at 6–7.  BHL further objects that Rule 4(k)(2) is inapplicable here because the stipulation also provides that Plaintiffs would forego arguing that BHL had waived any defenses, including lack of personal jurisdiction.  ECF 64-1 at 9; ECF 87 at 2–3.  Because the Court concludes that the D.C. long-arm statute appears to provide personal jurisdiction over BAM and BHL, it does not address whether Rule 4(k)(2) applies.[4]

"With limited exceptions, the [District]'s 'transacting any business' clause has been interpreted to provide jurisdiction to the full extent allowed by the Due Process Clause."  *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).  "[T]he statutory and constitutional jurisdictional questions, which are usually distinct," therefore "merge into a single inquiry:  would exercising personal jurisdiction accord with the demands of due process?"  *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (citation and internal quotation marks omitted).

---

[3] As relevant here, "the term 'person' includes . . . a corporation, partnership, association, or any other legal or commercial entity, whether or not a citizen or domiciliary of the District of Columbia and whether or not organized under the laws of the District of Columbia."  D.C. Code § 13-421.

[4] The Court also does not address the Parties' arguments as to whether BAM is the alter ego of BHL because this issue does not affect resolution of the pending motions.  *See* ECF 63-1 at 41–45; ECF 64-1 at 13–15; ECF 81 at 5–7, 20–26; ECF 83 at 14; ECF 86 at 12–18; ECF 87 at 7.  As will be explained, BAM and BHL separately have sufficient suit-related contacts for the Court to exercise personal jurisdiction over each of them under the D.C. long-arm statute.  And Plaintiffs fail to plead a plausible claim of aiding-or-abetting or primary liability under federal law even if the Court assesses the allegations against BAM and BHL collectively.

"A court's jurisdiction over a defendant satisfies due process when there are 'minimum contacts' between the defendant and the forum 'such that he should reasonably anticipate being haled into court there.'" *Id.* (first quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); and then quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  In addition, "submission through contact with and activity directed at a sovereign may justify specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'"  *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  The D.C. long-arm statute relatedly requires "a nexus between the plaintiff's claim and the defendant's business activities in the forum jurisdiction."  *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 332 (D.C. 2000); *see also Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2016) (explaining that although the "provision has been held 'to be coextensive (for cases that fit within its description) with the Constitution's due process limit[,]' . . . subsection (a)(1) still 'contemplates a connection that is related to the claim in suit'" (alterations adopted) (quoting *Crane v. Carr*, 814 F.2d 758, 762–63 (D.C. Cir. 1987))).

Plaintiffs allege a number of links between both BAM and BHL and the District.  The amended complaint alleges that "[a]t all relevant times, [BHL] intentionally maintained substantial connections to the United States, including in the District of Columbia, from which it generated, among other things, web traffic, user base, transaction volume, and profit."  ECF 47 ¶ 122. Plaintiffs also cite consumer complaints made by D.C. users against BAM in a Consumer Financial Protection Bureau database as evidence that residents of the District used its platform.  ECF 81-15 at 3, 6–7.  Focusing on Plaintiffs' allegations that BAM is "registered to do business in the district" and that "[t]he Binance Platform remains accessible to District of Columbia residents," ECF 47 ¶¶ 55, 57, BAM protests that "allegations that D.C. residents could access BAM's interactive

website are not tantamount to allegations that any D.C. residents actually engaged in any business transactions with BAM, as required to establish personal jurisdiction," ECF 63-1 at 13 (alteration adopted) (citation and internal quotation marks omitted).  But this objection ignores that Plaintiffs plead that "[t]he Binance Defendants derived substantial revenue from their business in the U.S., deriving substantial revenue in this District"—which would not be possible unless business transactions actually took place in the District.[5]  ECF 47 ¶ 133.

Other relevant allegations confirm the extent of BAM's and BHL's D.C.-based contacts, which appear to be "voluntary and deliberate, rather than fortuitous."  *Mouzavires v. Baxter*, 434 A.2d 988, 995 (D.C. 1981).  Plaintiffs allege that BHL "had several employees who worked from and reside in this District, including its Global Head of Intelligence and Investigations, its Global Money Laundering Reporting Officer, at least one member of its Global Advisory Board, and its Vice President of Global Intelligence and Investigations."[6]  ECF 47 ¶ 127.  Given that "physical

---

[5] In the amended complaint, "Plaintiffs collectively refer to Defendants Binance Holdings Limited . . . , Changpeng Zhao . . . , BAM Management US Holdings, Inc. . . . , and BAM Trading Services, Inc . . . as the 'Binance Defendants' or 'Binance entities.'"  ECF 47 ¶ 29.  References, as here, to the "Binance Defendants" therefore encompass both BAM and BHL.

[6] The cited paragraph of the amended complaint refers to "Binance" having these D.C.-based employees, which by Plaintiffs' own naming conventions, sweeps in only BHL.  *See* ECF 47 ¶¶ 29, 127.  Plaintiffs nonetheless contend in their response to BAM's motion to dismiss that "BAM maintains a physical presence in the District and maintains various employees in 'the precise type of positions' with 'decision-making capability surrounding the issues that form the basis for this Amended Complaint' in the District, including employees on the investigations, policy and compliance, and money laundering reporting teams."  ECF 81 at 16 (quoting ECF 47 ¶ 127).  As support for this claim, Plaintiffs cite the aforementioned paragraph, as well as another paragraph about relevant employees that more broadly alleges that "[t]hese individuals were specifically involved in the Binance Defendants' negligent acts and with the decision-making that caused the Binance Platform to be defective in design, guarding, and manufacture."  ECF 47 ¶ 126.  In addition, Plaintiffs cite exhibits establishing that at least some of the relevant employees worked for BAM.  *See, e.g.*, ECF 81-17 at 3 ("Binance.US is also deepening its presence in Washington D.C., having last week named Josh Wilsusen . . . as its first Chief Policy Officer.").  The Court consequently concludes that Plaintiffs have alleged that both BAM and BHL had compliance-related employees working in the District.

entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact," *Walden v. Fiore*, 571 U.S. 277, 285 (2014), the decision to hire key employees in the District supports personal jurisdiction here.  After all, "[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *McGee v. Int'l Life Ins.*, 355 U.S. 220, 223 (1957)).  Plaintiffs also highlight that BAM joined D.C.-based professional associations.  ECF 47 ¶ 134.  Although this sort of connection would likely be insufficient on its own, when considered with the other allegations, it is more evidence of an "affiliation with the [District]."  *Walden*, 571 U.S. at 286.

Plaintiffs therefore allege business activities by both BAM and BHL in the District, but whether there is a sufficient nexus between those activities and Plaintiffs' claims is a closer question.  Considerations of due process and the D.C. long-arm statute require that "the litigation results from alleged injuries that 'arise out of or relate to' those activities" that BAM and BHL "'purposefully directed'" at the forum.  *Burger King*, 471 U.S. at 472 (first quoting *Helicopteros Nacionales*, 466 U.S. at 414; and then quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." (citation and internal quotation marks omitted)).  Given that "[t]he requirement of a nexus between the plaintiff's claim and the defendant's business activities in the forum jurisdiction has been stated in the disjunctive," "if the claim either arises out of *or* relates to the nonresident defendant's business activity, specific jurisdiction may be exercised."  *Shoppers*, 746 A.2d at 332.  "The first half of that standard asks about causation; but

11

the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

Plaintiffs contend that they satisfy this nexus requirement because their "claims arise out of BAM's [and BHL's] decisions to drive users to the Binance Platform through *both* the Binance.com and Binance.us apps to increase the profits of BAM and BHL, despite lacking adequate KYC, AML, and sanctions-monitoring controls." ECF 81 at 17–19; ECF 83 at 5–6. Although Plaintiffs' nexus theory is somewhat novel, it appears to be just enough to satisfy the bar set by existing precedent.

Plaintiffs allege that BAM's and BHL's decisions not to implement sufficient anti-money laundering and sanctions controls were made in the District, and that those decisions led to the financing of the October 7 attacks that ultimately injured them. ECF 47 ¶¶ 186, 206–10, 493, 568, 622. Whether these allegations are sufficient hinges on the Court of Appeals's decision in *Bernhardt v. Islamic Republic of Iran*, which held in a comparable case involving the financing of terrorist entities that a plaintiff must "allege *some relation* between the sanctions evasion by the foreign defendants and the injuries suffered in the terrorist attack."[7] 47 F.4th 856, 866 (D.C. Cir. 2022) (emphasis added). There, the Court concluded that the plaintiff had not alleged a sufficient nexus between the terrorist attack that caused her injuries and the foreign bank defendants that allowed evasion of sanctions controls because transactions associated with the terrorist-linked intermediaries lacked any specific connection to al-Qaeda—the terrorist group that carried out the attack. *See id.* at 864–66.

---

[7] BAM's and BHL's reliance on *Cockrum v. Donald J. Trump for President, Inc.*, which required "a more exacting nexus," 319 F. Supp. 3d 158 (D.D.C. 2018), is misplaced because that case predated the Supreme Court's clarification of the requirement in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).

Unlike the plaintiff in *Bernhardt*, who "fail[ed] to allege any aid flowing indirectly through the[] intermediary banks to al-Qaeda," *id.* at 865, Plaintiffs here specifically allege that "[BHL] was aware that Hamas, PIJ, and other architects of the October 7th Attacks were using Binance to fundraise," ECF 47 ¶ 209; *see also id.* ¶ 255 ("[BHL], as well as its senior officers and employees, including Zhao, were aware that members of Hamas were using the Binance Platform to fund terrorism."). As for BAM, Plaintiffs argue that "in fulfilling its function to serve as a regulatory shield for BHL so that BHL could flout AML, KYC, and sanctions regulations, BAM ratified and made possible BHL's facilitation of terrorist financing through the Binance Platform." ECF 81 at 19; *see also* ECF 47 ¶¶ 154, 221, 258. Such allegations are sufficient given that Plaintiffs "did not need to allege the [compliance] evasion *caused* the [October 7 attacks]" nor "to identify specific dollars spent on the terrorist attack." *Bernhardt*, 47 F.4th at 866. In addition, where "a defendant uses forum contacts as an instrument for achieving the wrong alleged," there is enough of "'an affiliation between the forum and the underlying controversy'" for the Court to exercise personal jurisdiction. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 234 (D.C. Cir. 2022) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017)), *cert. granted*, *judgment vacated*, 144 S. Ct. 2675 (2024), *and opinion reinstated in relevant part*, 165 F.4th 592 (D.C. Cir. 2026). Although the question is a close one, the Court concludes that Plaintiffs have made the "*prima facie* showing" required to establish personal jurisdiction. *Edmond v. U.S. Postal Serv. Gen. Couns.*, 949 F.2d 415, 424 (D.C. Cir. 1991).

## IV.    Federal Claims

Plaintiffs assert two kinds of federal claims against BAM and BHL. First, they contend that BAM and BHL aided and abetted Hamas by allowing it to transact on Binance leading up to

13

the October 7 attacks.  ECF 47 ¶¶ 563–73.  Second, they argue that BAM and BHL directly committed acts of international terrorism.  *Id.* ¶¶ 574–600.

## A.    Aiding-and-Abetting Liability

The Justice Against Sponsors of Terrorism Act (JASTA) amended the Anti-Terrorism Act (ATA) to impose liability "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" against "any person who aids and abets, by knowingly providing substantial assistance."  18 U.S.C. § 2333(d)(2).  "To state a claim of aiding and abetting under the ATA, plaintiffs thus need to plead three statutory elements:  (1) an injury arising from an act of international terrorism; (2) which act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted the act of international terrorism by knowingly providing substantial assistance."  *Atchley*, 165 F.4th at 601–02.  BAM and BHL do not contest Plaintiffs' allegations as to the first two elements, but do argue as to the third that they did not knowingly nor substantially assist Hamas in carrying out the October 7 attacks.  ECF 63-1 at 15–21; ECF 64-1 at 20–31.

Liability under this provision of JASTA attaches only where a defendant "aids and abets, by knowingly providing substantial assistance.'"  18 U.S.C. § 2333(d)(2).  Although "[n]othing in the statute defines any of those critical terms," "terms like 'aids and abets' are familiar to the common law."  *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1218 (2023).  "In enacting JASTA, Congress provided additional context by pointing to *Halberstam v. Welch*, 705 F.2d 472 ([D.C. Cir.] 1983), as 'providing the proper legal framework' for 'civil aiding and abetting and conspiracy liability.'"  *Twitter*, 143 S. Ct. at 1218 (alteration adopted) (quoting JASTA, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016)).  Under *Halberstam*, six factors "help determine whether a

14

defendant's assistance was 'substantial':  '(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given.'" *Atchley*, 165 F.4th at 603 (quoting *Twitter*, 143 S. Ct. at 1219).  The "'basic thrust'" of these factors is "attaching liability to 'conscious, voluntary, and culpable participation in another's wrongdoing.'"  *Id.* (quoting *Twitter*, 143 S. Ct. at 1220, 1223).  And in practice, "[c]ulpability is measured by 'the twin requirements' of 'knowing' and 'substantial' assistance, which 'work in tandem' to permit a court to 'infer conscious and culpable assistance,' with a 'lesser showing of one demanding a greater showing of the other.'"  *Id.* (alteration adopted) (quoting *Twitter*, 143 S. Ct. at 1222).

In addition, the "defendants must have 'aided and abetted *the act of international terrorism that injured the plaintiffs.*'"  *Id.* (quoting *Twitter*, 143 S. Ct. at 1225).  Aiding-and-ability liability therefore attaches only where there is a sufficient nexus "between the alleged assistance and the wrongful act."[8]  *Twitter*, 143 S. Ct. at 1224.  "Like the ingredients of culpability, nexus operates on a sliding scale . . . measured by the closeness of the relationship between defendants' assistance and the act of international terrorism that injured plaintiffs."  *Atchley*, 165 F.4th at 604.  "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance."  *Twitter*, 143 S. Ct. at 1230.  "But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort."  *Id.*

---

[8] This nexus standard is distinct from the nexus standard for personal jurisdiction, as it concerns the connection between the alleged assistance and the terrorist act rather than the relationship between forum contacts and the claims in the suit.

Two recent decisions applying these considerations have illustrated the bounds of aiding-and-abetting liability under JASTA.  On one side of the line, the Supreme Court held in *Twitter, Inc. v. Taamneh* that victims of a terrorist attack failed to state an aiding-and-abetting claim against social media companies accused of "knowingly allowing ISIS and its supporters to use their platforms and benefit from their 'recommendation' algorithms, enabling ISIS to connect with the broader public, fundraise, and radicalize new recruits."  143 S. Ct. at 1217, 1231.  The Court concluded that the victims' claims could not survive a motion to dismiss because, among other pleading defects, they "never allege[d] that, after defendants established their platforms, they gave ISIS any special treatment or words of encouragement."  *Id.* at 1226.  It further emphasized that "[t]he fact that these algorithms matched some ISIS content with some users . . . does not convert defendants' passive assistance into active abetting."  *Id.* at 1227.  And it explained that aiding-and-abetting liability does not attach where "defendants [were] bystanders, watching passively as ISIS carried out its nefarious schemes."  *Id.*

On the other side of the line, the Court of Appeals held in *Atchley v. AstraZeneca UK Ltd.* that aiding-and-abetting claims could proceed against pharmaceutical manufacturers and suppliers alleged to have "paid illegal cash bribes directly to [terrorists] and supplied extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations against Americans."  165 F.4th at 596, 601.  The Court concluded that the victims "allege enough to support reasonable inferences that defendants knew their ongoing dealings with the Ministry of Health materially supported terrorist attacks against Americans" and pointed out that "[i]t is not business as usual for sophisticated transnational companies to provide cash and in-kind bribes to a known terrorist organization over a period of years when that organization is openly maiming and killing U.S. citizens."  *Id.* at 609, 611.  Distinguishing the case from *Twitter*,

the Court emphasized that "defendants here had bespoke dealings with Jaysh al-Mahdi" that amounted to a "voluntary, tailored relationship." *Id.* at 612–13.

Against this backdrop, Plaintiffs' claims for aiding-and-abetting liability against BAM and BHL merit dismissal. As to culpability, Plaintiffs fail to allege that BAM and BHL provided the degree of "knowing and substantial assistance to the primary tortfeasor" required to establish aiding-and-abetting liability under JASTA. *Twitter*, 143 S. Ct. at 1222. Plaintiffs do put forth some allegations that BAM and BHL had or should have had notice that terrorist organizations "were using Binance to fundraise." ECF 47 ¶ 209. They allege, for example, that senior employees "receiv[ed] information 'regarding HAMAS transactions' on Binance" in February 2019; that "[BHL] received reports from its third-party service provider, identifying Hamas-associated transactions," in April 2019; and that the Israeli NBCTF "issued at least nine . . . Seizure Orders identifying and seizing funds from dozens of Binance accounts affiliated with various terrorist organizations, including individuals associated with Hamas," between December 2021 and July 2023. *Id.* ¶¶ 191–92, 217–18 (citation omitted). But "[a]lleging that a defendant generally knew its assistance was going to a terrorist organization is insufficient." *Atchley*, 165 F.4th at 608; *see also Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1567 (2025) ("When a company merely knows that 'some bad actors' are taking 'advantage' of its products for criminal purposes, it does not aid and abet." (quoting *Twitter*, 143 S. Ct. at 1228)); *Twitter*, 143 S. Ct. at 1226 ("[I]t might be that bad actors like ISIS are able to use platforms like defendants' for illegal—and sometimes terrible—ends . . . . Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large."). After all, "the ATA imposes liability for aiding and abetting 'acts of international terrorism,' not for incidentally supporting a terrorist organization." *Atchley*, 165 F.4th at 608 (alteration adopted)

17

(quoting 18 U.S.C. § 2333(d)(2)).  That BAM and BHL were aware that some "Hamas-associated transactions," ECF 47 ¶ 192, were happening on their platforms that are "generally available to the . . . public" is not enough to establish a culpable "state of mind with respect to their actions and the tortious conduct," *Twitter*, 143 S. Ct. at 1226, 1229.

Notably, Plaintiffs fail to plead "[p]erhaps the strongest support for [an] inference of culpable association" in these sorts of aiding-and-abetting cases:  allegations of an "'unusual' kind of assistance." *Atchley*, 165 F.4th at 610.  "[T]here are no allegations that [BAM and BHL] treated [Hamas-linked users] any differently from anyone else." *Twitter*, 143 S. Ct. at 1227.  Instead, Plaintiffs merely allege that BAM and BHL helped high-dollar, VIP clients evade sanctions detection on occasion.[9]  *See, e.g.*, ECF 47 ¶¶ 177, 180–81, 183.  Because the special treatment alleged was given to "VIP users" generally, *id.* ¶ 177, rather than users associated with Hamas in particular, this set of facts falls short of the kind of "bespoke dealings" and "voluntary, tailored relationship" with a terrorist entity at issue in *Atchley*, 165 F.4th at 612–13.  Providing extra attention to high-volume customers who could generate BAM and BHL the most amount of money is simply not the same as "consciously and selectively cho[osing] to promote . . . a particular terrorist group." *Twitter*, 143 S. Ct. at 1228.  And the alleged assistance is a far cry from "knowingly structur[ing] their transactions to facilitate [terrorists'] diversion of funds, drugs, and medical devices." *Atchley*, 165 F.4th at 609 (citation and internal quotation marks omitted).

Furthermore, the assistance that BAM and BHL allegedly provided was not particularly substantial.  Focusing on "the 'basic thrust' of *Halberstam*'s elements" instead of treating each factor "'as immutable components,'" several considerations counsel against imposing aiding-and-

---

[9] Crucially, Plaintiffs allege that BHL flagged users as VIPs if they were "high-volume traders"— not because they had ties to terrorist organizations.  ECF 47 ¶ 411.

abetting liability here. *Twitter*, 143 S. Ct. at 1220 (quoting *Halberstam*, 705 F.2d at 478 n.8, 489). Starting with the relationship between BAM and BHL on the one hand and Hamas on the other, Plaintiffs do not allege a "voluntary, tailored relationship [of] the type courts require under the common law to ground aiding-and-abetting liability in culpable misconduct." *Atchley*, 165 F.4th at 613; *see also Bernhardt*, 47 F.4th at 872 ("The fourth factor considers the closeness of any relationship between the defendant *and the terrorist organization*." (emphasis added)). Plaintiffs do not plead that BAM and BHL had a direct relationship with Hamas or any other terrorist organization, as their evidence of a relationship illustrates that there were multiple degrees of separation between the entities.[10] *See, e.g.*, ECF 47 ¶¶ 208–09 (alleging that BAM and BHL failed to act after "Binance *user addresses* were found to *interact with* bitcoin wallets *associated with* the Islamic State of Iraq and Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and the Palestine Islamic Jihad (PIJ)" (emphases added)). Rather, Plaintiffs implicitly acknowledge this lack of a direct connection by focusing on BAM's and BHL's alleged "direct and deliberate relationship to Hamas's financing" rather than with Hamas itself when discussing this *Halberstam* factor. ECF 81 at 36. Such an attenuated connection is nothing like the "bespoke dealings" the defendants had with terrorists in *Atchley* by which they allegedly "directly supplied Jaysh al-Mahdi with cash and drugs to win its business." 165 F.4th at 612. And that BAM and BHL "w[ere] not

---

[10] Despite primarily pleading that BAM and BHL were aware of "Hamas-associated transactions" and "accounts affiliated with various terrorist organizations," ECF 47 ¶¶ 192, 217, Plaintiffs do in one instance allege that "[BHL], as well as its senior officers and employees, including Zhao, were aware that members of Hamas were using the Binance Platform to fund terrorism," *id.* ¶ 255. Even reading these somewhat inconsistent allegations most charitably to Plaintiffs, however, awareness that some individuals who were members of Hamas were among the millions of users on their platforms is hardly evidence that BAM and BHL had an "active, direct, and particularized" relationship with Hamas in the manner contemplated by *Halberstam* and its progeny. *Atchley*, 165 F.4th at 612.

19

physically present at the terrorist attack[s] on [October 7]" further highlights the several degrees of separation between them and the October 7 attacks. *Bernhardt*, 47 F.4th at 871.

To be sure, "[g]reater access to capital—the alleged aid—is important to [Hamas]'s terrorist efforts, which depend on depositing, transferring, and expending money," and thus can "weigh[] in favor of finding substantial assistance" under the first factor concerned with "the 'nature of the act encouraged.'" *Id.* at 870–71 (quoting *Halberstam*, 705 F.2d at 483). Yet it is worth reiterating that Plaintiffs do not allege that BAM and BHL "directly supplied [Hamas] with cash." *Atchley*, 165 F.4th at 612. They instead blame BAM and BHL for not taking more aggressive action to stop *others* from financially assisting terrorists. *See* ECF 47 ¶ 208. That attenuation, however, illustrates that "[Hamas's] ability to benefit from these platforms was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of defendants directed toward [Hamas]." *Twitter*, 143 S. Ct. at 1229. Concluding that BAM and BHL can be held liable for the October 7 attacks merely because their generally available services are financial-related and money is fungible would contravene *Twitter*'s warning that it is error to focus "primarily on the value of defendants' platforms *to [terrorists]*, rather than whether defendants culpably associated themselves with [the terrorists'] actions." *Id.* That Plaintiffs allege that BAM and BHL were aware that Hamas-associated accounts were operating on their platforms for several years in advance of the October 7 attacks does not save their argument either, as "a lengthy financial relationship does not terrorism assistance make." *Bernhardt*, 47 F.4th at 872.

Moving to nexus, Plaintiffs fail to allege a sufficient connection between BAM's and BHL's alleged assistance and the October 7 attacks that injured Plaintiffs—particularly given their minimal culpability. Even though "[r]equiring an overly rigid nexus is especially inappropriate

when a plaintiff alleges that a defendant provided financial assistance," *Atchley*, 165 F.4th at 606; *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010) (emphasizing that "[m]oney is fungible" for terrorist organizations), Plaintiffs' allegations establish only an attenuated link between BAM and BHL and the October 7 attacks. Once again, BAM and BHL did not fund Hamas—at most they allegedly did not stop others from transferring money to Hamas-associated accounts on their platforms. *Twitter*'s pronouncement that "the question is whether defendants gave substantial assistance to [terrorists] with respect to the [specific] attack," 143 S. Ct. at 1229, therefore appears to govern here rather than *Atchley*'s exception for "funding-based claims," 165 F.4th at 606. Given that Plaintiffs do not allege that any particular Binance transaction supported the October 7 attacks, they fail to adequately link any alleged assistance from BAM and BHL to their injuries. *See Twitter*, 143 S. Ct. at 1224 ("[I]t is not enough, as plaintiffs contend, that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it.").

But even treating the hosting of a cryptocurrency platform on which users associated with Hamas could transmit currency without being detected as a form of "financial assistance," there is not much "closeness . . . between defendants' assistance and the act of international terrorism that injured plaintiffs." *Atchley*, 165 F.4th at 604, 606. Plaintiffs allege that BAM and BHL were "aware that Hamas, PIJ, and other architects of the October 7th Attacks were using Binance to fundraise." ECF 47 ¶ 209. This accusation of "merely fail[ing] to act while [Hamas] (like everybody else) used their platforms," however, lacks a "close[] and . . . distinct tie" to Hamas's "acts of terrorism" against Plaintiffs. *Atchley*, 165 F.4th at 605. Plaintiffs do not allege that BAM and BHL engaged in any conduct like "persistently pursu[ing] opportunities to do business with [Hamas] in particular [or] ma[king] corrupt payments that directly financed [Hamas]'s sustained

21

campaign of terrorist attacks." *Id.* (alteration adopted) (citation and internal quotation marks omitted). And they do not allege specific facts about any "activity [BAM and BHL] *helped* [Hamas] to undertake," which could permit liability where later injuries were "a natural and foreseeable consequence of the activity." *Halberstam*, 705 F.2d at 488 (emphasis added). In light of BAM's and BHL's relatively minimal culpability "for providing their services to the public writ large," *Twitter*, 143 S. Ct. at 1226, such weak allegations of a nexus cannot establish aiding-and-abetting liability under JASTA.

Finally, Plaintiffs' theory of liability would improperly encompass every potential act of terrorism perpetuated by Hamas. Plaintiffs downplay the degree of nexus required to link BAM and BHL to the October 7 attacks, *see* ECF 81 at 32; *cf.* ECF 83 at 34 (arguing that "it would in fact be perfectly justifiable under these circumstances for Plaintiffs to impose liability on Binance for any terror attack in Israel in light of everything BHL knew and did" in the context of whether Plaintiffs' injuries were foreseeable), but in doing so, they implicitly illustrate that imposing aiding-and-abetting liability on BAM and BHL for the October 7 attacks has no limiting principle because any attack carried out by Hamas could theoretically have been funded with money linked to a Binance transaction. "[I]f a plaintiff's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise." *Twitter*, 143 S. Ct. at 1230. Plaintiffs fall well short of making this showing given the lack of any tailored assistance or substantial financial contributions on the part of BAM and BHL. Consequently, as in *Twitter*, "the expansive scope of

22

plaintiffs' claims" therefore "put[s] . . . to rest" any doubt that dismissal of the aiding-and-abetting claims is required.[11]  *Id.* at 1228.

## B.    Primary Liability

The ATA further provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).  The statute defines an act of "international terrorism" to encompass "activities" that (1) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State"; (2) "appear to be intended" to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping"; and (3) "occur

---

[11] The Court is aware that a different district court previously allowed aiding-and-abetting claims to proceed against BHL in a suit brought by other victims of the October 7 attacks.  *See Raanan v. Binance Holdings Ltd.*, No. 24-cv-697, 2025 WL 605594, at *18–24 (S.D.N.Y. Feb. 25, 2025).  But several factual and legal differences distinguish that case from this one.  Beginning with the pleadings, the plaintiffs in *Raanan* put forth more specific allegations of substantial assistance and knowledge than Plaintiffs here.  *See, e.g.*, *id.* at *20 ("The plaintiffs also allege that, from October 2020 to September 2023, Hamas and PIJ executed thousands of transactions on Binance, with a total value of at least approximately $60 million.  The plaintiffs further allege that Hamas publicized its use of Binance, pointing to a 2019 video that Hamas used to solicit donations, which instructs viewers to create a new account on one of the trading platforms, including, notably, Binance." (citations and internal quotation marks omitted)).  Next, the court in *Raanan* did not seem to grapple with the fact that BHL's alleged assistance in helping certain users evade sanctions controls was based on customers' VIP status as high-volume users rather than their connections to Hamas.  Finally, and most importantly, *Atchley* controls the Court's analysis here unlike in *Raanan*—a decision that predated *Atchley* and came from a court that would not have been bound by *Atchley* anyway.  The Court of Appeals made clear in *Atchley* that "[a]lleging that a defendant generally knew its assistance was going to a terrorist organization is insufficient," 165 F.4th at 608, and, for all the reasons already discussed, Plaintiffs have failed to state a plausible claim for aiding-and-abetting liability under the standard from that case.  This conclusion is not an outlier, as another district court in the same district as the *Raanan* court recently granted BHL's motion to dismiss in a similar case.  *See Troell v. Binance Holdings Ltd.*, No. 24-cv-7136, 2026 WL 636849, at *21–22 (S.D.N.Y. Mar. 6, 2026).

primarily outside the territorial jurisdiction of the United States." *Id.* § 2331(1).  Plaintiffs raise two claims of direct liability under the ATA.  ECF 47 ¶¶ 574–600.  The first is based on a violation of 18 U.S.C. § 2339A, which criminalizes "[w]hoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" various terrorism-related statutes.  And the second relies on a violation of 18 U.S.C. § 2339B(a)(1), which imposes liability on "[w]hoever knowingly provides material support or resources to a foreign terrorist organization."

Plaintiffs have not pleaded a plausible primary liability claim under the ATA.  None of the conduct BAM and BHL allegedly undertook rises to the level of "activities" that "involve violent acts or acts dangerous to human life."  18 U.S.C. § 2331(1).  Plaintiffs plead that "[t]he material assistance provided by the Binance Defendants to Hamas was dangerous to human life because it constituted material support for Hamas to finance the planning, training, and execution of the attacks."  ECF 47 ¶ 581.  As has already been discussed, however, such alleged assistance was limited to BAM and BHL not taking action to enforce stricter sanctions controls after receiving warnings that accounts associated with Hamas were using their platforms.  Holding that BAM's and BHL's alleged inaction here "involve[d] violent acts or acts dangerous to human life" would stretch the ATA's statutory requirements beyond any reasonable interpretation.  18 U.S.C. § 2331(1); *see also Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 159 (E.D.N.Y. 2019) (concluding that allegations about "Defendant's indirect contribution, through banking services, to terrorist activities" did not satisfy the statutory requirement after examining dictionary definitions of "violent" and "dangerous"), *aff'd in part*, *appeal dismissed in part*, 842 F. App'x 701 (2d Cir. 2021).  After all, "[d]irect liability under the ATA requires proof that . . . *the*

24

*defendant*"—not terrorists that the defendant allegedly assisted—"committed 'an act of international terrorism.'" *Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1014 (D.C. Cir. 2023) (emphasis added) (quoting 18 U.S.C. § 2333(a)).

There is a divide among courts—that the Court of Appeals has declined to "take a position on"—as to "whether mere financial support can be viewed as an act of international terrorism" under the ATA. *Id.*; *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 326–28 (2d Cir. 2018); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc). But the Court need not wade into that debate because Plaintiffs do not allege that BAM and BHL provided "direct monetary donations to a known terrorist organization," *Linde*, 882 F.3d at 327, or "[gave] money to Hamas," *Boim*, 549 F.3d at 690. It is readily apparent under the ATA's statutory requirements for direct liability that "the provision of banking services, in and of itself, is insufficient . . . to show that the services involved an act of violence or threat to human life." *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 162–63 (2d Cir. 2021). As another court held when adjudicating a similar suit brought against BHL, allegations that "the defendants enabled customers associated with Hamas and PIJ to engage in cryptocurrency transactions" "do not support the conclusion that the defendants committed a terrorist act." *Raanan*, 2025 WL 605594, at *16.

### V.     State-Law Claims

Plaintiffs also raise various tort claims against BAM and BHL.[12] *See* ECF 47 ¶¶ 447–562, 601–36. They argue that the Court possesses supplemental jurisdiction over these state-law claims

---

[12] Plaintiffs conceded in their opposition briefs that the Court should dismiss their negligence per se and manufacturing defect claims. *See* ECF 81 at 11 n.5; ECF 83 at 1 n.1.

pursuant to 28 U.S.C. § 1367(a). *Id.* ¶ 51. A "district court[] may decline to exercise supplemental jurisdiction over a claim," however, if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also* ECF 63-1 at 23 (BAM arguing that "[b]ecause Plaintiffs have no viable federal claims, their state-law claims should be dismissed as well"). "[W]hen state and federal claims are joined and the federal claims are dismissed before trial, the state claims should ordinarily be dismissed as well." *Network Project v. Corp. For Pub. Broad.*, 561 F.2d 963, 970 (D.C. Cir. 1977); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

"[G]uided by consideration of the factors enumerated in 28 U.S.C. § 1367(c)," *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265–66 (D.C. Cir. 1995), the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims. Not only has the Court "dismissed all claims over which it has original jurisdiction," but most of the claims "raise[] a novel or complex issue of State law" in seeking to fit the operation of modern cryptocurrency platforms into traditional torts. 28 U.S.C. § 1367(c).

## VI.    Conclusion

For the foregoing reasons, the Court grants BAM's and BHL's motions to dismiss. The Court also denies the outstanding discovery-related motions as moot. An Order will be entered contemporaneously with this Memorandum Opinion.

DATE: May 29, 2026

CARL J. NICHOLS
United States District Judge

26